UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BENCIVENGA CORPORATION D/B/A OFM CORPORATION | § § § |
| Plaintiff | § § |
| VS. | § § § |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, MERRICK B GARLAND IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES DEPARTMENT OF JUSTICE, STEVEN M. DETTELBACH, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE ATF, and TANARRA JAMES, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF INDUSTRY OPERATIONS FOR THE HOUSTON FIELD DIVISION OF THE ATF . | § § § § § § § § § § § § § § |
| Defendants | § |

Case No. 4:23-cv-03887

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

INTRODUCTION

1.    This lawsuit challenges a federal agency's unlawful rule making and enforcement of the Gun Control Act of 1968 (the "Act"), codified in 18 U.S.C. § 921 et seq.

2.    Plaintiff is therefore seeking a declaratory judgment followed by a preliminary and permanent injunctive relief restraining Defendants from ignoring established hearing procedures that were established in 2010, from implementing, defining or employing the definition of a responsible person, from

further implementing or otherwise enforcing a Department of Justice ("DOJ") "zero tolerance" policy that was first promulgated in 2022 for partisan purposes and, since then, has been wielded as a political weapon by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to revoke or deny renewal of the federal firearms licenses ("FFL") of numerous gun dealers across the nation and declaring one or more procedures, policies and/or regulations void or unenforceable on constitutional grounds. As the basis therefor, Plaintiff alleges the following:

A. Parties

3.     Plaintiff, Bencivenga Corporation d/b/a OFM Corporation ("OFM") is a Texas Corporation that holds an active Type 07 Manufacturer of Firearm other than Explosive Devices Firearms License ("FFL") issued in 2003, FFL# 5-78-201-07-4B-02738.   As such, OFM is an entity regulated by federal law administered by Defendant, Bureau of Alcohol, Tobacco Firearms and Explosives ("ATF"). OFM is located and has had its principal place of business in Houston Texas since its license was issued in 2003.

4.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226. ATF is delegated authority to enforce federal gun control laws. See 18 U.S.C. §926(a); 26 U.S.C. §7805(a); 26 U.S.C. §7801(a)(2)(A).

5.     Defendant, Merrick B Garland In His Official Capacity as Attorney General of the United States Department Of Justice, who may be served with

citation at U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001. Garland has appeared but has not answered or responded to Plaintiff's Original Complaint.

6.    Defendant, Steven M. Dettelbach, In His Official Capacity as the Director of the ATF who may be served with process at 99 New York Avenue NE, Washington, D.C. 20226. Dettelbach has appeared but has not answered or responded to Plaintiff's Original Complaint.

7.    Defendant, Tanarra James, In Her Official Capacity as the Director of Industry Operations for the Houston Field Division of the ATF who may be served with process ate 5825 N. Sam Houston Parkway West, Suite 300 Houston, TX 77086 James has appeared but has not answered or responded to Plaintiff's Original Complaint.

B. Jurisdiction

8.    The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702, and 28 U.S.C. §1331. This Court has authority to grant the remedy Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

C. Venue

9.    Venue is proper in this district pursuant to 5 U.S.C. § 703, and 28 U.S.C. § 1391(b)(2) and (e).

D. Standing

10.   Plaintiff has standing to assert the interests of itself and third parties, including its customers and suppliers because it has an interest in protecting those rights under the second, fifth and fourteenth amendments to the United States Constitution. . See *Craig v. Boren*, 429 U.S. 190 (1976)

E. Plaintiff's Claim for relief

11.   Plaintiff brings this suit for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202 and for injunctive relief under both 5 U.S.C 705 and Federal Rule of Civil Procedure 65.

12.   The jurisdiction of this court is based upon the actual controversy existing between Plaintiff and Defendants that arises under the Gun Control Act of 1968 and is wholly a question of whether or not Plaintiff has willfully violated any provision of the Gun Control Act and therefore is entitled to keep active and/or renew its prior issued FFL.

13. Furthermore, the actual controversy between Plaintiff and Defendants includes Plaintiff's contest of the regulatory powers of the ATF under the Gun Control Act of 1968, including but not limited to preventing Defendants from continuing its unlawful rule making and enforcement of the Gun Control Act of 1968 (the "Act"), codified in 18 U.S.C. § 921 et seq., conducing a hearing in conflict with the rules that were established in 2010 to revoke/deny renewal of OFM's FFL without clear congressional authority, inserting or defining the term responsible person that was omitted by congress when the GCA was enacted and amended.

14.   The jurisdiction of this court of equity arises from the fact that no action at law, and therefore no remedy at law exists relative to said controversy, and that further relief in the form of an injunction to restrain Defendants from making said baseless assertions pending the litigation and after the court has held that said Plaintiff has not willfully violated any provision of the Gun Control Act of 1968 is entitled to retain and when necessary, renew its FFL.

15.   That Plaintiff's operation as a holder of a FFL fully complies with the terms and conditions of the Gun Control Act of 1968 thereby entitled Plaintiff to continue its operations as a licensed Federal Firearms Dealer.

BACKGROUND

### I. The Gun Control Act of 1968

16.   The Gun Control Act (GCA), Chapter 44 18 U.S.C. § 921 et seq., as amended, is Congress' primary means of regulating the interstate commerce in firearms.

17.   The foundation for the GCA regulation of firearms is the Federal Firearms Act of 1938 (FFA), which Congress repealed in 1968 via the Omnibus Crime Control and Safe Streets Act, later replacing the FFA with the GCA. See 82 Stat. 234, 82 Stat. 1213.

18.   Specifically, Public Law 90-618 (was) AN Act To amend title 18, United States Code, to provide for better control of the interstate traffic in firearms.

19.   Congress pronounced: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that this Act may be cited as the "Gun Control Act of 1968"".(GCA)

20.   Section 101 provides: "The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title."

21.   Section 102 Provides: Chapter 44 of title 18, United States Code, is amended to read as follows, Chapter 44 Sections 921-928, the statutory regime of the GCA, are omitted but shall be referred to later.

22.   Section 103 provides, The administration and enforcement of the amendment made by this title shall be vested in the Secretary of the Treasury. Administration and enforcement has been changed and these tasks have been assigned to the Department of Justice. (DOJ)

23.   Section 104 is not germane to this petition and is not repeated here.

24.   Section 105 is not germane to this petition and is not repeated here.

25.   The original FFA created an unprecedented licensing scheme, which criminalized the interstate shipment or receipt of firearms by those not licensed under federal law. The FFA also established the precursors to certain categories of so-called "prohibited persons" – those individual citizens who were categorically barred by federal law from possessing firearms or ammunition – that would later appear in the GCA. See 52 Stat. 1251.

26.  The GCA ultimately retained many of the FFA's provisions and expanded the scope of federal firearm regulation.

27.  Notable among the GCA's provisions are its restrictions on unlicensed interstate and foreign firearm commerce, firearm serial number marking requirements, expansion and codification of "prohibited persons" at 18 U.S.C. § 922(g), and licensing and recordkeeping requirements for those federally licensed to engage in the firearm business.

28.   Congress and the Attorney General have delegated administration of the GCA to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 28 U.S.C. § 599A, 28 C.F.R. § 0.130(a).

## II. Licensing Requirements Under the GCA

29.   The GCA establishes a regulatory framework for Federal Firearms Licensees (FFLs), those licensed under the GCA to engage in the business of manufacturing, dealing, or importing firearms or ammunition.

30.   Absent an FFL, the GCA criminalizes business activities relating to the manufacture, dealing, repairing, or importation of firearms. 18 U.S.C. §

922(a)(1). Federal criminal penalties include both misdemeanor and felony penalties, including sentences of up to 30 years in prison. See 18 U.S.C. § 924.

31.   In order to obtain a manufacturer's, dealer's, or importer's FFL to avoid criminal penalties under the GCA, an applicant must display business intent – that is, a devotion of "time, attention, and labor … as a regular course of trade or business" with either the "principal objective of livelihood and profit" or to "predominantly earn a profit," depending on the type of business. 18 U.S.C. § 921(a)(21).

32.   Not every person who is eligible to purchase, own, and possess a firearm is eligible to be a FFL. See 18 U.S.C. § 923(d).

33.   The ATF issues FFLs on a shall-issue basis, provided an applicant meets certain statutory criteria. 18 U.S.C. § 923(d)(1).

34.   In addition to issuing FFLs, Congress also authorized the Attorney General, and by delegation the ATF, to revoke FFLs if certain conditions are met. 18 U.S.C. § 923(e) provides that:

> The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter....

35.   Congress did not define nor mention the term "willfully" when enacting the GCA in 1968, but inserted the word "Willfully" in Section 923(e)[1]

---

[1] Section 923(e) provides "the Secretary may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has (willfully) violated any provision of this chapter or any rule or regulation prescribed by the Secretary under this chapter. The Secretary's action under this subsection may be reviewed only as provided in

via the Firearms Owners Protection Act of 1986. Here again the word "willfully" was not defined in the Firearms Owners Protection act of 1986. However, the Supreme Court, in *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031 1035, 89 L.Ed. 1496 in its analysis of the word "willfully" concluded that an act or omission is "willfully" done if done voluntarily and intentionally and with the specific intent to do something that the law forbids or with the specific intent to fail to do something the law required to be done, that is to say, with bad purpose either to disobey or to disregard the law.  See *Willful* Black's Law Dictionary (6th ed. 1990)

36.    Moreover, in situations where ATF revokes licenses, firearms businesses cannot survive, livelihoods are lost, and employees are left jobless, as any attempt to conduct further business incurs severe criminal liability under the GCA. See 18 U.S.C. § 924.

### III. Recordkeeping Requirements Under the GCA

37.   FFLs are subject to a litany of state and federal laws and regulations governing the conduct of their business activities.

38.   For example, FFLs must maintain extensive documentary records of the acquisition and disposition of firearms in their inventory. 18 U.S.C. § 923(g)(1)(A). This practice aids in tracing.

39.  FFLs must also maintain records of firearm transfers to non-licensees – that is, ordinary customers. 27 C.F.R. § 478.124. Although these

---

subsection (f) of this section.

firearms transfer records originally included fewer than 30 information items, such as information that identified a specific purchaser, the DOJ has, by regulation, incrementally and massively increased the data required on modern firearms transaction records to over 100 distinct data points (although Congress has never enacted any requirement that FFLs gather or maintain this information).

40.   Generally, FFLs cannot transfer a firearm to a non-licensee without the completion of a background check through the FBI's National Instant Criminal Background Check System ("NCIS"), which was created in 1998 to ensure the non-licensee transferee is not a "prohibited person." 18 U.S.C. § 922(t)(1). However, Congress exempted some non-licensee transferees from background checks provided the non-licensee displays a state-issued permit that satisfactorily indicates the non-licensee has already undergone an equivalent background check and is not a "prohibited person." 18 U.S.C. § 922(t)(3).

41.   Texas has no law requiring firearms dealers to initiate background checks prior to transferring a firearm. As a result, in Texas, firearms dealers must initiate the background check required by federal law by contacting the NCIS directly.

42.   FFLs must maintain records of acquisitions and dispositions indefinitely until the discontinuation of business. 27 C.F.R. § 478.129(b). When an FFL discontinues business or its license is revoked by ATF, the FFL is required to transfer to ATF all of its original records concerning firearms acquisitions,

dispositions, and the detailed records concerning citizens who have purchased firearms.

43. FFLs' records are subject to periodic ATF inspections to ensure compliance and, as needed, in response to a firearm "trace request" during a criminal investigation. 18 U.S.C. § 923(g)(1)(B).

44. Warrantless compliance inspections may occur at most once per year, 18 U.S.C. § 923(g)(1)(B)(ii)(I), the actual rate of compliance inspection is much less frequent than the annual statutory maximum.

45. Good faith, clerical, and ultimately harmless errors in FFL recordkeeping are a statistical inevitability. For example, ATF has published data concerning its compliance inspections in 2020 reflects that it conducted 5,823 and found and reported errors in 43.7% of those inspections. See https://www.atf.gov/firearms/firearms-compliance-inspection-results . ATF's compliance inspections for 2022 increased over 2020 by 1,156 inspections to 6,979 inspections, and ATF's data reflects that it found and reported errors in 45.5% of the inspected FFLs. See https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022 . In 2020, ATF reported that, of those FFLs where errors were found and reported, ATF revoked the licenses of 40, while 96 either discontinued business or surrendered their licenses (5.3%). In contrast, ATF reported that, because of its 2022 compliance inspections, it revoked 90 FFL's, while a whopping 1,037 FFLs "discontinued" their operations (36%). Id.

### IV. The Purpose of the GCA Statutory Scheme

46. In the wake of several high-profile political assassinations,[2] Congress passed and President Johnson signed the GCA in to law with the stated intent of preventing the criminal use of firearms.

47. Congress' statement of legislative intent is set forth in paragraph 20 and is not repeated here. [3][82 Stat. 1213-14.]

48. Consequently, as specified by congress, the claimed overarching purpose of the GCA's licensing scheme is to prevent the use of firearms in primarily intrastate crimes, by prohibiting certain categories of individuals from possessing firearms or ammunition, and establishing record keeping requirements needed solely to facilitate the government's tracing of individuals who used firearms in crimes following a dealer transfer.

49. The GCA's purpose, as framed by the statement of Congressional intent, was not to destroy American businesses or the "Second Amendment Supply Chain," yet that is what ATF has been using the GCA to accomplish.

## V. ATF's New "Zero Tolerance" Policy

50. On June 23, 2021, the "Biden-Harris Administration" announced a purported "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety."[4] Part of that administrative "strategy" was "establishing zero tolerance for rogue gun dealers that willfully violate the law," described as

---

[2] See https://www.atf.gov/rules-and-regulations/gun-control-act (noting JFK, RFK Sr., and MLK).

[3] Public Law 90-618 An ACT To amend title 18, United States Code, to provide for better control of the interstate traffic in firearms.

[4] https://tinyurl.com/54rbhu5m .

"a new policy to underscore zero tolerance for willful violations of the law by federally licensed firearms dealers that put public safety at risk. Absent extraordinary circumstances that would need to be justified to the Director, ATF will seek to revoke the licenses of dealers the first time that they violate federal law by willfully 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records, such as a firearms transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law."

51.   Acting pursuant to the President's politicized "strategy" to put gun dealers out of business, an ATF Acting Assistant Director issued a July 14, 2021 memorandum[5] to ATF field leadership stating that, "effective immediately," ATF personnel should revoke licenses for certain types of recordkeeping violations "absent extraordinary circumstances," and reporting that "ATF will be amending ATF O 5370.1D, Federal Firearms Administrative Policy and Procedures to incorporate these requirements. This 2021 memorandum stated that, with respect to five categories of violations by FFLs, they "shall result in a revocation recommendation...." Id.

52.   Then, as promised, on January 28, 2022, ATF promulgated a heavily revised ATF Order 5370.1E[6] (Exhibit 3), entitled "Federal Firearms

---

[5]   https://tinyurl.com/5ehf2xa9.
[6] https://tinyurl.com/34hv9w86 .

Administrative Policy and Procedures," replacing its prior 2019 version 5370.1D (Exhibit 4)[7]

53. The ATF Administrative Action Policy ("AAP") is the internal ATF document that purports to "provide[] fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees (FFL's)."

54. In other words, the AAP is an "if this, then that" set of guidelines for use by ATF personnel to impose adverse action on FFLs for recordkeeping and other errors.

55. Historically, the AAP has been an internal document that ATF has refused to make publicly available. Instead, ATF concealed this document, keeping a secret its priorities, and treating FFLs as enemies, rather than sharing ATF's concerns and priorities with FFLs as partners so that they can improve and ensure compliance in key areas of focus by ATF.

56. The policies in ATF's AAP are not required by any congressionally enacted statute, but rather are created and implemented entirely by the administrative agency, without public or congressional input or oversight.

57. Generally, and with certain exceptions, the AAP lays out three possible scenarios (other than taking no action) for various types of violations found during an inspection of an FFL: (i) a Warning Letter, (ii) a Warning Conference, and (iii) Revocation pursuant to 18 U.S.C. § 923(e).

---

[7] https://tinyurl.com/38kf7f44.

### VI ATF's Harsh Change in Policy Between the 2019 AAP and 2022 AAP

58.  The revised 2022 AAP (revision E) adopts a much harsher stance than did the 2019 AAP (revision D). Significantly, Congress did not enact any new laws during this period that might have established some authority for ATF to create a materially "enhanced" AAP.

59.  For example, whereas the 2019 AAP stated, "ATF may revoke a federal firearms license under appropriate circumstances based on an initial set of violations" (Exhibit 4 at 6), the 2022 AAP states "ATF will revoke a federal firearms license, absent extraordinary circumstances on initial violations...." Exhibit 3 at 6.

60.  And whereas the 2019 AAP stated that "[n]ot every repeat violation is per se a willful violation," and that "[a] single, or even a few, inadvertent errors … may not amount to 'willful' failures, even when the FFL knew of the legal requirement" (Exhibit 4 at 6), the 2022 AAP eliminates this language, harshly declaring that "ATF does not have to establish a history of prior violations to establish willfulness." Exhibit 3 at 6.

61.  The 2022 AAP makes clear that, with respect to certain categories of violations, "[o]ne instance of a violation … does not constitute extraordinary circumstances and will not be an acceptable reason for an alternate recommendation" other than revocation. Exhibit 3 at 9, 11.

62.  Additionally, the 2022 AAP makes numerous specific changes, ratcheting up the severity of penalties for various offenses, as compared to the

2019 AAP. For example, under the 2019 AAP, "failure to conduct a [National Instant Background Check ("NCIS")] check or obtain an alternate permit" merited a Warning Conference (Exhibit 4 at 5), but under the 2022 AAP, the same offense results in an automatic Revocation. Exhibit 3 at 7.

63.   Likewise, for a dealer who even runs a NCIS check but merely forgets "to retrieve a … response," such an unintentional oversight merited only a Warning Letter in 2019 (Exhibit 4 at 4), yet jumps two levels of severity to an automatic Revocation in 2022 (Exhibit 3 at 7) – even if it turns out that the purchaser was fully eligible to purchase the firearm.

### VII The 2022 AAP Removes Virtually All Discretion from ATF Field Personnel

64.  Historically, ATF field personnel had significant discretion to consider the totality of any given situation and to construct an appropriate remedy based on a unique set of facts. For many years the AAP has required this very practice, explaining that "[e]ach inspection has unique and sometimes complex circumstances," and that "even in cases where violations appear willful, the field should consider mitigating factors," including (i) willingness and ability to "maintain voluntary compliance," (ii) whether the FFL represents "a threat to public safety" or will "contribute to violent crime and/or other criminal activities," (iii) whether the FFL is "taking responsibility for violations and willing to work with ATF to correct them," (iv) whether the violations "directly impact[] the traceability of firearms," and (v) whether the violations "have a nexus to persons prohibited from possessing firearms." Exhibit 4 at 7.a.3.

65. The 2022 AAP not only severely increases the penalties associated with various infractions, but also it essentially prohibits the exercise of any discretion on the part of ATF field personnel.

66. While the 2022 AAP retains mitigating factor language as a carry-over from prior versions, the 2022 AAP actually sets forth a very different system. Now, rather than ATF field personnel considering unique cases and crafting appropriate remedies, the 2022 AAP orders that "revocation is the assumed action, unless extraordinary circumstances exist...." Exhibit 3 at 7.a.4.

67. When ATF field personnel believe revocation is inappropriate, they have no discretion to take alternative action. Rather, they first must create a detailed report substantiating their recommendation of alternate action, and then have it approved by the "Director of Industry Operations" within their ATF Field Division and, if approved, it is then "submitted to the [Monitored Case Program] for [Deputy Assistant Director for Industry Operations] approval" at ATF headquarters in Washington, D.C. See Exhibit 3 at 7.h. See also ATF July 14, 2021 letter at 2 ("Inspections where the Director, Industry Operations determines an alternate recommendation to revocation is appropriate shall continue to be routed to the Deputy Assistant Director, Industry Operations, Office of Field Operations (DAD(IO)). The DAD(IO) will approve or deny the recommendation and advise the field division, accordingly.").

68. It is no surprise that last year ATF found "extraordinary circumstances" and provided alternate resolutions in only 4.7 percent of

revocation cases.    See    https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy

69.    Twenty five[8] members of the House of Representatives recently noted that, under ATF's new "zero tolerance" policy, "[l]ocal ATF field agents have shared they feel pressured to take actions against individual businesses that they do not feel are appropriate or in the interest of public safety," that "[s]ome have even reported that ATF field divisions are being pitted against each other and being forced to compete on the number of licenses revoked," and that "ATF Directors of Industry Operations, who oversee revocation proceedings, are being told to press forward with this escalating quota system or face professional repercussions."

70.    ATF administrative investigators no longer are permitted to have any role at all with respect to determining whether an FFL acted willfully or whether its license should be revoked. Rather, the role of field staff under the 2022 AAP is administrative –cataloging violations and entering them into ATF's computer system, the "Spartan"[9] database.

71.    The ATF inspector responded, when asked in a recent revocation hearing whether, "[i]n preparing the report of violations, is the issue of willfulness even a factor, "I input data, and Spartan does the figuring." See Exhibit 5,

---

[8]   https://tinyurl.com/3wvy67cv .
[9]   "Spartan is a system for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), that serves as the case management system and database for creating, tracking, and collecting investigative information and inspections in support of ATF's regulatory, strategic, law enforcement mission, program initiatives, and tactical field activities." See https://www.justice.gov/d9/2023-02/atf_spartan_pia_-_final.pdf .  .

Transcript of Revocation Hearing of Goodlettsville Gun Shop, Mar. 7, 2023, at 70-71.

72.   When asked a clarifying question "in this report of violations that you did … are you … commenting on the question of whether or not the violation … was done willfully?" the ATF inspector answered "No, sir. Not my job." Id. at 73.

73.   Later, when asked "[y]ou don't even get into the issue of whether or not the error was intentional or reckless or just a human error?" the ATF inspector answered "no," unless the FFL directly refused to comply with record keeping requirements. Id. at 75-76.

74.   When pressed again, why ATF had "charged a single disposition out of roughly 7,000" transactions, the ATF inspector responded, "Spartan does the configuring." Id. at 80.

75.   When further pressed "[d]id you have any role in the decision … regarding your compliance inspection?" the ATF inspector said "No. … Spartan does. … It assesses the errors and – and after the adverse action policy apparently that is input into Spartan, it – recommends – makes a recommendation." Id. at 109. Case 3:23-cv-23985-MCR-ZCB Document 1 Filed 08/29/23 Page 21 of 101

76.   The DOJ Office of Inspector General ("OIG") confirms this state of affairs, stating, "When an IOI enters inspection results into Spartan, the system

prompts the IOI with a recommendation consistent with the Administrative Action Policy."11[10] Id. at 57.

77.   Upon information and belief, under the current AAP, the finding of "willfulness" necessary to initiate revocation of an FFL is made not by any human being, but rather an ATF computer algorithm.

78.   Apparently, willfulness is no longer determined by an individual based on facts, circumstances, and the exercise of human judgment. Rather, it is determined by computer software based upon nothing more than the category of recordkeeping violations that have been identified and fed into the computer system. A clear miss definition of the term "Willful". Id.  *Screws* 325 U.S. at 101.

### VIII. The 2022 AAP Was Deliberately Designed to Greatly Increase FFL Revocations

79.   The 2022 AAP represents a clear redirection of ATF's mission – from regulating the firearms industry to seeking to eliminate it. Indeed, prior to the 2022 AAP, ATF previously described its inspection program as being designed "to ensure compliance," "to educate licensees on the specific requirements of [] laws and regulations," "to assist with business practices designed to improve compliance" and, if violations are discovered, "to guide the FFL into correction of such violations and to ensure future compliance...." ATF May 2014 Fact Sheet, https://www.atf.gov/file/11136/download (emphasis added). ATF continued

---

[10]   See https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf .

that, only when an FFL "demonstrates a lack of commitment to improving …
business practices," this "may require revocation of the FFL." Id.

80.   Hence, the 2022 AAP now promotes a one-way ratchet in favor of
license revocation – designed and intended from the ground up to put as many
firearm dealers as possible out of business, not only ruining livelihoods but also
impeding Americans' ready access to constitutionally protected firearms in the
process.

81.   The current AAP, however, is not designed to ensure, educate,
assist, or guide. Rather, it pursues revocation as its primary goal and political
agenda.

82.   The  ATF has not only implemented the 2022 AAP with respect to
new inspections and revocations of FFLs, but also ATF has reopened old cases,
revoking the licenses of gun stores to whom ATF previously issued a Warning
Letter or held a Warning Conference, and who subsequently have rectified their
mistakes.[11]

83.   This policy of reopening closed cases and retroactively imposing new
punishments is in direct contradiction of a 2013 DOJ OIG report that raised
concerns with that very same, unfair tactic. DOJ Office of Inspector General,
"Evaluation and Inspections Division. Review of ATF's Actions in Revoking the
Federal   Firearms   License   of   Guns   &   Ammo,"   Sept.   2013,
https://www.oversight.gov/sites/default/files/oig-reports/e1308.pdf at 17.

---

[11] https://tinyurl.com/3wvy67cv

84.  As ATF itself reports, the Biden Administration's "zero tolerance" policy, as implemented in ATF's revised 2022 AAP, has achieved the desired results – a massive increase in the number of FFLs who are having their licenses revoked or otherwise are terminating their licenses. Indeed, "ATF revoked 92 licenses in 2022, the most since 2008," which "more than triples the number of licenses revoked in 2021," even though "a similar number of dealers were inspected" both years. C. Barton, "New data shows ATF gun store revocations at highest rate in 16 years," The Trace, Oct. 5, 2022, https://www.usatoday.com/story/news/investigations/2022/10/05/atf-crackdown-gun-shops-new-data/8186091001/.

85.  On August 18, 2023, the Wall Street Journal reported that the ATF "has revoked the licensed of 122 gun dealers in the fiscal year that began in October, up from 90 for all last fiscal year and 27 in 2021." `https://tinyurl.com/mthuvzez.

86.  In addition to revocations, ATF has coerced and intimidated an ever-increasing number of FFLs into "voluntarily" ceasing operations. https://tinyurl.com/mrwyhwt4  . The number of FFLs who discontinued business following a compliance inspection increased from 96 in 2020 to 789 in 2021 (the year that "zero tolerance" was adopted) to 1,037 in 2022, [12]an overall increase of more than 1,000%. See Exhibit 6. Actually, that was the ruse

---

[12] See https://tinyurl.com/39t346aj.

employed by the Thomas Gray III about OFM's FFL when the amended second report was discussed by Romo with Gray. (Exhibit 13)

87. Moreover, due to the lag in time from inspection to revocation, the astronomical increase in revocations almost certainly will continue to increase.

88. On August 7, 2023, journalist John Crump reported on an impending "rule" to be issued by the ATF to "eliminate private sales."[13]

89. While seeking to put as many FFLs as possible out of business, ATF also reportedly is attempting to force all gun sales to occur at FFLs, entirely without "clear Congressional Authorization. See *West Virginia vs EPA* 142 S. CT. 2587 (2022)

90. First reported by the New York Times, and then "verified by AmmoLand News sources, the new rule is expected to be unveiled by the end of the year." Id.

91. Reportedly, this rule will be designed to "close" what anti-gun group Everytown calls the "private sales loophole." In the vast majority of states, including Texas, intrastate firearm transactions between law-abiding non-licensees need not go through an FFL, and no background check is required.[14]

---

[13] See https://tinyurl.com/4tdfc7km.

[14] As Justice Scalia noted, "... perhaps Congress drew the line where it did because the Gun Control Act, like many contentious pieces of legislation, was a 'compromise' among 'highly interested parties attempting to pull the provisions in different directions.'... A statute shaped by political tradeoffs in a controversial area may appear 'imperfect' from some perspectives, but 'our ability to imagine ways of redesigning the statute to advance one of Congress' ends does not render it irrational.'" *Abramski v. United States*, 573 U.S. 169, 201, 134 S. Ct. 2259, 2280 (2014) (Scalia, J., dissenting) (citations and punctuation omitted).

92. ATF thus has been ordered by its political masters to administratively expand the scope of its statutory authority, to regulate this previously unregulated activity.

93. Thus, by forcing all transactions to take place at dealers, and then putting as many dealers as possible out of business, ATF seeks to impede and destroy the Second Amendment supply chain and Americans' access to constitutionally protected "arms."

### IX ATF's Recently Issued 2023 AAP Is Not Materially Different from the 2022 AAP

94. A recent DOJ OIG report recounts that "ATF stated that in January 2023 it issued a revised FFL Administrative Action Policy (ATF Order 5370.1F), which ATF also provided for [OIG] review."[15] At 56

95. However, the OIG report explains that the changes from the prior 2022 version predominately involve the process by which FFL revocations are reviewed by ATF headquarter personnel. Id.

96. The OIG report notes, "[w]e compared ATF's revised policy with previous policy versions and note that it does not represent a significant departure from ATF's prior policy." Id. at 57.

97. Upon information and belief, ATF's 2022 AAP and its new 2023 AAP are substantially and materially identical as pertains to the standards taking

---

[15] See https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf.

various adverse actions including revocations, and as is pertinent to the Notice of Revocation issued to OFM, and generally to Plaintiff's claims in this case.

98.  Actually, the 2023 AAP is more extreme than the 2022 AAP. This comes into realism because the ATF waited until just last month to revoke OFM's FFL (Exhibit 1)[16], more ten months after that inspection that took place in July of 2022 and reported August 30, 2022. See the document titled "Information Concerning your Federal/License Permit marked Exhibit 2 attached to and incorporated by reference. Exhibit 2 is fundamentally a "no action taken" notice.

99.  Thus, this Complaint uses the terms "AAP" to refer to the policies announced in the 2022 AAP and, upon information and belief, still represented in the 2023 AAP. For clarity's sake, however, Plaintiff challenges the current version.

100. Of course, ATF's 2023 AAP is not immune from judicial review simply because ATF keeps it close to the vest. Rather, as the Seventh Circuit has written, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

## X. Statutory Requirement of Willfulness

---

[16]  See the Notice to Revoke or Suspend License and/or Impose a Civil Fine marked Exhibit 1 Attached hereto and Incorporated by reference.

101. ATF's 2022 AAP notes that "ATF must establish willfulness to proceed with revocation under 18 U.S.C. § 923(e)." Id. at 7.e.1. See also Section 923(e) (emphasis added) ("The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter").

102. Section 923(e)'s "willful" language was no accident, but rather was a deliberate addition to the statute by Congress as part of the 1986 Firearms Owners' Protection Act ("FOPA"), 100 Stat. 449 – Pub. L. No. 99-308.[17]

103. For example, in an April 1980 Senate Appropriations hearing, Democratic Senator Dennis DeConcini recounted prior testimony from a series of witnesses, explaining that most "BATF cases … involved defendants who had no criminal intent, but were enticed by Bureau agents into violating technical requirements which the defendants did not know existed." See Exhibit 7 at 7-8.[18]

104. Compounding the problem, the ATF has moved to revoke licenses after numerous licensees were acquitted of criminal charges in federal court. Id. at 8. ("Like Mr. Moorhead, Mr. Phillips was acquitted when the Federal judge directed a verdict of not guilty. The Bureau then proceeded to attempt to revoke his license…."); see also Id. at 14.

---

[17]  See https://tinyurl.com/5n6d8f9w.
[18] See https://tinyurl.com/5n7ccbum.

105. Senator DeConcini concluded that "the problem appeared far more serious and widespread than I had thought possible," surmising that ATF "had, for all intents and purposes, abandoned any attempt to respect the rights of our citizens." Id. at 9. Senator DeConcini then referenced his statements from July of 1979, where he opined, "I predict that Congressional action of a dire sort will be forthcoming. We are reaching the point with BATF where the wrongs it perpetrates on innocent citizens is beginning to outweigh the good it does in other areas. The time has come for basic and dramatic changes within BATF. Also, the time has come to make some revisions in the Gun Control Act of 1968." Id. at 10.

106. A February 1982 Report entitled "The Right to Keep and Bear Arms" from the Senate Subcommittee on the Constitution later noted that, while the Gun Control Act had been enacted to keep certain persons like felons from acquiring arms, most of ATF's prosecutions "involve citizens with no police record whatsoever," based "upon technical malum prohibitum charges[] of individuals who lack all criminal intent and knowledge.[19] See Exhibit 8.

107. That same report stated that ATF's "amply documented" practices "leave little doubt that the Bureau has disregarded the rights guaranteed by the constitution and laws of the United States." Id. at 27. Specifically, the report found that the ATF "trampled upon the second amendment by chilling the exercise of the right to keep and bear arms," that it "offended the fourth

---

[19] See https://constitution.org/1-Constitution/2ll/2ndschol/87senrpt.pdf  at 25

amendment by unreasonably searching and seizing private property," and finally, that it "ignored the Fifth Amendment by taking private property without just compensation and by entrapping honest citizens without regard for their right to due process of law." Id.

108. Further, the Appropriations Subcommittee heard testimony "establishing that approximately 75 percent of BATF gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." Id.

109. A later June 1982 Senate Report referenced these earlier hearings and findings, stating that they formed "the mandate for the additional civil liberty guarantees to the Gun Control Act of 1968" that were being proposed in S.1030, which would be enacted as FOPA in a later congressional session. See Exhibit 9 at 14.[20]

110. When advocating for FOPA's passage four years later, Representative Harold Volkmer (the bill's sponsor in the House) stated that, "the Gun Control Act provided the open door to make easy cases against unsuspecting persons. With the strict liability provided by the act, even the most trivial and unintentional misstep would do…. This potential for abuses continues today."[21]

111. Representative Volkmer continued, opining that the "intent of the [GCA], not to place undue or unnecessary federal restrictions on law abiding

---

[20] See https://tinyurl.com/5f8xab8v.
[21] 132 Cong. Rec. 6841, https://tinyurl.com/44387b56 (emphasis added).

citizens with respect to the acquisition, possession, or use of firearms was clearly violated by the technical enforcement practices being utilized … The need [for FOPA] is not based upon hypotheticals, but upon civil rights abuses perpetrated [by ATF] against real people. These abuses were documented in six years of hearings before two different committees, and deserve our attention." Id. at 6481, 6489 (emphasis added).

112. In response to Congress' repeated and heavy criticism, ATF then-Director G. R. Dickerson wrote a letter to Senator DeConcini, agreeing that it was time for ATF "to reexamine our practices, policies, motivations and techniques," and that ATF's mission instead should be not to target the "inadvertent violations" by well-intentioned dealers but instead "to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms." See Letter to Senator DeConcini from ATF Director G. R. Dickerson, Sept. 7, 1979, Exhibit 7 at 6.

## XI. ATF's Misuse of "Willfully" Includes Unintentional Paperwork Mistakes

113. As ATF's 2022 AAP states, "the term willful means a purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation." Exhibit 3 at 5.c. See also *Sturdy v. Bentsen*, 1997 U.S. App. LEXIS 27671, *4 (8th Cir. 1997) (unpublished) ("To show a willful violation, the BATF had to prove [the FFL] knew of the legal record-keeping requirements and 'purposefully disregarded' or was 'indifferent to' them.").

114. Faced with the addition of FOPA's statutory "willfulness" standard, ATF was forced to get creative about how to demonstrate that an FFL had "willfully" committed an unintentional and inadvertent technical, recordkeeping, or paperwork violation.

115. Nevertheless, the following clearly demonstrates that the ATF has voluntarily and intentionally and with the specific intent to do something that the law forbids by defining "willful" in direct conflict with a 1945 Supreme Court decision that construes the term "Willful". See paragraph 36 citing *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031 1035, 89 L.Ed. 1496.

116. The 2019 AAP provided three ways that "ATF can establish the knowledge element of willfulness" – (i) a history of similar violations brought to the FFL's attention by ATF, (ii) prior "acknowledgement of Federal firearms regulations" in prior inspection reports, and (iii) statements or admissions by the FFL. Exhibit 4 at 7.3.e.a-c.

117. The 2022 AAP, however, adds three new categories, now listing six ways to demonstrate willfulness: (i) "publications and information provided to the FFL which explain the FFL's legal responsibilities," (ii) a history of past compliance by the FFL with the same regulation, and (iii) by "demonstrate[ing] that the FFL has substantial experience as an FFL." Exhibit 3 at 7.e.4.d-f.

118. ATF fails to further explain how any of these factors demonstrates any actual "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" necessary to prove willfulness.

119. Nevertheless, based on factors (ii) and (iii), ATF believes that a lengthy history of an FFL following the rules should be used to prove that the FFL "willfully" failed to follow the rules when a mistake or oversight inevitably occurs. In other words, the longer and more faithfully an FFL has followed the rules, the more severely it can be punished for an inevitable inadvertent slip up, leading to a perverse incentive structure where a history of good behavior is grounds for more serious punishment.

120. Likewise, with respect to factor (i), when ATF initially grants a license, ATF personnel are required to provide the new licensee with a website link to the ATF Federal Firearms Regulations Reference Guide, a 237-page document.[22] The FFL is then made to sign a special form that ATF has created, entitled "Acknowledgement of Federal Firearms Regulations," attesting that the FFL has received and understands the rules set forth in the manual.[23]

121. The purpose for ATF requiring formal acknowledgement of receipt of the website link to the Regulations Reference Guide is devious on the part of ATF – nothing more than a way to manufacture evidence that can later be used against the FFL to revoke its license – specifically, on the theory that the one-time provision of a reference to this manual represents "publications and

---

[22] https://tinyurl.com/pwvjcmep.

[23] See 2019 ATF Industry Operations Manual, Chapter B. "Firearms Application Inspections," 34.d(8)(b) https://tinyurl.com/3asev9jr ("The IOI shall thoroughly review the Acknowledgment of Federal Firearms Regulations with the applicant. Have the applicant sign and date the acknowledgement electronically in Spartan.").

information provided to the FFL which explain the FFL's legal responsibilities" (2022 AAP).

122. This ATF tactic – revoking a federal firearms license on the basis that a licensee agreed, often years in the past, to have understood every nuance of regulatory scheme hundreds of pages long – is a bit like revoking a lawyer's admission to a court for failure to use the proper size font in a brief, on the theory that his decades-old admission application attested that he had read and understood the local rules. It is also like revoking the driver's license of a person who fails to use his turn signal, alleging that he acted in "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation." After all, several decades ago, the DMV handed that driver a manual with hundreds of pages of nuanced rules and regulations.

123. On the contrary, just as no reasonable person would characterize the lawyer's or the driver's honest mistakes as "willful," is neither an FFL's technical nor paperwork or recordkeeping violation "willful."

124. One ATF Director of Industry Operations recently opined, "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … is irrelevant to the standard of willfulness." Exhibit 10, at 6 (emphasis added). He went on to say "[A]fter-the-fact efforts to correct the specific violations 'are irrelevant to the issue of willfulness at the time the errors occurred."

125. Yet revoking a FFL upon such meaningless and harmless errors is precisely what FOPA and Section 923(g)'s standard of willfulness were intended to prevent. Recall, Representative Harold Volkmer (FOPA's sponsor) stated that

FOPA was necessary to avoid "the strict liability provided by the act," where "even the most trivial and unintentional misstep would do." See 132 Cong. Rec. 6841.

126. "Human mistakes" and "harmless misunderstandings" simply do not, as a matter of law, amount to a "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation." Nor do "Human mistakes" and "harmless misunderstandings" meet the standard of willfulness espoused in *Screws id.*

127. In other words, the AAP and ATF's definition of "Willfully" directly obfuscates the explicit Congressional purpose of GCA's statutory intent and the unambiguous Supreme Court analysis of the term "willfully".  Id *Screws*

128. In another instance, the AAP takes the position that repeat paperwork violations are evidence of willfulness, particularly after the ATF has given prior notice to the FFL that the errors are a violation of the law. Exhibit 3 at 6. Yet ATF is clearly aware that such human errors happen and are unavoidable, and typically pose no real risk to public safety or ATF's ability to trace firearms. For example, in the AAP, ATF provides that a warning letter (the lowest form of adverse action) is not appropriate unless an FFL has "5 percent or more errors" on the FFL's acquisition records. Id. at 7.c. (1). Similarly, the complete failure to record "valid and complete" or even "any" transferee information on the Form 4473 Firearms Transaction Record does not warrant a Warning Letter, so long as Form 4473 with errors constitute less than "10 percent" of the total. Id. at 7.c. (4-5). Even so, ATF uses a first compliance inspection and warning as a basis to set the trap to subsequently assert

"willfulness" under its non-Congressional "repeat violation" doctrine. Id. at 7.e.(4)(a).

129. Further documenting ATF's hardline position, the AAP specifically deletes language from the 2019 AAP, which previously had stated, "Not every repeat violation is per se a willful violation. A single, or even a few inadvertent errors in failing to complete forms may not amount to 'willful' failures, even when the FFL knew of the legal requirement to complete the forms." Exhibit 4 at 7.3.1.

130. This deletion was intentional. In fact, ATF recently has undertaken to revoke the FFL of one dealer merely for forgetting to transcribe the Tennessee Instant Check System ("TICS") Number on an ATF Form 4473, with respect to gun sales that had been approved. Adding insult to injury, it turns out that the TICS Number actually had been stapled to the very same Form 4473, requiring only that the document be flipped to the next page to obtain the information. Moreover, an ATF agent testified that the transcription omissions had in no way affected ATF's ability to determine the chain of custody of the firearm.

131. To sum up: first, according to ATF, a history of compliance indicates an FFL's knowledge of recordkeeping duties, meriting revocation. Second, a history of noncompliance shows an FFL's deliberate intention not to improve its behavior, warranting revocation. And third, no history either way is irrelevant, as even a single violation merits revocation.

132. Here again, the AAP was created for form a "heads I win, tails you lose" situation where all roads lead to revocation or refusal to renew.

**XII. The ATF Does abide to the Same Standards of Exactness**

133. Actually, the ATF does not hold itself to the same standards of exactness with respect to firearm recordkeeping.

134. For example, in 2019, Christopher Lee Yates, an ATF contractor, was convicted or stealing thousands of firearms from ATF's Martinsburg, West Virginia headquarters, over the course of several years.[24] Even when caught, the theft was not discovered by ATF headquarters, but instead by tracing firearms Yates stole and sold.

135. As part of the Yates scandal, criminal investigators discovered that ATF personnel had deliberately falsified "certif[ied] … reports" stating that countless firearms had been destroyed, even though the same firearms were later recovered on the streets (clearly not destroyed).[25]

136. Were these same violations committed by an FFL, license revocation would be swift for having made "a false or fictitious written statement in the FFL's required records," or "inventory … for which disposition could not be accounted for…." Exhibit 3, 2022 AAP at e.6.d and j. Yet upon information and belief, not one ATF employee was ever held accountable for the Yates fiasco.

137. Even though Gun Owners of America, Inc. submitted a FOIA request to ATF in November of 2019 (more than 3.5 years ago), seeking more information regarding the Yates case (FOIA # 2020-0097), ATF refuses to respond.

---

[24] See https://tinyurl.com/2437kw59.
[25] See https://tinyurl.com/h92yysxm.

138. Another example of ATF's appalling firearm recordkeeping is the National Firearms Registration and Transfer Record ("NFRTR"), the registry of all firearms registered pursuant to the National Firearms Act of 1934 (machineguns, silencers, etc.). In 2007, the DOJ OIG issued a report entitled "The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record,"[26] summarizing that "NFA Branch staff members do not process applications or enter data uniformly into the NFRTR. The staff's variations in completing these tasks result in errors in NFRTR records, reports, and queries as well as inconsistent decisions on NFA weapons registration and transfer applications." Id. at v.

139. The OIG has reported that, comparing the records from ATF and FFLs, it is almost always the FFL with the accurate records, while ATF's records are erroneous: "In our survey of IOIs, 46.5 percent (139 of 299) reported that they found a discrepancy between the NFRTR inventory report and a licensee's inventory

140. By way of comparison, The Office of Inspector general (OIG) Results in Brief: "Over the 59-month period we tested, 76 weapons and 418 laptop computers were lost, stolen, or missing from ATF. ATF's rate of weapons loss per month has nearly tripled since Treasury's 2002 audit, and the rate of loss per month for laptop computers was 50 times higher than what the 2002 audit revealed. According to ATF officials, the much higher rate of laptop computer

---

[26] See https://oig.justice.gov/sites/default/files/legacy/reports/ATF/e0706/final.pdf.

losses resulted primarily from adjustments ATF made to its inventory records to correct inaccurate data accumulated over several years. We also found serious deficiencies in ATF's response to these lost, stolen, or missing items. ATF staff did not report many of the lost, stolen, or missing weapons and laptop computers to ATF's Internal Affairs Division (Internal Affairs), as required by ATF's property management policies. In addition, ATF did not report most of the missing laptop computers to ATF Internal Affairs for investigation. We also□ found that ATF staff did not enter 5 lost, stolen, or missing weapons into NCIC and did not document[27] what data was contained on 398 of the 418 lost, stolen, or missing laptop computers. Consequently, ATF could not provide assurance that these computers did not contain sensitive information, personally identifiable information (PII), or classified information. Because ATF did not begin to install encryption software on its laptop computers until May 2007, few if any of the laptop computers lost, stolen, or missing during our review period were protected."

141. Recently, the ATF admitted that it is taking more than two weeks to complete a gun-tracing request. See sports.yahoo.com August 19, 2022.

142. This is not a new phenomenon. Rather, the magnitude of ATF's recordkeeping errors in the NFRTR cannot be understated. As far back as 1995, then-NFA Branch Chief Thomas Busey openly conceded, "Our error rate was

---

[27] Quoted from The Bureau Of Alcohol, Tobacco, Firearms And Explosives' Controls Over Its Weapons, Laptop Computers, And Other Sensitive Property U.S Department of Justice Office of the Inspector General Audit Division Audit Report 08-29 September 2008

between 49 and 50 percent, so you can imagine what the accuracy of the NFRTR could be, if your error rate's 49 to 50 percent."[28]

143. Chief Busey then beamed that ATF's error rate, under his watch, had been reduced to "below 8 percent" (id. at 3:25) – an error rate that would never be permitted of any FFL. However, Chief Busey then demurred "[t]hat's common errors and critical errors. We do a little finagling upstairs on what we consider. A common error is an error in the database entry, but it does not affect the lookup. It would not hurt an agent. It doesn't really have any damage." Id. at 3:27 (emphasis added).

144. Yet the 2022 AAP, in contrast, requires revocation even in cases of what Chief Busey would categorize as a "common error" – one that does not impede the tracing of a firearm, lead to an unqualified person obtaining a firearm, or cause any harm to public safety.

145. In spite of this monumental level of errors in the NFRTR (that apparently had not improved as of the 2007 OIG report), Chief Busey stated that ATF's policy was to commit what has been called "institutional perjury": "when we testify in court, we testify that the [NFRTR] database is 100 percent accurate. That's what we testify to, and we will always testify to that. As you probably well know, that may not be 100 percent true." Id. at 1:15. This is similar to "institutional perjury" when the Biden administration claims that the border "is

---

[28] See https://tinyurl.com/5n775nj2;
https://www.youtube.com/watch?v=bO6BQVAZpwU  (at 3:14).

secure." See The Washington Free Beacon, September 21, 2022; "Watch, 17 times the Biden Administration said the border is Secure."

146. Chief Busey continued that, when tracing lawful firearm ownership under the National Firearms Act, ATF was unable to rely on the NFRTR, stating, "You're basing your warrants on it. You're basing your entries on it. And you certainly don't want a Form 4 waved in your face when you go in there, showing that the guy does have a legally registered Type II weapon." Id. at 1:52.

147. Chief Busey then joked, noting with a smile that ATF has used bad information to kick down the front doors of innocent people: "I've heard that's happened. I'm not sure." Id. at 2:04

148. When later attempting to walk back his statements when they were made public (i.e., expressing remorse only when he was caught), Chief Busey reportedly claimed that "[t]his was a miss-statement of the facts on my part. What I meant was that the database does contain errors that are contributable [sic] to human causes (misspelled names, inverted serial numbers), but what we do testify to is the accuracy of the search we perform and the results gained from that search."[29]

149. The NFRTR's errors are the very sort of "human cause[]" errors that the AAP penalizes with automatic revocation of licenses.

---

[29] See https://www.gunowners.com/ip06.htm .  Plaintiff has been unable to locate the original source for this later statement, but intend to pursue obtaining it through a FOIA request and/or discovery in this matter.

150. While the AAP has no sympathy for Chief Busey's NFA Division, and instead ATF's own error-ridden database would actually represent something done willfully, in violation of a known legal duty. Indeed, as ATF says, "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … is irrelevant to the standard of willfulness," and shows "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" on the part of ATF's own personnel. A clear indifference with the term "Willful" as anolized in *James* id.

151. Again, ATF's inept NFRTR recordkeeping would result in mandatory and immediate revocation, were ATF held to the same standards to which it holds FFLs. Of course, "rules for thee, but not for me."[30]

### XIII The Fast and Furious Debacle

152. Perhaps ATF's most spectacular failure (in recent history that is) was its infamous Operation "Fast and Furious", where the agency "allowed illegal gun sales [purportedly] in order to track the sellers and purchasers, who were believed to be connected to Mexican drug cartels."[31] Of course, ATF did not "track" anything, and usually had no idea as to the whereabouts of the trafficked firearms until, for example, one was used on December 14, 2010 to murder U.S. Customs and Border Protections Agent Brian Terry.

---

[30] Rules for thee but not for me refers to a new emerging idiomatic phrase that is used by people to express their disregard for certain regulations. It is often used in critique of politicians, who always seem to break their own laws.
[31] See https://tinyurl.com/2zxv6363 .

153. If any FFL had been involved in or permitted such willful violations of the Gun Control Act, or kept such shoddy records, license revocation would have been the least of its worries. Yet, to date, no ATF personnel have faced any serious repercussion for the Fast and Furious debacle.

**XIV. ATF Makes the Same Errors for which it Revokes Licenses.**

154. ATF's open admissions about the error-ridden NFRTR, ATF personnel readily admit that they are not immune from committing the very same clerical errors for which they revoke licenses. See Exhibit 5, Transcript of Revocation Hearing of Goodlettsville Gun Shop, Mar. 7, 2023, at 85-86 (ATF IOI admitting that she had accidentally misspelled the name of a firearm importer in her Report of Violations and that, if the FFL had made the same mistake, it would have been a "willful" chargeable violation for falsifying records).

155. Technically, ATF does not hold a federal firearms license, and thus technically is not bound by the statutory and regulatory recordkeeping requirements that apply to licensees. Au contraire. For reasons unknown, the ATF in fact has, in the past, maintained at least four of its very own Federal Firearms Licenses.[32]

156. Not surprisingly, ATF's own history of willful deficient firearm recordkeeping shows that the agency would never itself be able to achieve

---

[32]        See        https://www.atf.gov/firearms/docs/undefined/0920-ffl-list-district-columbiaxlsx/download .

anywhere close to the standard of perfection that the ATF through its unrealistic AAP demands from the nation's FFLs.

157. Essentially, the 2022 AAP is a deliberate attempt by ATF to revert to the very same, highly questionable tactics and practices from more than four decades ago – tactics that were repudiated on a bipartisan basis in Congress, and which directly led to enactment of the FOPA in 1986.[33]

158. Ignoring both the plain text and the unambiguous intent of FOPA's addition of "willfulness" to the statute, ATF's 2022 AAP results in a situation where a single violation of any statutory or regulatory requirement by an FFL can be characterized by ATF as "willful," potentially leading to the loss of a license and livelihood even for entirely minor, technical, paperwork violations, tempered only by ATF's exercise of unbridled discretion. See Exhibit 3, 2022 AAP at 7.e.2 ("ATF may … revoke for any other willful first-time violation as it deems appropriate.").

159. Because basic human error inevitably results in paperwork mistakes being made, this means that ATF believes itself to have the authority eventually to revoke every single federal firearms license in the country – regardless of whether merely "inadvertent violations" were involved, and irrespective of whether the revocation is "to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms."

---

[33] Notwithstanding President Biden and the ATF implementing the Administration's "zero tolerance" policy, President Biden voted for the 1986 FOPA when he was a Senator. See https://tinyurl.com/n4fuvu9a.

160. ATF has strayed far afield from the "enforcement objective of ATF … to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms." See Letter to Senator DeConcini from ATF Director G. R. Dickerson, Sept. 7, 1979, Exhibit 7 at p 5. ATF's anti-gun and anti-FFL agenda is reflected by the foreseeable outcome of its published policies – the slow but certain elimination of the Second Amendment supply chain.

## XV. Explanation of the Hearing Process

161. Upon notice of suspension, revocation, or imposition of civil fine, the applicant has the right to request a hearing. 27 CFR § 478.74.

162. An applicant or licensee may be represented at the hearing by an attorney, certified public accountant or other person recognized before ATF as provided in 31 C.F.R. Part 8. 27 CFR § 478.76

163. According to the current circular that described the hearing process, the DIO will preside over the hearing. A copy of the ATF Explanation off the hearing process marked as Exhibit 11 attached hereto is incorporated by reference.

164. This proclamation is in direct conflict with the requirement to select the presiding officer at the hearing as published in the Federal Registrar Volume 75 No. 153 date August 10, 2010 at page 48362. The Federal Registrar Volume 75 No. 153 date August 10, 2010 marked Exhibit 12 attached hereto is incorporated by reference. (the "2010 Notice")

165. Specifically, the 2010 Notice articulates "To ensure impartiality, the hearing officer will generally be appointed from outside the applicant's/licensee's division.

166. The 2010 Notice at page 48364 goes on to provide; "Hearings are informal in nature and adherence to civil court rules and procedures is not required. Providing further at page 48363, Hearing procedures in firearms licensing matters are informal in nature; the regulations found in the Administrative Procedure Act (APA) (5 U.S.C. 554) do not apply to hearings held under 18 U.S.C. 923(f) (2) because a federal firearms licensing hearing is subject to de novo judicial review in district court under 18 U.S.C. 923(f)(3).

167. Nevertheless, nowhere in the current promulgated regulations that implements the provisions of 75 FR 48362 pages 48362-48365 (4 pages) are mentioned or incorporated in 27 C.F.R. 478. Nor have the provisions in 75 FR 48362 pages 48362-48365 been supplemented, revoked, or amended. Rather the administrative body of the ATF just ignores, with impunity, its rules promulgated by the ATF in 75 FR 48362.

168. Nevertheless, judicial review of administrative proceedings are permitted under 5. U.S.C. 702 unless prohibited. The Gun Control Act of 1968 as amended does not prohibit judicial review but instead specifically states that judicial review is allowed.

FACTS

**I Bencivenga Corporation d/b/a OFM Corporation**

169. Bencivenga Corporation d/b/a OFM Corporation ("OFM") is a Texas Corporation that was initially incorporated as Paga Enterprises, Inc. in 1987.

170. In 1991, Paga's articles were amended by changing its name to Bencivenga Corporation.

171. In January 2003, under the Assumed Name OFM Corporation, ATF issued Plaintiff a Federal Firms License (FFL) FFL# 5-78-201-07-4B-02738.

172. Subsequent to the issue of Plaintiff's FFL, the laws and regulations issued under the GCA were reviewed with License President and sole listed responsible person[34], Ramio Romo ("Romo") on December 23, 2002, April 22, 2008, May 26, 2020. August 16, 2012, October 20, 2016, December 9, 2019 and August 30, 2022.

---

[34] The term "Responsible Person" is not defined in 18 U.S.C. part 44 (the GCA) nor in 27 CFR part 478, Rather the ATF on September 8.2023 in 88 FR 61993 under the guise of "Definition of "Engaged in the Business" as a Dealer in Firearms is proposing to add such a definition. 88 FR 61693 marked as exhibit 17 _ attached hereto is incorporated by reference. The ATF in 88 FR 61993 is proposing to bootstrap this term from 18 U.S,C, part 40 and 27 CFR part 555." Generally, the term "Responsible Person is defined in 18 U.S.C. §841(s) and further defined in in 17 CFR part 555 to include partners, sole proprietors, site managers, corporate officers and directors, and majority shareholders" and does not include every person excepting the janitor as proposed by the ATF in 88 FR 61933. Rather the corporate representative's statutory unambiguous definition is set forth in 18 U.S.C. §923(d)(1)(B). Unquestionably, the ATF does not have "clear congressional authorization" to amend an unambiguous statue such as 18 U.S.C. part 44 to create such a definition in 27 C.F.R, 478. See *West Virginia vs EPA* 142 S. CT. 2587 (2022) for a clear and precise definition of the term "clear congressional Authorization. Furthermore, reliance upon the Chevrons deference, *Chevron, U.S.A., Inc. v NRSC* 467 U.S. 837 (1984) is on the chopping block because the Supreme Court has <u>accepted</u> *Loper Bright Enterprises., Inc. v. Raimondo* ("Loper"), 45 F.4th 359 (D.C. Cir. 2022) that could result in the court overruling Chevron entirely or narrowing it significantly.

## II The 2022 Compliance Inspection

173. On August 30, 2022, The ATF sent via email, Information concerning Plaintiff's Federal License Permit. This report was in connection with Compliance Inspection FCI-35519 that was conducted in 2022. See Exhibit 2. Ramiro Romo, ("Romo") President and designated corporative representative under 18 U.S.C. 922(d)(1)(B), electrically signed and returned the report, via email, certifying the report dated 6/30/2022 was reviewed and the appropriate corrective measures would be undertaken.

174. On or about December 9, 2022, a second or amended report of violations in connection with inspection FCI-35519 was hand delivered to Romo. Based upon Information and belief, this document was emailed by the Lead Industry Operations Investigators, Thomas Gray III. A copy of the amended or second compliance report for Inspection FCI 35519-dated 12/06/2022 marked Exhibit 13 is incorporated by reference. Romo refused to sign or give credence to the Second Amended Compliance Inspection Report.

## III The Notice to Revoke

175. On or about June 26, 2023, the ATF issued ATF E form 4500(5300.4) which is Notice to Revoke or Suspend License and/or Impose a Civil Fine. See Exhibit 2. The Notice to Revoke was hand delivered July 6, 2023, by Area Supervisor Alicia Flowers.

## IV PLAINTIFF'S CONTEST OF ATF'S CLAIMS IN THE NOTICE

**TO REVOKE**

Count I –
Wrongfully accusing Plaintiff of making one or more false
statements when applying for a federal license.

176. Defendant, in the -Notice to Revoke or suspend License and/or
Impose  Civil Fine alleged the following:

1) On two occasions, in an Application for an Amended Federal
   Firearms License, ATF E-Forn 5300.38, dated October 3 J, 2019,
   and Federal Firearms License Renewal Application, ATF Form
   8(5310.11), dated November 19, 2020, Licensee knowingly made a
   false statement or representation in applying for a firearms license.
   in violation of 18 U.S.C. § 924(a)(l) and 27 C.F.R. § 478.128(a). For
   GCA purposes, the term Responsible Person" means, in the case of
   a corporation, partnership, or association, any individual
   possessing, directly or indirectly, the power to direct or cause the
   direction of the management and policies of the corporation,
   partnership, or association pertaining to firearms. In or about 2018,
   Alan Aronstein became a person who has the power to direct or
   cause the direction of the management and policies of corporation
   at the time Licensee should have added him to its license as a
   responsible person[35].

177. The ATF alleges that Alan Aronstein is an individual who possesses,
directly or indirectly, the power to direct or cause the direction of the
management and policies of the corporation, partnership, or association
pertaining to firearms. This accusation is patiently false and is made without a
scintilla of evidence supports such an accusation. See Exhibit 1 attached hereto
and incorporated by reference.

178. Alan Aronstein is an unpaid professional consultant who has been
in the gun business for over fifty years. He does not own a single share of

---

[35] See footnote 33, The term "Responsible Person" is not defined in 18 U.S.C. part 44 (the GCA) nor in 27 CFR part 478.

Bencivenga Corporation, is not on the board of directors, and does not make management decisions. Besides being an unpaid consultant, he is a clerk who handles most if not all sales for OFM.

179. Whenever a customer appears with the intention of purchasing a firearm, he presents the applicant with the ATF form 4473 and submits the applicant's name to the NCIS for a background check. After the required waiting in period after the background check clears the applicant for a firearm purchase, Aronstein completes the required documents for the purchase and delivers the firearm to the applicant. When acting a clerk for Bencivenga Corporation, Aronstein has no discretion as to whether or not an applicant is allowed to purchase a firearm. If the applicant passes the background check, the applicant is allowed to purchase the firearm. If the applicant does not pass the background check, the applicant is not allowed to purchase a firearm.

180. The sole person that possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association pertaining to firearms is Romo.

181. Alan Aronstein is not disqualified from acting as a clerk for OFM because he is not disqualified from doing so under the GCA.

182. Apparently, this violation was somehow concocted sometime after the Information Concerning Your Federal License/Permit was emailed to Romo. See Exhibit 2. Nowhere on this report is this violation mentioned or insinuated.

183. The compliance history reports that compliance inspections were conducted in 2002, 2008, 2010, 2012, 2016, 2019 and 2022.

184.  This same report alleges that Alan Aronstein was added as a person in control in 2018.

185. Apparently the presence of Alan Aronstein was not objectionable during the 2019 compliance inspections but only became objectionable in 2022 after Alan Aronstein appealed the ATF's decision to deny the license application submitted on behalf of Crusader Gun Group Control. Aronstein has never received a warning letter concerning an alleged GCA violation, nor has the ATF scheduled a warning Conference.  He has never personally held a FFL so he never has been subject to a revocation proceeding. The sole basis upon which the ATF bases its claim is claim that Alan Aronstein has been a previous willful violator of the GCA is by imputing the alleged willful violations of a company named Tex-Products to Aronstein. Hence, a clear law making proceeding that is prohibited by the Fifth Circuit in *Vanderstok v Garland,* 86 F. 4th 179, 182 (5th Cir. 2023)

## Count II
## Wrongfully Alleged that Plaintiff is a willful violator as Unlisted Responsible Person

186. Defendant,  in  the  -Notice  to  Revoke  or  suspend  License  and/or Impose  Civil Fine Alleges the following:

> 2)  Alan Louis Aronstein, an unlisted Responsible Person for Licensee, is a prior willful violator of the GCA[36] and is thus ineligible for licensing. Alan Aronstein was the sole responsible person for Tex-Products, who ATF has determined is a willful violator of the GCA 1• As such. Licensee is a willful violator of the GCA and subject to revocation under 18 U.S.C. § 923(e) and 27 C.F.R. § 478.73.

---

[36] Alleging that Alan Aronstein is a willful violator is a false accusation. This case involving this issue is on appeal in in the 5th Circuit under 23-20449 Crusader Gun Group, LLC v James USDC No. 4:22-cv-906.

187. Alan Aronstein is not an unlisted, undefined Responsible Person for OFM.

188. Furthermore if he were an undefined Responsible Person, which is denied, Alan Aronstein is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under 18 U.S.C §922(g) and (n).

189. Apparently, this is another violation that was somehow concocted sometime after the Information Concerning Your Federal License/Permit was emailed to Romo. See Exhibit 2. Nowhere on this report is this violation cited nor mentioned.

Count III
**Wrongfully Alleged that Plaintiff failed to given written
notification in violation of 27 C.F.R. § 478.54**

190. Defendant, in the -Notice to Revoke or suspend License and/or Impose  Civil Fine Alleges the following:

3) Licensee willfully failed to give written notification to the Chief, National Licensing Center within 30 days of an actual or legal change in control of the corporation or association holding the license in violation of 27 C.F.R. § 478.54. Specifically, Licensee added Alan Aronstein in a position of control in 2018.

191. This allegation is false because Alan Aronstein is not in a position of control. See Exhibits 18 & 19.

192. This allegation is false because Alan Aronstein is not an individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of OFM

193. Deceptively, this is still another violation that was somehow concocted sometime after the Information Concerning Your Federal License/Permit was emailed to Romo. See Exhibit 2. Nowhere on this report is this violation cited or mentioned.

## Count IV
### Defendant Wrongfully Alleged that Plaintiff Violated 18 U.S.C. § 922(d) and 27 C.F.R. § 478.99(c).

194. Defendant, in the -Notice to Revoke or suspend License and/or Impose Civil Fine Alleges the following:

4) On one occasion, Licensee willfully sold or disposed of a firearm to Earle Seymour Wainstein who Licensee knew or had reasonable cause to believe was subject to Federal firearms disabilities, because he was an alien admitted into the United States with a nonimmigrant Visa.

195. This allegation is also false. See Exhibits 18 & 19. The Declarations of Alan Aronstein and Romo.

196. Apparently, this violation was somehow concocted after the Information Concerning Your Federal License/Permit was emailed to Romo. See Exhibit 2. This alleged violation neither cited nor alluded to in this report.

## Count V
### Defendants wrongfully alleged that Plaintiff willfully violated 18 U.S.C. § 923(g)( 1 )(A) and 27 C.F.R. §478.123(a).

197. Defendant, in the -Notice to Revoke or suspend License and/or Impose Civil Fine Alleges the following:

5) On one occasion, Plaintiff willfully failed to timely and/or accurately record the acquisition of a firearm, namely a Browning Pump .22 caliber rifle, by incorrectly recording the serial number as Serial number as 36267 RB176 instead of as 36867 RP176.

198. Plaintiff admits that the serial number was not accurately recorded. Specifically, the correct serial number is 36867 RP176. By mistake, the serial number was incorrectly written as 36267 RB176.

199. The clerical mistake in the serial number on the Browning firearm did not and does not have a negative impaction the safety of the citizens of the United States not does the incorrect serial number have a negative impact in tracing the firearm because the firearm remains in the custody of OFM.

200. Nevertheless, this clerical error did not warrant a warning letter other than stating that some violations may require a corrective action on your part. See Exhibit 2

Count VI
**Defendants wrongfully alleged that Plaintiff willfully violated
18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. §478.123(b).**

201. Defendant, in the -Notice to Revoke or suspend License and/or Impose Civil Fine Alleges the following:

6) On three occasions. Plaintiff willfully failed to timely and/or accurately record the disposition of a firearm, in violation of 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. §478.123(b).
Namely; (a) an OFM Corp, Pro Series 2000, RM20005, .45 caliber pistol, (b) an OFM Corp, Pro Series 2000, X 1000, .22 caliber pistol, and (c) an OFM Corp, X-Series, X1046, Frame only, .22 caliber

202. The 45-caliber pistol and the 22-caliber pistol are personal firearms that belong to Romo.

203. The mistake is that Romo, with the intention of again placing the firearms his personal collection, completed the proper 4473's but failed to remove the 4473's from the acquisition and disposition book.

204. Parenthetically, the correct model number for the 22-caliber pistol that belongs to Romo is X Series and not Pro Series 2000.[37]

205. Consequently, failing to remove a 4473 from the acquisitions and depositions book does not have a negative impact upon the safety of the citizens of the United States of America nor does it have a negative impact upon tracing the firearms because the firearms remain in the custody of Romo.

206. Nevertheless, this violation did not warrant a warning letter other "that some violations may require a corrective action on your part." See Exhibit 2

## Count VII
### Defendants Wrongfully Alleged that Plaintiff willfully violated 18 U.S.C. § 923(g)(1)(A), 27 C.F.R. § 478.124(c)( 1). 18 and 27 C.F.R. § 478.124(c)(5).

207. Defendant, in the -Notice to Revoke or suspend License and/or Impose Civil Fine Alleges the following:

7) On eight occasions on two forms, Licensee willfully failed to obtain a complete and/or accurate Firearms Transaction Record, ATF Form 4473, from the transferee prior to making an over-the-counter transfer of a firearm to a non-licensee, whose names are Earle Seymour Wainstein, where Items 21f, 21g, 21h, 21i,21j, 21.1.2, 21k were blank and  Item 36 incorrect

8) On two occasions. Licensee willfully failed to sign and/or date the Firearms Transaction Record, ATF Form 4473 certifying that Licensee does not know or have reason to believe the transferee is disqualified by law from receiving the firearm described on the Form, namely for Robert Hilsher where item 9 was incomplete and for Jessica Portillo where item 36 was incorrect.

---

[37] Apparently in accordance with the current AAP criteria, this is a willful violation of 18 U.S.C. § 923(g)(l)(A) and 27 C.F.R. § 478.123(a) by either Thomas Gray III or Tenarra James.

208. The allegation that OFM's transfer of a weapon to Seymour Wainstein, a non-licensee transferee, was a violation of the GCA is false. See Exhibit 18 the Declaration of Alan Aronstein. All items were correctly marked and the date appears to be correctly stated. However, as to item 36, more than likely the date entered in his section was the date that the applicant completed the form as opposed to the actual date that the firearm was physically delivered to the applicant.

209. Here again, inserting the date that the applicant completed form 4473 as opposed as to the actual date the firearm was delivered does not have a negative impact upon the safety of the citizens of the United States of America nor does it have a negative impact upon tracing the firearms.

210. Nevertheless, this violation did not warrant a warning letter other than, "some violations may require a corrective action on your part." See Exhibit 2

211. With respect to the violation concerning Robert Hilsher where item 9 was incomplete. The proper initial of Mr. Hilsher is clearly written on by form that was completed by Mr. Hilsher.

212. Therefore, the 4473 that was completed by Mr. Hilsher was correct.

213. Nevertheless, if this reported violation was correct, this meaningless violation did not warrant a warning letter other than stating that some violations may require a corrective action on your part. See Exhibit 2

214. With respect to the violation concerning Jessica Portillo where item 36 was alleged to be incorrect

215. The date set forth in item 36 was the date that Jessica Portillo completed the ATF 4473 form rather than the date that the firearm was physically transferred to Jessica Portillo.

216. Nonetheless, this meaningless violation did not warrant a warning letter other than stating that some violations may require a corrective action on your part. See Exhibit 2

## Count VIII

### Defendants wrongfully alleged that Plaintiff willfully violated 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. §478.123(b)

217. The allegation that that OFM failed to timely record disposition of firearm (missing after reconciliation) is false.

218. The timely notification was sent via certified mail to the ATF. See Exhibit 19 Declaration of Romo.

219. Though this accusation is false, if this violation were correct, this violation did not warrant a warning letter other than the general statement "some violations may require a corrective action on your part." See Exhibit 2

## V. Plaintiff Timely Requested a Hearing

220. On or about July 19, 2023, Plaintiff timely delivered a formal written request for a hearing on the Notice to Revoke or Suspend License and/or Impose a Civil Fine.

221. On or about July 17, 2023 Plaintiff acknowledged the September 24, 2023 hearing date, identified its potential witnesses and included the

Declaration of Ramiro E. Romo as evidence to be considered. A Copy of the Declaration of Ramiro E. Romo marked Exhibit 14 is incorporated by reference.

222. On or about September 7, 2023, counsel or Plaintiff requested a continuance of the Hearing to the week of October 23, 2023.

223. Plaintiff's request was approved and the hearing was reset to October 26, 2023 with the connotation that no further continuances would be granted. A copy of the communications between concerning the rescheduling the hearing marked Exhibit 15 attached hereto is incorporated by reference.

224. The hearing to Revoke Plaintiff's FFL was conducted on November 16, 2021.

### VI The Final Notice of Denial of Application, Revocation Suspension and/or Fine of Firearm License

225. January 29, 2024, the ATF issued ATF form 5300 which is the Final Notice of Denial of Application, Revocation Suspension and/or Fine of Firearm License. See Exhibit 20.

### VII Plaintiff's Contest of ATF's Claims in the Final Notice of Denial of Application, Revocation Suspension and/or Fine Of Firearm License[38]

#### Count IX

226. The allegations set forth in findings number two do not indicate or tend to prove that the business operations of OFM did not comply with the GCA.

---

[38] The findings number referenced herein are set for in Exhibit 20_ In addition, footnote number two states that the hearing on OFM's notice to revoke was converted to a hearing to deny as result of OFM submitting a timely renewal application, While the ATF refers to a 11th Circuit case for authority, there is no clear congressional authority to do so thereby constituting

227. Rather, the stated findings in number two are a typical ATF example insinuating that the business operations of a FFL are sinister.

228. In addition, the findings reference Gov Ex 16 a copy of which marked Exhibit 21 attached hereto is incorporated by reference.

229. Therefore, the only perceived purpose of finding number two is a blatant attempt to characterize Alan Aronstein as a person that possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association pertaining to firearms instead of that as a salesman who follows orders from Romo.

Count X

230. The allegations set forth in findings number three are wrongful because it misstates of the nature of the proceedings in the appeal docketed, No. 23-20449 (5th Cir. Sep. 14, 2023).

231. The issue in No 23-20449 is the same here. The ATF does not have clear congressional authority to impute the alleged willful violations of the GCA to the corporate representative. Thus, this practice of law making is soundly rejected by the Fifth Circuit in *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023)

---

unlawful law making. *West Virginia vs EPA* 142 S. CT. 2587 (2022) and *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023).

Count XI

232. The allegations set forth in findings number five are disputed because the findings are wrongful when the hearing officer alleges, "Mr. Aronstein still services firearms for one of the companies that surrendered its Federal firearms license in 2012 and that ATF found willfully violated the GCA at Licensee's business premises."

233. The companies that surrendered their fire arms license in 2012 are; (a) Tex-Products Inc.,(FFL License 5-76-00154) (b) High Standard Manufacturing Company, Inc. (FFL license 5-76-36527), and (c) Firearms International, Inc. (FFL license 5-76-00160)

234. Government Exhibits number 24 pertains to an entity named High Standard Firearms USA as sales agent for OFM Corp.

235. High Standard Firearms USA is a d/b/a of Crusader Gun Group, LLC.

236. Government Exhibits number 25 pertains to the entity named High Standard Manufacturing Company, Inc.

237. Plaintiff admits that High Standard Manufacturing Company, Inc. surrendered its FFL 2012 but deny that High Standard Firearms USA is in any way connected with High Standard Manufacturing Company, Inc.

238. Therefore, the finding set forth in number five should be disregarded because it is wrongful.

Count XII

239. The allegations set forth in findings number seven that Mr. Romo and Mr. Aronstein are misleading because the conduct of which does not rise to the level of a violation of the GCA.

240. There is or was no evidence that the "joint venture" involved any aspect of, purchasing a firearm, manufacturing a firearm, importing a firearm, selling a firearm or repairing a firearm.

241. Furthermore, the GCA does not control or regulate the financial aspect a FFL's business. Consequently the financial arrangements between Plaintiff, and Crusader Gun Control Group, LLC or that when purchases on behalf of Plaintiff are processed through an Interarms account or Tex Products account are not within the scope of the ATF's regulatory power of the GCA.

242. The allegation that "the application filed for a federal firearms license by Crusader Gun Group, LLC, was denied in federal court on 08/18/23 because of Mr. Aronstein's previous association with High Standard Manufacturing Co., Inc." is false.

243. The sole basis for denying a FFL to Crusader Gun Group, LLC's as articulated by the hearing officer was; "Tex-products is a willful violator of the GCA for the reasons described herein person. The prior willful violations of the GCA by Tex-products are imputed to its sole responsible person, Alan Aronstein, and therefore Applicant is not qualified to receive a new license under 18 U.S.C. § 923(d)(l){C). Hence, there was no evidence that Alan Aronstein personally violated any provision of the GCA or that the basis of the FFL to Crusader Gun

Control Group, LLC was in any way connected with High Standard Manufacturing Co., Inc.

244.  Mr. Romo testified at the hearing that the perceived "Joint Venture" between Mr. Aronstein him was that  Mr. Aronstein agreed to attempt to find a buyer for a number of gun molds that he has acquired or paid for that should be valued at over one million dollars. Because he did not intend to continue the business of manufacturing firearms, he wanted to sell the molds. If Mr. Aronstein found a buyer, he would be paid a commission upon the closing of the sale

245. For the reasons stated herein, Finding of fact number seven should be rejected.

Count XIII

246. The statements set forth in findings number nine concern the business arrangement between Plaintiff and Crusader Gun Control Group, LLC involving the lease of the business premises. For the reasons set forth in Count number XVII, the finding set forth in finding number nine should be disregarded because the business arrangements for the lease of the business premises by a FFL are not within the scope of the regulatory powers of the ATF in the GCA which averments thereto should be ignored.

Count XIV

247. The allegations set forth in findings number ten: "For purposes of the regulatory provisions of the GCA, a "willful" violation is committed when the licensee knows of its legal obligations and purposefully disregarded or was plainly indifferent to those requirements is not the law of the land.

248.   As previously stated in paragraph 35, the term willful is not defined in the GCA.

249.   Nevertheless, the term Willful has been defined by the Supreme Court in *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031 1035, 89 L.Ed. 1496. In its analysis of the word "willfully", the Supreme Court concluded that an act or omission is "willfully" done if done voluntarily and intentionally and with the specific intent to do something that the law forbids or with the specific intent to fail to do something the law required to be done, that is to say, with bad purpose either to disobey or to disregard the law.  See also *Willful* Black's Law Dictionary (6th ed. 1990)

250.   Furthermore, the cases cited by the ATF in Exhibit 20 findings number 9 predate the holdings in *West Virginia vs EPA* 142 S. CT. 2587 (2022) and *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023).

251.   Consequently, the ATF has engaged in "Law Making," an act that is specifically prohibited or rejected in *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023) by defining" a "willful" violation is committed when the licensee knows of its legal obligations and purposefully disregarded or was plainly indifferent to those requirements is not the law of the land."

252.   Therefore the ATF's definition of Willfully should be rejected. *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023)

Count XV

253. The allegations set forth in findings number eleven states  Violation 1 of the Notice to Revoke alleges that on two occasions, Licensee knowingly made

a false statement or representation in applying for a firearms license, in violation of 18 U.S.C. § 924(a)(I) and 27 C.F.R. § 478.128(a).

254.  Plaintiff's dispute of this fact is set forth in Plaintiff's Count Number 1 and is incorporated here.

255. Plaintiff categorially denies the facts set for in finding number eleven.

Count XVI

256. The allegations set forth in findings number twelve states; Violation 2 of the Notice to Revoke alleges that Alan Louis Aronstein, an unlisted Responsible Person for Licensee, is a prior willful violator of the GCA and is thus ineligible for licensing. As such, Licensee is a willful violator of the GCA and subject to revocation under 18 U.S.C. § 923(e) and 27 C.F.R. § 478.73.

257. Plaintiff's dispute of this fact is set forth in Plaintiff's Count Number 2 and is incorporated here.

258. Furthermore, the term "responsible Person" is not defined in the GCA or Code of Regulations that pertain to the GCA and both OFM and Alan Aronstein meet the provisions of 18 U.S.C. 923(d)(1)(B). In addition, if there were such a definition, Alan Aronstein is not a partner, sole proprietor, site manager, corporate officer, director, or shareholder, nor is Alan Aronstein an individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies OFM,  (3) nor there was a change in Plaintiff's control in violation of 27 C.F.R. 478.84 because Plaintiff's sole shareholder and sole officer has not changed since its FFL was issued in 2003,

259.  Consequently the sole basis to determine the eligibility of the (he applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter; See 81 U.S. C. 923

260. Therefore, the corporates representative, Romo, complies with all of the criteria and is qualified to receive the renewal of its FFL.

Count XVII

261. The hearing officer, in 'Fact number 14, concluded that Alan Aronstein was a responsible person who should have been listed and the failure to do so was a violation of the GCA.  See reference to Gov Ex 2, 6.

262. Without rearguing that while the term "responsible person" is defined in Chapter 40, there is no such person defined in Chapter 44.

263. There was direct testimony presented at the hearing that Alan Aronstein (a) was not an officer of OFM, (b) (B)   was    not    an    individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) (c)  was not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter ie.. Chapter 44, (d) was not  under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; (e)

was not  a fugitive from justice; (f) was not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))(g)  has not been adjudicated as a mental defective or who has been committed to a mental institution; (h) was not an alien, other than an alien who—(A) is lawfully admitted for permanent residence (as that term is defined in section 101(a)(20) of the Immigration and Nationality Act); (B) is in lawful nonimmigrant status, is a refugee admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157), or is in asylum status under section 208 of the Immigration and Nationality Act (8 U.S.C. 1158),

264. Consequently, the facts set forth in fact number 12 should be rejected by the court.

## Count XVIII

265. The allegations set forth in findings number fifteen state "Responsible Person: means, ... is supported  by seven cases that predate *West Virginia vs EPA* 142 S. CT. 2587 (2022) and *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023)

266.  In addition, term responsible person is not defined in Chapter 44 nor in CFR 978.

267. Responsible person is defined in chapter 44 which is 18 U.S.C. 843(b)(1)

268. The ATF is definitely law making when it conceives the definition of Responsible person by adopting and expanding the definition of that term as enacted by congress in 18 U.S.C 843(b)(1).

269.  The Court should strike the term responsible person in accordance with the holding in *Vanderstok v Garland*, 86 F. 4th 179, 182 (5th Cir. 2023)

Count XIX

270. The allegation set forth in findings number seventeen:" Based on the statements made by RP Romo at the hearing, Aronstein clearly possesses, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of Licensee insofar as they pertain to firearms" is false.

271. Romo's testimony during the hearing in the notice to revoke clearly and unambiguously disputed that Aronstein directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of Licensee insofar as they pertain to firearms.

272. Furthermore, the ATF did not present any evidence that contradicts Plaintiff's denial that Aronstein directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of Licensee insofar as they pertain to firearms

273. Thus, the facts set forth in fact number seventeen should be rejected by the court.

Count XX

274. Findings number eighteen in not a fact but the hearing officer's conclusion that Alan Aronstein was a person who directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of Licensee insofar as they pertain to firearms.

Page 65 of 89

275. The objection and argument in count number XIX is adopted by reference.

## Count XXI

276. The allegations set forth in findings number twenty that "As a prior willful violator of the GCA, Aronstein is not eligible to serve as a responsible person for a Federal firearms licensee and therefore the subject license may be revoked under the GCA is a conclusion that is not supported by the evidence and is therefore disputed.

277. The allegations that Alan Aronstein is a responsible person and that he has previously been found as a willful violator of the GCA has been addressed in Count Numbers XIX through XXII. The objections and remedies there claimed are adopted by reference.

## Count XXII

278. The allegations set forth in findings number twenty one; Violation 3, that the Licensee willfully failed to give written notification to the Chief, Federal Firearms Licensing Center within 30 days of an actual or legal change in control of the corporation or association holding the license in violation of 27 C.F.R. § 478.54 is false.

279. The objection to the findings that Licensee willfully failed to give written notification to the Chief, Federal Firearms Licensing Center within 30 days of an actual or legal change in control of the corporation or association holding the license in violation of 27 C.F.R. § 478.54 has been addressed in Count III.

280.  Count III is adopted by reference in response to count XXII.

## Count XXIII

281. The allegations set forth in findings number twenty two that "Evidence presented during the hearing revealed RP Romo knew that Alan Aronstein had taken over responsibilities of his business, but either purposefully disregarded or was plainly indifferent to the reporting requirements of the GCA is false.

282.  Romo's clear and unambiguous testimony at the hearing disputed the allegation that Aronstein had taken over responsibilities of his business.

283. Therefore, the Court should disregard this fabricated allegation.

## Count XXIV

284. The allegations set forth in findings number twenty three and twenty four that the averment in the Notice to Revoke alleges that on one occasion, Licensee willfully sold or disposed of a firearm to a person who Licensee knew or had reasonable cause to believe was subject to Federal firearms disabilities, in violation of 18 U.S.C. § 922(d) and 27 C.F.R. § 478.99(c) is a misstatement of the law that controls this transaction.

285. Findings number twenty three and twenty four shall be combined for comment,

286.  Plaintiff's response to this violation is addressed in Count Number IV and is incorporated here.

287. Apparently, the knowledgeable IOI (GRAY) and Hearing Officer (James) are relying upon the incorrect statute or part of the statute to make this finding and resulting conclusion.

288. The Code of federal regulations that applies to this transaction is 27 C,F,R, 478(c)(5)(i) which states "Admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;"[39]

289. ATF 4473 (Exhibit 22) reverses the language in the explanation and instructions for the transfer of a firearm to a Nonimmigrant Alien.

290. ATF 4473 in  Notices and Instruction's provides the instructions for Question 26.d. Exceptions to the Nonimmigrant Alien Prohibition: An alien admitted to the United States under a nonimmigrant visa is not prohibited from purchasing, receiving, or possessing a firearm if the alien: (I) is in possession of a hunting license or permit lawfully issued by the Federal Government, a State or local government, or an Indian tribe federally recognized by the Bureau of Indian Affairs, which is valid and unexpired; (2) was admitted to the United States for lawful hunting or sporting purposes;...Consequently the wording in the explanation for question number 26.d incorrectly states the wording of 27 C,F,R, 478(c)(5)(i).

---

[39] A copy of the Firearms Transaction Record ATF Form 4473 marked Exhibit 22 Attached hereto is incorporated by reference.

291. The fact that Mr. Earle Seymour Wainstein did not possess a valid Texas hunting license is irrelevant.

292. A lawful sporting practice could consist of shooting tin cans or glass bottles off a post in the proper location or going to a shooting range to improve your shooting skills.

293. Furthermore, Governor Greg Abbott signed Senate Bill 317 into law on May 31, 2019, permitting any landowner, landowner's agent or lessee to take wild pigs without a hunting license.

294. In the footnote number two of Exhibit 20, the hearing officer states; ATF Special Agents explained this to Wainstein, and he voluntarily surrendered the firearm.

295. This act is a violation of Mr. Wainstein's rights under the fifth and fourteenth amendments of the U.S. Constitution. The ATF has taken Wainstein's property without due process of law.

296. The alleged violation that Plaintiff wrongfully transferred a firearm to a Nonimmigrant Alien should be rejected along with imposing sanctions against the ATF for violating Mr. Wainstein's rights under the fifth and fourteenth amendment.

Count XXV

297. The allegations set forth in findings number twenty-six that Licensee willfully committed this violation as other firearms were correctly logged out is false.

298. This violation was previously addressed in count number VI and is incorporated by reference.

299. During the hearing, Gray testified that this violation was not the reason or the basis of the decision to issue the notice to revoke by the ATF.

## Count XXVI

300. The allegations set forth in findings number twenty-eight that Licensee willfully committed this violation as other Forms accurately noted the transfer date of the firearms, is false.

301. This alleged violation was previously addressed in Count number VII and is incorporated here,

302. During the hearing, Gray testified that this violation was not the reason or the basis of the decision to issue the notice to revoke by the ATF.

## Count XXVII
**Tanarra James Should Not Have Legitimately Presided Over OFM's Hearing**

303. FR 75 48362 promulgated in 2010 titled "Hearing Procedures Relating to Federal Licenses (2010R-2T) provides in pertinent part the following:

  a) Section 478.73 provides that whenever the Director has reason to believe that a firearms licensee has willfully violated any provision of the Act or part 478, a notice of revocation of the license (ATF Form 4500) may be issued. In addition, a notice of revocation, suspension, or imposition of a civil fine may be issued on Form 4500 whenever the Director has reason to believe that a licensee has knowingly transferred a firearm to an unlicensed person and knowingly failed to comply with the requirements of 18 U.S.C. 922(t)(1), relating to a NCIS (National Instant Criminal Background Check System) background check or, in violation of 18 U.S.C. 922(z) and 924 (p), has sold, delivered, or transferred any handgun to any unlicensed person without providing a secure gun storage or safety device. At 75 FR 48362

3n

b) As specified in §478.74, a licensee who receives a notice of license suspension or revocation, or imposition of a civil fine, may file a request for a hearing with the DIO. On conclusion of the hearing and after consideration of all the relevant information presented at the hearing, the Director renders a decision and prepares a brief summary of the findings and conclusions on which the decision was based. If the decision is that the license should be revoked or, in actions under 18 U.S.C. 922(t)(5) or 924(p), that the license should be revoked or suspended, and/or that a civil fine should be imposed, a certified copy of the summary is furnished to the licensee with the final notice of revocation, suspension, or imposition of a civil fine on ATF Form 4501. If the decision is that the license should not be revoked, or in actions under 18 U.S.C. 922(t)(5) or 924(p), that the license should not be revoked or suspended, and a civil fine should not be imposed, the licensee will be notified in writing. At 75 FR 48362

c) Under §478.76, a firearms licensee or an applicant for a firearms license may be represented at a hearing by an attorney, certified public accountant, or other person recognized to practice before ATF, provided certain requirements are met. The Director may be represented in hearing proceedings by an attorney in the Office of Chief Counsel. Pursuant to §478.77, hearings concerning notification of license denials, suspensions, revocations, or the imposition of a civil fine are held in a location convenient to the aggrieved party. At 75 FR 48362

d) The Chief, FES Division will select hearing officers from a list of contractors and volunteers furnished by the Office of Field Operations. While there are no formal selection requirements, at a minimum, candidates for hearing officer should possess the following: Qualifications omitted at 75 FR 48362

e) Hearing officers are appointed by and serve at the discretion of the Chief, FES Division with the concurrence of the hearing officer's DIO or other appropriate field division management official. Expenses for hearing officer travel and equipment needs will be funded by the FES Division. At 75 FR 48362

f) Upon receipt of a timely filed request for a hearing, the DIO will advise the Chief, FES Division that a request for a hearing has been made. The Chief, FES Division will designate a hearing officer for the case. The selection of the hearing officer will be made according to the following criteria:

   1) Complexity and nature of the case will be considered. More experienced hearing officers will be assigned to complex cases.

   2) The hearing officer's impartiality and/or prior relationship with or knowledge of the applicant or licensee will be considered. The Chief, FES Division will consider whether there is reasonable cause to believe that the hearing officer's

ability to conduct a fair and impartial inquiry is impaired by the hearing officer's prior knowledge of the case or interactions with the applicant/licensee.

3) The hearing officer's location will be considered. To ensure impartiality, the hearing officer will generally be appointed from outside the applicant's/licensee's division; however, if staffing and resource issues demand, a hearing officer from within the applicant's/licensee's division may be assigned.

4) When assigning cases, the Chief, FES Division will attempt to rotate selection among all eligible hearing officers in order to maintain a high level of proficiency in conducting hearings.

g) An individual should decline to act as a hearing officer in a particular case if he/she is not fully confident that he/she can administer a fair and impartial proceeding. If, at any time after being designated as hearing officer for a case, the officer determines that he/she cannot administer a fair and impartial proceeding, the hearing officer should immediately recuse himself or herself from the matter and notify the Chief, FES Division.

304. The rule promulgated in 75 CFR 48362-dated 8/10/2010 by the ATF has not been set aside, amended or revised. In addition, the substance of this rule is not or has not been adopted and published in C.F.R. 478.[40]

305. It is common practice for the Houston Field Division of the ATF to purposefully ignore the rule promulgated by 75 FR 48362.

306. Tanarra James, the Directors, Industry Operations Houston Field Division, was the hearing officer who conducted the hearing regarding the Notice to Revoke OFM's FFL.

307. Selecting her as the hearing officer was wrongful See Exhibit 11 page 2 under the heading "Hearing Overview".

---

[40] In *Lambert v. California*, 355 U.S. 225 (1957), Justice Douglas, writing for a divided Court, acknowledged the doctrine that ignorance of the law is no excuse, but concluded that the due process clause limits that concept, and that "[e]ngrained in our concept of due process is the requirement of notice. Hence, if a law or regulation is not published, then enforcement thereof is a violation of due process.

308. Here, the ATF did not follow that published policy because, by definition, a DIO's impartiality is impaired because the DIO (Tanarra James) signed the Notice of Revocation under review. In addition, she conducted the hearing on the notice to Revoke OFM's FFL.

309. DIO James is not some small player in the OFM's proceedings, but instead she is the very same official who made the decision to revoke OFM's license. Yet expectedly she sat in judgment of her own decision.

310. Furthermore, DIO James was the same official that conducted the hearing where a FFL was denied to a company named Crusader Gun Control, LLC. See footnote 37 where the matter is on appeal and DIO James is the Appellee.  Likewise, the decision in that case is on appeal in the 5th Circuit court of appeals that contests similar ATF's wrongful and unconstitutional conduct.

311. Furthermore, one element of due process requires an impartial arbiter. See *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242-243 & n. 2, 100 S.Ct. 1610, 1613 & n. 2, 64 L.Ed.2d 182 (1980)

312. On its face, the 75 FR 48362 appears neutral.

313. However, ignoring 75 FR 48362 on the other hand suggests something sinister.

314. DIO James will be evaluating a decision to revoke made by a peer and already approved by DIO James and assumedly her boss

315. The Supreme Court in *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669,  as stated that hearing officers are presumed to be unbiased until a conflict of interest or other specific reason for disqualification is shown.

316. At trial, OFM may be able to further demonstrate a conflict of interest in the hearing officer. On the surface, the OFM has shown a substantial likelihood that a conflict may exist that would impinge the hearing officer's impartiality.

317. This case is even shoddier. Here, the hearing officer is not just from a "nearby district," but rather is the same person who made the decision to revoke and deny renewal of OFM's license.

318. The Supreme Court in *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Quoting *In re Murchison*, 349 U. S. 133, 136 (1955) has stated, "'not only is a biased decision maker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness.'". A fair trial in a fair tribunal is a basic requirement of due process.*" In re Murchison*, 349 U. S. 133, 136 (1955). See also *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) ("decision makers are constitutionally unacceptable ... when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.") and *Baran v. Port of Beaumont Navigation Dist. of Jefferson County,* 57 F.3d 436, 444-46 (5th Cir.1995)..

319. This applies to administrative agencies that adjudicate as well as to courts. *Gibson v. Berryhill*, 411 U. S. 564, 579 (1973).

320. "Our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* supra, at 136; cf. *Tumey v. Ohio*, 273 U. S. 510, 532 (1927).

321. In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome Id at *Witjhrow* 41`1 U.S. 47.

322. Stated previously, DIO James is (1) the decision maker who has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) she has been the target of personal abuse or criticism from the party before her; and (3) when DIO James is the judicial or quasi-judicial decision maker who has the dual role of investigating and adjudicating disputes and complaints.

323. Consequently, DIO James fails to meet all constitutional standards concerning being an arbitrator in OFM's hearing because routinely sitting on both sides of the equation, not only as the person who decides to revoke OFM's FFL, but also then sitting in judgment of her own decisions.

Count XXVIII
Conducting the hearing outside of the Administrative Procedures
Act is a violation of Plaintiff's due Process protections under
Amendments 5 & 14 to the U.S. Constitution

324. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is responsible for enforcing Federal criminal laws and regulating the firearms and explosives industries.

325. ATF, known as the Bureau of Alcohol, Tobacco, and Firearms, was initially established by Department of Treasury Order No. 221, effective July 1, 1972, which transferred the functions, powers, and duties arising under laws relating to alcohol, tobacco, firearms, and explosives from the Internal Revenue

Service to ATF. The Homeland Security Act of 2002 (6 U.S.C. 531) transferred certain functions and authorities of ATF to the Department of Justice and established it under its current name. ATF works, directly and through partnerships, to investigate and reduce violent crime involving firearms and explosives, acts of arson, and illegal trafficking of alcohol and tobacco products.

326. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is a Department of Justice federal law enforcement agency charged with investigating violations of federal firearm, alcohol, and tobacco laws.

327. Title 28, Section 599A of the U.S. Code establishes the ATF and directs it to investigate: "criminal and regulatory violations of Federal firearms, explosives, arson, alcohol, and tobacco smuggling laws . . . and any other function related to the investigation of violent crime or domestic terrorism that is delegated to the Bureau by the Attorney General."

328. The Administrative Procedure Act (APA) is a federal act that governs the procedures of administrative law. The APA is codified in 5 U.S.C. §§ 551–559.

329. The core pieces of the act establish how federal administrative agencies make rules and how they adjudicate administrative litigation. 5 U.S.C. § 551(5)–(7) clarifies that rulemaking is the "agency process for formulating, amending, and repealing a rule," and adjudication is the final disposition of an agency matter other than rulemaking.

330. The law and regulations (18 U.S.C. 923(f)(2) and 27 CFR part 478, subpart E) provide for a hearing if requested by an applicant or licensee upon receipt of a Notice of Denial or Revocation.

331. The law (18 U.S.C. 923(f)(3)) provides If after a hearing held under paragraph (2) the Attorney General decides not to reverse his decision to deny an application or revoke a license, the Attorney General shall give notice of his decision to the aggrieved party. The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation.

332. Neither U.S.C. Title 28, Section 599A nor U.S.C. Chapter 44 exempts or removes proceedings in accordance with the Administrative procedures act 5 U.S.C. §§ 551–559 for the refusal, non-renewal or revoking of a FFL

333. Yet, without clear congressional authority, in 75 FR 48362 (Exhibit 12) and again in 81 FR 32230 (Exhibit 16). the ATF gives the following notice; "Hearing procedures in firearms licensing matters are informal in nature; the regulations found in the Administrative Procedure Act (APA) (5 U.S.C. 554) do not apply to hearings held under 18 U.S.C. 923(f)(2) because a federal firearms licensing hearing is subject to de novo judicial review in district court under 18 U.S.C. 923(f)(3)." Id 75 FR at 48363 and 81 FR at 32231

334. Nonetheless, not a single word regarding conducting the hearings in an informal manner nor the Administrative Procedure Act not applying to a hearing to deny, non-renewal or revoke a FFL is found in 27 U.S.C. 978.

335. One commenter in 81 FR 32231 states that the inclusion of the term "informal" in the proposed rule is directly contrary to what Congress intended

for license hearings under 18 U.S.C. 923(f)(2), and that Congress intended all firearms license proceedings to be subject to the formal adjudication requirements of the APA. The commenter concluded, "[t]he Administrative Procedure Act [under 5 U.S.C. 556(d)] requires that the hearings be formal proceedings where the agency has the burden of proof, where the evidence offered must be reliable, probative, and substantial, and where the applicant may present evidence and conduct cross-examination of the agency's witnesses." Id at 81 FR 32333

336. The ATF's Reply; "Although the provisions of the APA generally apply to firearms license administrative hearings[41], ATF disagrees with the conclusion that the APA's formal adjudication provisions are applicable to firearms license administrative proceedings. Under 5 U.S.C. 554(a), the formal adjudication provisions of the APA (sections 554, 556, and 557) apply "in every case of an adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. 554(a). In order to trigger this requirement, courts have held, a statute generally must state that an agency shall provide a "hearing on the record," rather than just a "hearing." R.R. Comm'n of Tex. v. United States, 765 F.2d 221, 227 (D.C. Cir. 1985). Moreover, the APA's formal adjudication provisions do not apply "to the extent that there is involved . . . a

---

[41] Not only does the ATF generally agree that the APA apply to the ATF, Title 28 U.S.C. § 599A (the Administrative Procedures Act) is its basis of authority to establish and adopt "Federal "Firearms Policy and Procedures". See Exhibits 3 & 4.

matter subject to a subsequent trial of the law and the facts de novo in a court."
5 U.S.C. 554(a)(1). Id at 81 FR 32333

337. The ATF further replies: The Act does not trigger the formal adjudication provisions of the APA with respect to firearms hearings. The pertinent provisions of the Act require the Attorney General to hold "a hearing," not a hearing "on the record," in connection with the denial, revocation, or suspension of a license, or imposition of a civil fine. See 18 U.S.C. 922(t)(5), 923(f)(2), 924(p)(1). Moreover, 18 U.S.C. 923(f)(3) permits an aggrieved party to, at any time within sixty days after the date notice of a decision is given, "file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of [a license] denial or revocation." See also 27 CFR 78.78 (authorizing a dissatisfied applicant or licensee to "file a petition for judicial review . . . with the U.S. district court for the district in which the applicant or licensee resides or has his principal place of business"). Accordingly, the APA's formal adjudication procedures do not apply to ATF hearings conducted pursuant to 27 CFR 478.72 and 478.74. Citations omitted at Id at 81 FR 32333.

338. Moreover, nowhere in either U.S.C. Title 28, Section 599A nor U.S.C. Chapter 44 is found a distinction between a "Formal Hearing" or  Informal" hearing." Rather the purpose of the "hearing" is to adjudicate the taking or refusing to permit a licensee from receiving, renewing or revoking its FFL license, which is "property".

339. In addition, nowhere in 27 C.F.R. 478 is found any reference to 75 FR 48362 or 81 FR 32230.

340. While the ATF acknowledges that the provisions of the APA generally apply to firearms license administrative hearings, (Id. at FR 81 32333) without clear congressional authority, most if not all of the provisions of the Administrative Procedures Act are ignored thereby clearly violating the fifth and fourteenth amendment to the constitution thereby taking property without the due process of law. That ignoring (1) one or more administrative law judges Sec 556(b)(3), (2) refusing to administer oaths and affirmations Sec 556(c)(1), (3) or refusing to take depositions or have depositions taken when the ends of justice would be served; Sec 556(c)(4), clearly violates the due process clause of the fifth and fourteenth amendments.

## Request for Preliminary Injunction.

341. To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. *Di Giorgio v Causey* 488 F.2d (5th Circuit 1973)

## I. LIKELY HOOD OF SUCCESS ON THE MERITS

342. There is a substantial likelihood that plaintiff will prevail on the merits because Plaintiff will prove that, (1) It did not willfully violate U.S.C. § 924(a)(l) or 27 C.F.R. § 478.128(a)

## II. IRREPARABLE INJURY

343. Plaintiff will likely suffer irreparable injury if defendant is not enjoined from proceeding with the hearing on ATF's Notice to revoke Plaintiff's FFL.  Monetary loss is an irreparable harm and such harm includes situations where there is no adequate remedy at law to recover damages for the harm suffered. See *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008); *Celsis In Vitro, Inc. v. Cellz Direct, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2012); *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011).

344. When there is no adequate remedy at law, unrecoverable monetary loss is an irreparable harm. .See *Louisiana v Biden* 55 F 4th 1017 (5th Cir 2022, *N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984); *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003); *Winston v. Gen. Drivers, Warehousemen & Helpers Local Union No. 89*, 879 F. Supp. 719, 725 (W.D. Ky. 1995)

345. OFM has no adequate remedy at law, as "money damages" are not available under the APA. See *Dep't of the Army v. Blue Fox*, 525 U.S. 255, 263 (1999) (money damages unavailable under APA). See also *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("economic harm is not

generally considered irreparable But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable.").

346. Likewise, Plaintiff cannot obtain damages for its constitutional claims because "the ATF does not waive sovereign immunity for general federal constitutional torts, and Congress has not expressly waived sovereign immunity for alleged constitutional violations elsewhere." *Hall v. United States*, 2020 U.S. Dist. LEXIS 250196, at *12 (N.D. Ala. Oct. 30, 2020) (cleaned up, quoting *McCollum v. Bolger*, 794 F.2d 602, 608 (11th Cir. 1986) and *U.S. v. Timmons*, 672 F.2d 1373, 1380 (11th Cir. 1982) (other citation omitted).

347. "Loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.*" Royalty Network, Inc. v. Harris,* 756 F.3d 1351, 1357 (11th Cir. 2014) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because the Supreme Court does not subject the Second Amendment to "an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated," *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010), a loss of Second Amendment rights also constitutes irreparable injury. See *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975); *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012); *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009).

### III. THE THREATENED INJURY IF THE INJUNCTION IS DENIED OUTWEIGHS ANY HARM THAT WILL RESULT IF THE

INJUNCTION IS GRANTED;

348. The harm faced by plaintiff outweighs the harm that would be sustained by defendant if the preliminary injunction were granted. Plaintiff maintains that it has presented sufficient facts that it would suffer irreparable harm if its licenses were revoked before being allowed to adjudicate the merits of its claim. I.e. a violation of its constitutional rights if the preliminary injunction is denied. Furthermore, permitting Plaintiff to continue business while adjudicating the merits its claim does not impede the ATF from seeking a similar action upon other holders of a FFL if the ATF's action were lawful and in compliance with the GCA. See *Yakus v. United States*, 321 U.S. 414, 440 (1944); Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 297 (5th Cir. 2012); Coca-Cola Co. v. Purdy, 382 F.3d 774, 789 (8th Cir. 2004)

## IV. THE GRANT OF AN INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST

349. Issuance of a preliminary injunction would not adversely affect the public interest. Rather, Plaintiff asserts the balance of interests tilts in its favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."*Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir. 2014)(district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).

350. Here, Plaintiff has a constitutional right to maintain and exercise its business under its FFL because continued operation is permitted even if the FFL has expired while suit is pending. See 27 C.F.R. §478.78 Consequently, the

threat to revoke Plaintiff's FFL is a violation of Plaintiff's constitutional rights to maintain and operate its business pursuant to the FFL until and/or unless its FFL is revoked after trial on the merits. See *Defense Distributed v. US Dept. of State*, 838 F. 3d 451 (5th Cir 2016), *Opulent Life Church,* 697 F.3d at 298; *Alliance for the Wild Rockies,* 632 F.3d at 1138-39; Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362-63 (Fed. Cir. 2008)

351. Plaintiff is willing to post a bond in the amount the Court deems appropriate set by the Court for the temporary restraining order. See *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 425-26 (3d Cir. 2010); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 & n.3 (4th Cir. 1999)

352. Plaintiff asks the Court to set its application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against defendant.

## Count XXXIX.
### Judicial Review Is Appropriate Now, Irrespective of ATF's Inevitable Revocation and Denial to Renew OFM's FFL

353. 18 U.S.C. § 923(f)(3) provides that the Unites States District Court for the district of the principal place of business of the petitioner shall have jurisdiction to hear complaints for a de novo judicial review of the Attorney General's findings regarding the revocation of a firearms license.

354. This complaint is being filed in advance of the ATF administrative revocation hearing and after the notice of denial to renew and thus obviously in advance of the 60 day deadline contained within 18 U.S.C. § 923(f)(3).

355. However, due to the nature of the claims asserted in this complaint, Section 923 is not implicated, and judicial review is appropriate now, for several reasons.

356. First, Plaintiffs in this action are challenging the revocation of OFM's license and denial of the renewal of OFM's FFL that has occurred'. The AAP (an ATF "Order") is "final agency action" under the APA, irrespective of the particular revocation proceedings in OFM's case. See *Cargill v. BATFE*, No. 1:22-CV-1063-DAE, 2023 U.S. Dist. LEXIS 123249, at *14 (W.D. Tex. July 18, 2023) (finding the AAP is a "final agency action.").

357. Second, Plaintiffs' claims are also advanced on behalf of all other FFLs, representing similarly situated FFLs across the country, in addition to OFM, who have, are, and will face ATF compliance inspections, warning letters, warning conferences, and revocations under the legally flawed AAP.

358. Third, Plaintiff asserts claims independent of any claim under §923(f)(3), including claims under the Administrative Procedures Act and the Second Amendment. None of these claims (especially constitutional ones) could be brought or was brought in an administrative hearing before ATF, as administrative hearing officers have no authority to resolve APA or constitutional claims.

359. Fourth, the Supreme Court notes that, "[a]s we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590,

600 (2016).  See also *Sackett v. EPA,* 566 U.S. 120, 127 (2012) (plaintiff need not "wait for the Agency to drop the hammer").

360. Fifth, ATF's final revocation and rejection of OFM's renewal will result in irreparable harm not only to OFM but also to of the members of the stay of revocation pending judicial review, ATF now (as part of its "zero tolerance" push to revoke licenses as efficiently as possible) refuses to agree to stays, meaning that dealers are left in the untenable position of seeking emergency judicial review.  See, e.g., *The Tactical Edge, LLC v. Garland*, No. 3:23-cv-00544 (M.D. TN June 1, 2023) (concluding that "923(f)(2) does not require the Attorney General to stay the revocation of a license during the pendency of district court proceedings," but "wonder[ing] why [ATF] did not voluntarily agree to postpone revocation of Plaintiff's license").

361. This is why the Plaintiff in Precision Tactical Arms Co., LLC was forced to seek a temporary restraining order from this Court.  2023 U.S. Dist. LEXIS 116500.  Otherwise, by the time a court considers the matter, the irreparable harm has occurred, as an FFL has been forced to stop doing business, liquidate its inventory, and close up shop.

362. Sixth, Plaintiffs contend that the few, isolated violations that are the subject of ATF's Notice of Revocation in this case fail – as a matter of law – to establish that OFM "willfully" violated any of its recordkeeping requirements.  In addition, the allegation that Alan Aronstein's existence is somehow a disqualifying factor to OFM's FFL is also wrongful as a matter of law. Undeniably, another district court in the Eighth Circuit recently rejected ATF's revocation of

an FFL based on a similar fact pattern. *Streicher's, Inc. v. Hummel*, No. 23-995 (PAM/ECW), 2023 U.S. Dist. LEXIS 68898, at *10 (D. Minn. Apr. 20, 2023). As Judge Magnuson noted there, "ATF has cited no court decisions in which a federal firearms license has been revoked for conduct akin to that at issue here: a small number of violations and the licensee's first violations of the particular type." Id. at 13 (noting that cases generally are premised on "repeated failure[s]" and a "large number of violations" and "multiple instances"). Finding that "the public interest requires the uniform application of the federal firearms laws," and "the revocation here is contrary to that principle," Judge Magnuson implicitly rejected the 2022 AAP that changes ATF policy and adopts a strict-liability revocation for even single instances of a violation. Id. at 14.

363. Factually, Gray at the hearing freely admitted that the presence of Alan Aronstein was the sole basis for deciding to issue the notice to revoke OFM's FFl and it was apparent from the final notice to deny the renewal, Aronstein's presence is the sole basis for the ATF denying the renewals of OFM's FFL.

364. For each of these reasons, OFM cannot wait for ATF to actually enforce the denial to renew its licenses.

### Request for Permanent Injunction

365. Plaintiff asks the Court to set it} application for injunctive relief for a full trial on the issues in this

### F. Prayer

366. For these reasons, plaintiff asks that the Court do the following:

a.    Grant a stay to enforcement of the proposed revocation of OFM's federal firearms license and denial of the renewal of OFM's FFL  pending the final resolution of this action;

b.    Declare that the Defendants are not authorized under any statute or law to revoke OFM's federal firearms license based or deny the renewal of OFM's FFL  on the findings and allegations set forth in the ATF Notice of Revocation and the findings and conclusions in

c.    Issue an injunction preliminarily and permanently enjoining Defendants' misuse of the "willful" requirement in the Gun Control Act;

d.    Issue an injunction preliminarily and permanently enjoining Defendants using or applying the term "responsible person" when no such term is defined in the  GCA;

e.    Issue an injunction preliminarily and permanently enjoining Defendants' from failure to conduct hearing authorized pursuant to 18 U.S.C. 923(f)(2) from complying with the Administrative Procedures Act; 5 U.S.C. §§ 551–559.

f.    Issue an injunction preliminarily and permanently enjoining the use of Defendants' "Zero Tolerance" policies regarding FFLs, including ATF Order 5370.1E and 5370.1F (and any more current version of the AAP) as contrary to law and constitutional right;

g.    Declare that the Defendants have acted unconstitutionally, arbitrarily, capriciously, and contrary to law, in the establishment of and/or application of standards for revocation and/or renewal of federal firearm licenses in general  an OFM's FFL in particular;

h.    Declare that Defendants do not have clear congressional authority to define, establish or categorize a corporate

representative, clerk or sales person as a/or the "Responsible person".

      i.      Order the ATF to issue the renewal of OFM's FFL

      j.      Grant Plaintiffs an award of their attorneys' fees and expenses in these proceedings pursuant to applicable federal law; and

      k.      Award court costs.

      l.      Grant Plaintiffs such other additional or alternative relief to which it may be entitled.

      Respectfully submitted,

      /s/G. P. Matherne
      G. P. Matherne
      Attorney at Law
      P. O. Box 547
      Spring, Texas 77383-0547
      713 253-0674 Telephone
      281 353-2651 Fax
      TBA 13186300
      legistgpm@icloud.com
      Attorney for Plaintiff
      Bencivenga Corporation
      d/b/a OFM Corporation