# EXHIBIT D

ATF Administrative Hearing
Transcript

1

BENCIVENGA          *   NOTICE TO REVOKE OR SUSPEND LICENSE

CORPORATION.        *   AND/OR IMPOSE CIVIL FINE

                    *

*********************************************************

HEARING DATE:                      HEARING START TIME:
11/16/2023                         9:30 A.M.
                                   CENTRAL STANDARD TIME

HEARING OFFICER:
TANARRA JAMES

Reported by:
Amanda Sailsbury, CSR
November 16th, 2023

        Hearing held before TANARRA JAMES, Hearing

Officer.  All parties, except the court reporter,

appeared in person at the ATF office in Houston, Texas

taken on the 16th day of November, 2023, from 9:39 a.m.

to 12:29 p.m.

2

APPEARANCES

THE HEARING OFFICER:
    TANARRA JAMES, Director of Industry
    Operations

DIVISION COUNSEL:
    JENNIE BASILE, Senior Attorney (Via Teams)

ALSO PRESENT:
    AMANDA SAILSBURY, Texas CSR No. 11923
    TOMMY GRAY, Industry Operation Investigator
    G.P. MATHERNE, Attorney for Bencivenga
    ROMIRO ROMO, Witness for Bencivenga
    STEPHEN HAWKINS, Observer
    MELISSA DELVECCHIO, Observer
    PETER MICKELSON, Observer

3

THE HEARING OFFICER:  The hearing has officially begun.  The time is 9:38 a.m., date is November 16th, 2023 and this hearing is being held at the Houston Field Division Office, located at 5825 North Sam Houston Parkway West, Suite 300, Houston, Texas 77086.  My name is Tanarra James, J-A-M-E-S.  I am the Director of Industry Operations for the Houston Field Division and will be the officer presiding over this hearing by the direction and under the authority of the Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice.

This hearing is an administrative proceeding and is informal in nature.  The hearing is to review the notice to revoke or suspend license and/or impose a civil fine, ATF E-Form 4500 (5300.4) issued under the provisions of Title 27, Code of Federal Regulations, Part 478, subpart E.  As a result of the issuance of ATF E-Form 4500 (5300.4) you requested in writing that a hearing be granted.  The focus of this hearing will be on the evidence regarding whether the license should be revoked.  There are a couple of procedural issues I will address before we get started.

A transcript is being made of these proceedings for the record.  Because of this, I ask that you speak one at a time so that a clear and accurate

4

record can be made.  Answers must be audible.  Please do not nod or shake your head in response to a question.  At this time, I'll ask the licensee and those present on its behalf to introduce themselves.  Please give me your full name, spelling your last name for the record.

MR. ROMO:  Romiro E Romo Junior R-O-M-O is the last name.

MR. MATHERNE:  I'm G.P. Matherne that's M-A-T-H-E-R-N-E.

THE HEARING OFFICER:  We have several observers for this hearing.  Please introduce yourselves providing your full name spelling her last name for the record.

MR. HAWKINS:  Stephen Hawkins H-A-W-K-I-N-S spelling of the last name.

MS. BASILE:  I'll introduce him.  Peter Mickelson will be observing P-E-T-E-R M-I-C-K-E-L-S-O-N and Melissa Delvecchio, Melissa M-E-L-I-S-S-A, Delvecchio, D-E-L-V-E-C-C-H-I-O.

THE HEARING OFFICER:  Okay.  Jennie Basile, will you and anyone producing evidence on behalf of ATF introduce yourselves.  Please give me your full names spelling your last name for the record.

MS. BASILE:  Jennie Basile, division counsel B-A-S-I-L-E.

MR. GRAY:  Tommy Gray G-R-A-Y.

MS. BASILE:  I, Jennie Basile will act as attorney for the government on behalf of the Director of Industry Operations as provided by 27CFR478.76.

THE HEARING OFFICER:  You may now proceed with your presentation.

MR. MATHERNE:  Are we going to introduce exhibits first?

THE HEARING OFFICER:  No, sir.  We'll do that as you -- I guess if you want to do it now --

MR. MATHERNE:  I would like to have them admitted now if it's not objectionable.

THE HEARING OFFICER:  It is not a problem. We normally do that at the end.

MR. MATHERNE:  Here's the deal.  I don't want to have an objection to one of your exhibits. That's why I would like to voice it now.  I know you're going to overrule it but I would still like to have that on the record if you don't mind.

THE HEARING OFFICER:  Sure.  Go ahead.

MR. MATHERNE:  How many exhibits do you have?

MS. BASILE:  Now, I have 49 with the two I give you this morning.

MR. MATHERNE:  Okay.  I only have one

6

objection as to Number 16.  Number 16 is hearsay and the reason it's hearsay is because the person who wrote that is not here.  Okay.  Now, I have 15 exhibits, did you have any objections to those.

MS. BASILE:  I don't have any of objection to your exhibits and I will say in response to your objection, the rules of evidence don't apply.

MR. MATHERNE:  I know.  I realize that.

MS. BASILE:  What you're going to say is permissible and the exhibit is relevant is the only objection that would be relevant.

MR. MATHERNE:  Okay.

MS. BASILE:  If it wasn't relevant then I think you would have a basis for your objection.

MR. MATHERNE:  I don't see how it is relevant but in any event one of the things the reason that I'm saying this is as you well know I have one of these matters on appeal.  One of the comments that the judge made is that I did not make any objections to the exhibits which was absolutely false.  That's why I'm doing that.

MS. BASILE:  I understand.  Okay?

MR. MATHERNE:  Okay.

THE HEARING OFFICER:  Okay.  So.

MS. BASILE:  I would argue that it is

7

relevant and since the rules of evidence don't apply hearsay is permissible.

THE HEARING OFFICER:  Okay.

MS. BASILE:  And so I don't know if you want to rule now whether you're going to let them all in or not.

THE HEARING OFFICER:  Well, at this point I'm going to admit all of the --

MS. BASILE:  That's fine.

THE HEARING OFFICER:  Yes, sir.

MR. MATHERNE:  Yes, ma'am.

THE HEARING OFFICER:  Yes.

MS. BASILE:  Okay.

MR. MATHERNE:  It's just for the record.

THE HEARING OFFICER:  I accept government Exhibits 1 through 49 and I accept Licensee Exhibit 1 through 15.

MR. MATHERNE:  Yes, ma'am.

THE HEARING OFFICER:  Yes.

MR. MATHERNE:  Like you made an opening statement, I would like to make one too if you don't mind.

THE HEARING OFFICER:  Sure.

MR. MATHERNE:  I object to this hearing today because it's unlawful.  It's unlawful because of

8

the following reasons.  Number 1 it's being undertaken in violation of the Administrative Procedures Act because the legislator has not enacted nor amended the GCA that authorizes the ATF to inhibit or exclude any administrative hearing for the protections of the Administrative Procedures Act.

I base my objections on the following: West Virginia versus EPA-142 Supreme Court 25787-3614 and 2022.  It also quoting the utility air regulation corp verse EPA 573 US302, 324 and 214, and more recently a decision that was rendered by the Fifth Circuit in VanDerStok et Al versus Garland in docket Number 23-1071 that's my Exhibit 15.

The second reason is the hearing day is not being conducted in an impartial manner in violation of Section 556 of the Administrative Procedures Act.  The rule was promulgated by the ATF in 75FR48362 and an 81FR32230 and in violation of due process in a clause of the United States constitution.

This hearing is not being conducted in an interpersonal matter because the hearing officer here today is one and the same person who has decided to revoke the FFL/OFM.  The respondent here.  The ATF does not have clear congressional authority to define a term such as responsible party when Congress by enacting the

GCA did not provide such a definition or imply-ly gave the clear congressional authority to the ATF to make such a definition.

Define the term responsible party.  Is it keen to the ATF definition of framer or receiver to include a weapon parts kit that is designed or may be reasonably completed, assembled, stored or otherwise converted to expel projectors on the action of an explosive?  This rule marking authority was soundly rejected in VanDerStok versus Garland.  It's also my Exhibit 15.

Furthermore the definition of responsible party was included in the Organized Crime Control Act of 1970 when the Explosives Procedures Act of 1917 was repealed.  The definition of responsible person was not added to the GCA when the term "willingfully" was added to Section 923A of the GCA by the Firearms Protection Act of 1976, but Congress could have easily done so they chose to it admit this term from the GCA.  See this discussion in the VanDerStok versus Garland 915, and I request that this hearing be dismissed at this time.

THE HEARING OFFICER:  No, sir, it will not. It will continue.  Thank you.

MR. MATHERNE:  Haven't I a say?

THE HEARING OFFICER:  As I stated earlier

10

you may now proceed with your presentation.

MS. BASILE:  Okay.  And this is an informal hearing Mr. Matherne, and so if you need to interrupt me, go ahead.  If not we'll go through our evidence and then it will be your turn to tell the Director anything you wish.

MR. MATHERNE:  That's fine.

MS. BASILE:  If that's okay.

EXAMINATION OF TOMMY GRAY

BY MS. BASILE:

Q.   Okay, Mr. Gray, how are you employed?

A.   I'm an industry operations investigator for the Bureau of Alcohol, Tobacco and Firearms.

Q.   And how long have you been an industry operations investigator?

A.   I began my employment on May 15th, 2005.

Q.   Okay.  And when you say you completed your employment, did you complete formal training to become an industry operations investigator?

A.   I did.

Q.   And did you successfully complete that training?

A.   Yes.

Q.   Could you explain for the record just briefly what are the general duties of an industry operations

investigator?

A.   Well, we regulate the firearm and explosives business.  We evaluate applications for people who apply for license and make sure they meet the legal requirements.  We do compliance inspections on firearms and explosives businesses to make sure they maintain compliance.  Occasionally we assist special agents investigations.  We try to act as a resource to the industry members.

Q.   Okay.  And in your role as an industry operations investigator, approximately how many inspections have you completed?

A.   890.

Q.   And that's an approximate number, does that include firearms and explosives inspections?

A.   It does.

Q.   And does it include qualification and compliance inspections?

A.   Yes.

Q.   Of those 890 inspections, approximately how many times have you needed to recommend a revocation or denial?

A.   A total of six including this one.

Q.   Can you please explain also for the record in brief detail the general process to obtain a federal

firearms license?

A.   Once the applicant sends in the application, it's routed to us from a licensee and a supervisor assigns it to an investigator.  We do a background check on the person to ensure that they are not prohibited, and we set up a time to come out and interview them.

We look into the premises to make sure they are suitable for that type of business operation, and when we go out and interview the person we explain the rules and operations, how the records are maintained and kept and hook them up with various references, forms, links to the firearms regulation guide, publications that we have and how to access them.

Once this is completed we write a report which is submitted to the supervisor with our recommendation and it is reviewed and approve or deny.

Q.   And when you do this, when you conduct inspections, do you consult the federal firearms regulations found at Title 27 of the code of federal regulations Section 478?

A.   Yes.

Q.   And did you consult those regulations in this inspection?

A.   I did.

Q.   And as part as your official duties, were you

13

assigned an amended application for a change of address and a compliance inspection for Bencivenga Corporation in 2019?

A.   Yes.

Q.   And a compliance inspection of Bencivenga in 2020?

A.   Yes.

Q.   And so the reason for today's hearing results from your inspection in 2020; is that correct?

MR. MATHERNE:  '22.

A.   Yes, '22.

Q.   Sorry, 2022.

A.   Yes.

Q.   So, in 2019 you went to Bencivenga for a change of address, and in 2022, sorry, not 2020, 2022 you went there, based on that inspection is why we're here for a hearing today, right?

A.   Right.

Q.   But we might also talk a little bit about some things you learned during 2019; is that correct?

A.   Yes.

Q.   That led to your inspection for 2022?

MS. BASILE:  Starting with Government's Exhibit No. 2, is the amended inspection application that you first did in 2019?

14

A.    Yes.

Q.    Okay.  And we look at it, we see a Bencivenga Corporation and we see Mr. Romo signed it on 10/31/2019, correct?

A.    Yes.

Q.    Okay.  And we're going to talk more about Government's Exhibit 22 in a minute -- I'm sorry Government's Exhibit 2 in a minute but for now that is when you first went to Bencivenga Corporation, correct?

A.    Yes.

Q.    And when you look at Government's Exhibit 2, do you see the address they're moving to?

A.    Yes.

Q.    And is that 5151 Mitchelldale Street?

A.    Yes.

Q.    Were you familiar with that address for any reason in 2019 when you went out there?

A.    Yes.

Q.    And why are you familiar with that address?

A.    Alan Aronstein had previously operated businesses from that location.

Q.    Okay.  And were the businesses he operated high standard manufacturing from '93 to 2000, Firearms International Inc., from 2000 to 2012, and Tex Products from 2000 to 2012, and High Standard from 2000 to 2012?

15

A.   Yes.

Q.   And those were all operated at one point at Mitchelldale; is that correct?

A.   Yes.

Q.   And if we look at Government's Exhibit No. 23, is that a list of businesses associated with Alan Aronstein?

A.   Yes.

Q.   And you had been out on an inspection at that location with a different industry operations investigator in the past, correct, when Mr. Aronstein was investigated, correct?

A.   Correct.

Q.   And does Mr. Aronstein currently have a firearms license?

A.   No.

Q.   Why not?

A.   Because he's been revoked.

Q.   So he was the responsible person for the businesses I just listed, correct?

A.   (No response.)

Q.   And he surrendered those licenses after a notice to revoke was issued, correct?

A.   Correct.

Q.   And how long was he in the firearms business

16

before he no longer had a license?

A.   1973.

Q.   So the first application that we have on record for Tex Products is 1973?

A.   Yes.

Q.   Okay.  And in 2020, now it is 2020 by the way.  In 2020 did Mr. Aronstein apply for a new license?

A.   Yes.

Q.   And if we look at Government's Exhibit 26 and 27, is that the FLS for the license he applied for and the application for the license he applied for?

A.   Yes.

Q.   Okay.  And was that company named Crusader Gun Group?

A.   Yes.

Q.   And again he applied for that business in November of 2020?

A.   Yes.

Q.   And just while we're on it, what is an FLS?

A.   FLS is an acronym for the Federal Licensing System which maintains the license records for individual licenses, and the report always lists the licensed name, the responsible persons address location, business phone number, contact information and a running history of filing dates and things of that nature.

Q.    So by him filing an application it created an FLS; is that fair?

A.    Yes.

Q.    Okay.  And so 26 and 27 per Crusader Gun Group, did he get that license?

A.    No.

Q.    Did ATF issue a notice to deny that license?

A.    Yes.

Q.    And is that Government's Exhibit 28?

A.    Yes.

Q.    And did Crusader Gun Group through his attorney ask for a hearing on that notice to deny?

A.    Yes.

Q.    And following that hearing, are you aware that ATF issued a notice, a final notice to deny the license?

A.    Yes.

Q.    And is that Government's Exhibit 29?

A.    Yes.

Q.    And are you aware that Mr. Aronstein through his attorney, for Crusader Gun Group I should say, through his attorney appealed that decision?

A.    Yes.

Q.    And are Government's Exhibit 30 and 31 the Southern District of Texas granting a summary judgment motion denying the appeal?

A.    Yes.

Q.    Okay.  And although Mr. Aronstein no longer has a firearms license, does Mr. Aronstein still service firearms for one of the companies that surrendered their FFL and move of revocation, High Standard Guns?

A.    Yes.

Q.    Where does he do that?

A.    At Bencivenga Corporation.

Q.    And if we look a Government's Exhibit 24 and 25, what is that?

A.    It's a print of the computer screen for the High Standard Firearms USA website?

Q.    And where -- does it say on there anything about -- if you look at the second page, what does it say?

A.    It says that High Standard Firearms USA is the sales agent for OFM Corporation which is the -- OFM port which is the business name for Bencivenga Corporation.

Q.    So the doing business name for Bencivenga Corporation is OFM Corp.?

A.    Yes.

Q.    And on the High Standard website if people want to service their High Standard Firearms, it says that it's going to be done at OFM Corp; is that correct?

A.    Yes.

19

Q.   And so Mr. Aronstein is working out of OFM Corp. to service these firearms?

A.   Yes.

Q.   Okay.  And if we look at Government's Exhibit 25 that's an FLS for the company High Standard Manufacturing which shows on the top that it was surrendered in lieu of revocation, correct?

MR. MATHERNE:  It says what.

MS. BASILE:  Government's Exhibit 25.  If you look at the top it says surrendered in lieu of revocation.

MR. MATHERNE:  Okay.

MS. BASILE:  It's not an active license.

MR. MATHERNE:  That's correct.

MS. BASILE:  Okay.

MR. GRAY:  Yes.

BY MS. BASILE:

Q.   Okay.  Redirecting your attention to Bencivenga Corporation, are Government's Exhibit 14 and 15 FLS for that business?

A.   Yes.

Q.   And explain why there's two please?

A.   When Mr. Romo applied for a manufacturer firearms license with his corporation that license was issued in January 2003; however the license was

20

incorrectly issued as a dealer of firearms license. This error was corrected later and the license was reissued as a manufacturer of firearms license with a new license number.

Q.   So that's why there's two FLS?

A.   Yes.

Q.   And that's why once it's out of business that was the incorrect one, and the one which is for Government's 14 and Government's Exhibit 15 is the current correct license, correct?

A.   Yes.

Q.   Okay.  And is Government's Exhibit 6 the renewal application regarding the compliances that you were assigned?

A.   Yes.

Q.   And was this assignment originally given to Elaine (phonetic) Mata?

A.   Yes.

Q.   Okay.  In addition to what we already talked about the change of address which was Government's Exhibit 2.  In addition to Government's Exhibit 6 and Government's Exhibit 2, are there also two other applications, one being the initial application for Bencivenga which is Government's Exhibit 1?

A.   Yes.

Q.   And did John James complete the application inspection in 2002?

A.   Yes.

Q.   And Mr. Romo signed Government's Exhibit 1 when he first applied for a federal license, correct?

A.   Yes.

Q.   Okay.  And then did he renew the license twice in Government's Exhibit 4 and 5?

A.   Yes.

Q.   Okay.  And again that was signed by Mr. Romo and 4 and 5 are the renewal applications, correct?

A.   Yes.

Q.   And all of these applications for Bencivenga, is Mr. Romiro Romo the only responsible person?

A.   Yes.

Q.   Did he ever add any other responsible persons?

A.   No.

Q.   If we look at a blank version of the -- if we go back to Government's Exhibit 2 that was the change of address he did in 2019.  If we also look at the Government's Exhibit 3 that is a blank form of the same renewal amended application, correct?

A.   Yes.

Q.   So, when you go online and fill out a change of address you would get this entire form, correct?

22

A.   Yes.

Q.   Okay.  And then he filled it out and submitted it but if we look at the blank form there's an additional page that has definitions; is that correct?

A.   Yes.

Q.   Specifically if we look at number four, it defines responsible persons; is that correct?

A.   Yes.

Q.   Can you read that please to the record?

A.   Responsible person in addition to a sole proprietor, a responsible person is in the case of a corporation, partnership or association, any individual possessing directly or indirectly the power to direct or cause the direction of the management and policies and practices of the corporation, partnership or association insofar as far as they pertain to firearms.

Q.   So when someone is filling out this application for an amended firearms license and moving to another address, are they certifying on this form that their answers are true and correct in Number 29 of Government's Exhibit No. 2?

A.   Yes.

Q.   And also in Section 3, Number 11 does it ask if there's any changes in the business structure of the FFL's operation and among Government's Exhibit 2?

23

A.   Repeat the question please.

MS. BASILE:  I gave you a whole set.

MR. MATHERNE:  You did.  I just misplaced it.  That's okay.  It is now.  You can go ahead.

MS. BASILE:  Right here at Number 11, Section 3, Number 11.  Does it say, are there any changes in the business structure of the FFL's operations?

A.   Yes.

Q.   Change of control, change of partnership?

A.   Yes.

Q.   Okay.  And if you look at the back 5C, what does that say?

A.   5C.  The applicant has not willfully failed to disclose any material information required or has not made any false statement as to any material fact in connection with his application.

Q.   Okay.  And if someone is confused when they read the definition of a responsible person as to who needs be a responsible person, could they call ATF and ask a question?

A.   Yes.

Q.   Or any basically anything about their firearms license.  Can they call an Industry Operations investigator and ask them for clarification?

24

A.    Yes.

Q.    Are there also ATF newsletters that they can sign up for to learn more about compliance issues and also provide important information including who needs to be a responsible person?

A.    Yes.

Q.    And is Government's Exhibit 38 one of those newsletters?

A.    Yes.

Q.    And if we look at Page 6 of Government's Exhibit 38, does it also define a responsible person?

A.    Yes.

Q.    And could you read just the part we've previously highlighted that starts in addition in the middle of the first paragraph?

A.    On-site responsible persons in addition to a sole proprietor, a responsible person is in the case of the corporation, partnership or association any individual possessing directly or indirectly the power to direct, or cause a direction of the management policies, and practices of the corporation partnership or association as they pertain to firearms.

Q.    And at the end of that section, does it also say questions about this requirement should be directed to the federal licensing center?

25

A.    Yes.

Q.    So in addition you can either call the local office or you could call the licensing center if you were confused; is that correct?

A.    Yes.

Q.    Okay.  We talked about Government's Exhibit 2 when he did the amended application.  I want to direct your attention back to Government's Exhibit 6, is the application that led to this inspection, correct?

A.    Yes.

Q.    The renewal application.  Okay.  If we look at Government's Exhibit 6, does it ask in Number 6, are there any new responsible persons to be added.  I'm sorry, I think it's C6, Section C, Number 6 on Government's Exhibit 6.

A.    Yes.

Q.    And on the second page Section C, he's again certifying that his answers are true and correct, right?  On the second page it says under Number 19 under penalties imposed by 18USC924, I certify that the statements in this renewal application are true and correct, right?

A.    Yes.

Q.    And were any responsible persons added at that time?

26

A.    No.

Q.    Okay.  Were any responsible persons ever added?

A.    No.

Q.    Okay.  You said that Elaine Mata was originally assigned to the compliance inspection in 2022, correct?

A.    Yes.

Q.    Did she go to the business?

A.    Yes.

Q.    Did she talk to Mr. Romo about the business?

A.    She met with Mr. Romo but she did not complete the inspection with him.

Q.    And why not?

A.    Mr. Romo told her Mr. Aronstein runs the show. IOI Mata asked him to explain what he meant.  He stated Mr. Aronstein was in charge of everything from shipping, receiving and ordering firearms.  Mr. Romo stated Mr. Aronstein also assisted with the record-keeping for the business.

Q.    Did she also talk to Mr. Wong?

A.    No.  That's a typo.

Q.    Okay.  Sorry.  So she said that he was in charge of everything from shipping and receiving and ordering firearms and that he also assisted with the record-keeping, correct?

A.    Yes.

Q.   And so she was unable to do the inspection with Mr. Romo, correct?

A.   Yes.

Q.   And based on this, did she prepare a memorandum of conversation and take it back out to Mr. Romo to sign?

A.   Yes.

Q.   And is that Government's Exhibit 16?

A.   Yes.

Q.   And could you read either side because they're the same but basically did she have Mr. Romo and Jessica Portillo both sign the same document on July 15th, 2022 and July 22nd, 2022?

A.   Yes.

Q.   And is that Government's Exhibit 16 with both signatures?

A.   Yes.

Q.   And the information -- can you just read what's in the statement?

A.   Okay.

Q.   It's dated July 14th, 2022, correct?

A.   Yes.

Q.   There's an acronym SIOI that stands for Senior Industry Operations Investigator.  It reads as follows:  SIOI Mata attempted to conducted a full compliance

inspection at the business premises of Bencivenga Corporation doing business as OFM Corp. SIOI Mata rang the doorbell and was greeted by administrative assistant Jessica Portillo.

SIOI Mata requested to see the owner of OFM Corp. and was told he was not at the license premises. This SIOI Mata presented a card and was invited into the business premises. Ms. Portillo stepped to the back office and Mr. Romiro Romo, President of OFM Corp. greeted SIOI Mata. SIOI Mata explained she was there to conduct a full compliance inspection.

Mr. Romo indicated that Mr. Alan Aronstein was out of town and SIOI would have to return to the business premises upon his return. SIOI Mata verified that Mr. Romo was the President of OFM Corp. and the sole person listed as a responsible person on the license.

Mr. Romo indicated that Mr. Alan Aronstein conducted all firearms transactions for the business. Mr. Romo contacted me Mr. Alan Aronstein via telephone. SIOI Mata spoke to Mr. Alan Aronstein and made an appointment to conduct the inspection on July 27, 2022. Mr. Alan Aronstein indicated it should take no longer than two days since the business was small. SIOI thanked Mr. Aronstein and left the business premises.

The document was signed by Romiro Romo and Jessica Portillo.

And again they both signed it on two different dates, correct?

A.   Yes, July 15, 2022 and July 22nd, 2022.

Q.   Okay.  So even though Mr. Romo is the only responsible person, Ms. Portillo said that the owner was not there and Mr. Romo did not do the compliance inspection because Mr. Aronstein was the one that needed to do it, correct?  That's what it says.

A.   Yeah.

Q.   Okay.  When did you first go to -- then you were assigned the compliance inspection and when did you first go to Bencivenga Corporation this time for this inspection?

A.   August 18th, 2022.

Q.   And how long did your inspection last?

A.   Until October 12th, 2022?

Q.   And what were the dates of the inspection?

A.   August 18th, 2021, to August 18th, 2022.

Q.   What was the volume of the business at that time?

A.   (No response.)

Q.   During the inspection period?

A.   Yes.  The business volume during the inspection

30

period consisted of 613 firearms acquisitions and 431 dispositions.

Q.   And it's a storefront location?

A.   Yes.

Q.   Okay.  And when you went into the business in 2022 just describe for us how the business is set up, and where Mr. Aronstein sits, where his office is, you know, what it looks like?

A.   Alan Aronstein has an office desk in the forefront of the floor space.  Mr. Romo has an office, small office further back.

Q.   And when you were there, did you observe Mr. Aronstein working when you walked in on any occasions?

A.   He was there and at one point Steve Hawkins heard him discussing gun prices on the phone with a wholesale supplier.

Q.   Okay.  And when you did your inspection in 2022, who did you speak to about the business?

A.   I spoke to Alan Aronstein and Romiro Romo.

Q.   Okay.  And during -- so you said you were there from August to October.  During that time can you put please tell us any statements that Mr. Aronstein provided to you about how the business operates?

A.   When I spoke with Alan Aronstein on

31

September 30th, 2022, he provided the following statement which I documented:

Mr. Aronstein stated that he and Mr. Romo are operating a joint venture based on a verbal agreement.  He said there's been no formal documentation filed with the Texas Secretary of State.  He stated that Bencivenga Corporation has its own bank accounts; however Mr. Aronstein stated he also purchases firearms through his Interarms account and with an American Express credit card for Bencivenga Corporation.

Mr. Aronstein stated that he conducts payroll operations through his Tex Products account for Bencivenga Corporation employees.  Mr. Aronstein is also the Director of Crusader Gun Group LLC., and the application filed for a federal firearms license by Crusader Gun Group LLC., was denied in federal court on August 18th, 2023, because of Mr. Aronstein's previous association with High Standard Manufacturing Company Incorporated.  Mr. Aronstein also stated that Bencivenga Corporation is staffed by the same employees that he had with High Standard and they were operating from the same location.

Q.   Okay.  So just to summarize what he said before and what he told you now.  Mr. Aronstein was previously responsible person for several firearms licenses,

32

correct?

A. Yes.

Q. And some of those same employees are now working for him at Bencivenga Corporation, correct?

A. Yes.

Q. And he's paying them through one of his previous firearms licenses that's no longer active, correct?

A. Yes.

Q. And he's also purchasing the firearms through a different company of his own, correct, Interarms accounts?

A. Yes.

Q. Okay. And you said you documented this right away because you thought it was important; is that correct?

A. Yes.

Q. So Mr. Aronstein told you this and what did you do? You went and documented it right away? You went back to your computer?

A. Yes.

Q. Yeah. Okay. And why did you think it was important?

A. Because Bencivenga Corporation is a corporation but based on the statements of Mr. Aronstein it sounded

33

like a partnership.

Q.   And so did that sound like a change in control to you as well?

A.   Yes.

Q.   Okay.  During the time you were there, you said you talked to Mr. Aronstein and Mr. Romo.  What did Mr. Romo tell you about how the business was operating?

A.    I spoke with Romiro Romo on October 12th, 2022. He stated that he and Mr. Aronstein had been working together since about 2018 and he wants to continue with the present business arrangement.

THE HEARING OFFICER:  Excuse me.  Are you recording this?

MR. MATHERNE:  I was checking the time.

THE HEARING OFFICER:  I'm sorry.

MR. MATHERNE:  No, no, no.  I'm not recording it.

MS.  BASILE:  Uh.

MR. MATHERNE:  I think the law would let me do it if I wanted to though but I'm not.

THE HEARING OFFICER:  Yeah, we would not allow you to.

MR. MATHERNE:  I'm sure there's regulation that says I can.

BY MS. BASILE:

Q.   So just to say that again.  They have been working together since about 2018 and he wants to continue their present business arrangement you said, correct?

A.   Yes.

Q.   And again just going back to the application to be reviewed Government's Exhibit No. 2 was a change of address from 2019 and Government's Exhibit 6 was the renewal application from 2021, correct, both of which are after this business arrangement, correct?

A.   Yes.

Q.   And we've already talked about how in both of those no additional responsible persons was added, correct?

A.   Yes.

Q.   Okay.  While you were at the -- during your inspection did you obtain from them a lease agreement and a sublease agreement?

A.   Yes.

Q.   Okay.  So, now we're going to go through Government's Exhibit 17, 18, 19 and 20.  Is Government's Exhibit 17 the lease agreement?

A.   Yes.

Q.   And who is the lease between?

A.   The commercial lease agreement was executed

35

between Hartman Mitchel Business Park LLC., and Crusader Gun Group LLC.

THE HEARING OFFICER:  Is that Mitchelldale, Hartman Mitchelldale?

MR. GRAY:  Yes, yes, Hartman Mitchelldale Business Park LLC., and Crusader Gun Group LLC.

BY MS. BASILE:

Q.  And we already discussed the owner of the company Crusader Gun Group and Crusader Gun Group applied for a firearms license with Alan Aronstein; is that correct?

A.  Yes.

Q.  Okay.  And if we look at -- if we look through the -- through the lease.  What is the monthly payments?

A.  Monthly payments start $4,050 a month in November 30th of '20 and it graduated to $4,500 a month on November 30th of 2022.

Q.  On the top of the lease amount, is there also taxes?

A.  Yes.

Q.  And insurance?

A.  Yes.

Q.  And then did the lease holder also have to put a security deposit of $7,488?

A.  Yes.

36

Q.   Okay.  And is there also a maintenance fee of $984?

A.   Yes.

Q.   And taxes and insurance of $798.  We already discussed that.  That's a repeat.

And the utilities, who would pay the utilities?

A.   Crusader Gun Group, LLC.

Q.   Okay.

THE HEARING OFFICER:  Which section is utilities under?

MS. BASILE:  Sorry.  It's 6.1.  The tenant will pay for his utilities.

MS. BASILE:

Q.   And then if we look at the end of the lease who signed?

A.   Alan Aronstein did.

Q.   Okay.  So when you add up these different fees which we did previously, Mr. Aronstein is paying approximately $6,282 to rent the space where Bencivenga is operating, correct?

A.   Yes.

Q.   Okay.  And then if we look at Government's Exhibit 18, is it being subleased?

A.   Yes.

37

Q.   And who is it being subleased to?

A.   Bencivenga Corporation.

Q.   And how much is Bencivenga Corporation pay Mr. Aronstein to sublease it?

A.   $10 a month.

Q.   18 is just the document allowing them to sublease, correct?

A.   Yes.

Q.   Okay.  And then if we look at 19 it's the actual lease agreement, and in 19 is where it says he's paying $10 a month, correct?

A.   Yes.

Q.   Okay.  So Mr. Aronstein is paying 6000 a month and Bencivenga Corporation is paying $10 a month, correct?

A.   Yes.

Q.   Okay.  And then they extended the sublease for five more years from August 1 of '19 through August 1 of 2024 on Government's Exhibit 20; is that correct?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   And you already said Mr. Aronstein maintains an office in the premises also; is that correct?

A.   Yes.

Q. And I think we covered it. In the lease it says that Mr. Aronstein will pay the utilities?

A. Yes.

Q. How are security services covered?

A. They are covered under the lease.

Q. And the casualty insurance is also paid for by Mr. Aronstein, correct?

A. Yes.

Q. And I think you said before but who pays the employees of Bencivenga Corporation?

A. Mr. Aronstein stated that he pays them through his company Tex Products.

Q. Okay. And we talked about that Mr. Aronstein has been in the firearms industry since 1973. How long has Mr. Romo been in the firearms industry?

A. Mr. Romo has been in the firearms business since 1990 continuously with the exception of about an 18-month period when he was not licensed.

Q. So in addition to Bencivenga Corporation, did he also have a different firearms business?

A. Yes.

Q. And was that Armas Manufacturing?

A. Armas International Manufacturing Company Incorporated.

Q. And so if we look at Government's Exhibit 21

39

and 22, are those other firearms businesses associated with Mr. Romo?

A.   Yes.

Q.   One is the FLS for Armas and the other is a Secretary of State printout showing the other businesses he's associated with, correct?

A.   Yes.

Q.   And so Mr. Romo is also very knowledgeable about the firearms; is this would you say?

A.   Yes.

Q.   What is an Acknowledgement of Federal Firearms Laws and Regulations?

A.   It's a list of bullet points that we review with the responsible person at the conclusion of a qualification or compliance investigation, covering various aspects of the business, record-keeping, inventory, security things of that nature.

Q.   Does it familiarize an FFL with all the regulations that they're required to follow?

A.   Yes.

Q.   And is it done every time someone submits an application, has a compliance inspection or a change of address inspection?

A.   Yes.

Q.   So, we're going to talk about some of the ones

40

that we have here as exhibits, but every single time Mr. Aronstein or Mr. Romo, did anything any of those three things with any of their firearm businesses since '73 for Mr. Aronstein or 33 years for Mr. Romo.  An IOI would've went over the rules and regulations they were required to follow, correct?

A.    Yes.

Q.    Okay.  And the ones that we have as exhibits today are Government's Exhibit 7 through 13, so starting with Number 7, what is that?  Is that the initial --

A.    It is the acknowledgment of regulations that was signed by Mr. Romo when he was qualified to operate as a licensee by IOI John James in 2002.

Q.    Okay.  And Mr. Romo signed that?

A.    Yes.

Q.    Okay.  And the next one is Government's Exhibit 8, what is that?

A.    This is an acknowledgment of regulations signed by Mr. Romo's during a compliance investigation in 2008.

Q.    And if we look at Section 2 under licenses it is checked off there reporting changes of control.  Was that one of the areas they discussed?

A.    Yes, that's in Section 3.

Q.    Sorry.  What did I say, 2.  Three.  Sorry.  Was this signed by Mr. Romo on April 22nd, 2008?

41

A.   Yes.

Q.   Okay.  And Government's Exhibit 9 and again these are all for Bencivenga Corporation, right?

A.   Yes.

Q.   Government's Exhibit 9, what is that?

A.   It's an acknowledgment of firearm regulations.

Q.   Okay.  And again under Section 3, is it checked off that they discussed reporting changes of control?

A.   Yes.

Q.   And was it signed by Mr. Romo in --

A.   May 26th, 2010.

Q.   Okay.  And Government's Exhibit 10?

A.   Acknowledgment of federal firearms regulations?

Q.   And was this done by --

A.   It was signed by Mr. Romiro Romo on August 16th, 2012.

Q.   And Myles Ashley was the Industry of Operations Investigator.  Again this was done for Bencivenga Corporation?

A.   Yes.

Q.   And Government's Exhibit 11?

A.   Acknowledgment of federal firearms regulations.

Q.   And is that done by you -- this is when you went to the scene of the address, correct, and this is when Mr. Romo moved to the Mitchelldale, correct?

42

A.   Yes, that's correct, and Mr. Romo signed this on December 9th, 2019.

Q.   Okay.  And again these are only the ones for Bencivenga Corporation, but every time any of those inspections was done with either Mr. Romo or Mr. Aronstein, something like this would have been done with an IOI, correct?

A.   Yes.

Q.   Reviewing the laws and regulations that they need to comply with?

A.   Yes.

Q.   Based on the facts relative to the physical location, financial management and business structure of Bencivenga Corporation combined with the written statement by Mr. Romo, and verbal statements provided by Mr. Aronstein and Mr. Romo which indicate Alan Aronstein is managing the daily business operations, does he need to be a responsible person?

A.   Yes.

Q.   Was Aronstein ever added as a responsible person?

A.   No.

Q.   Therefore in 2019 when licensee did an amended application and in 2021 when licensee did a renewal application, did licensee knowingly make false

43

statements or representations in applying for a firearms license in violation of 18 United States code Section 924(a)(1) and 27 CFR Section 478.128(a)?

A.    Yes.

Q.    Once Aronstein started running the company, did licensee willfully fail to give written notification to the chief national licensee center within 30 days of an actual or legal change in control of the corporation or association holding the license in violation of 27 CFR Section 478.54?

A.    Yes.

Q.    Did you therefore recommend a revocation of the license?

A.    Yes.

Q.    Is Government's Exhibit 32 the notice of that revocation?

A.    Yes.

Q.    For failing to add Mr. Aronstein's address in the first three paragraph of that notice, correct?

A.    Yes.

Q.    In addition to these three violations, did you also find other violations during inspection?

A.    Yes.

Q.    And at the end of your inspection did you issue an ROV?

44

A.    Yes.

Q.    What is ROV?

A.    ROV is an acronym for your Report of Violations which details the discrepancies and errors identified during the inspection process.

Q.    And did you first issue an ROV Government's Exhibit 45 which you went over with Mr. Romo?

A.    Yes.

Q.    And later did you find additional violations that you added which is Government's Exhibit 46?

A.    Yes.

Q.    And was there another version in the middle of those two versions which we didn't include but everything is contained in 46, correct, so you have three versions, one you went over with Mr. Romo and two where you added additional items?

A.    Yes.

Q.    Okay.  So in 45 he received a copy of and 46 he did not receive copy of, right?

A.    Yes.

Q.    Okay.  So starting --

THE HEARING OFFICER:  Can I interrupt for just a second?

MS. BASILE:  Yes.

THE HEARING OFFICER:  And I kind of want to

45

kind of go back. When Mr. Aronstein spoke of their partnership, did he give an approximate time when that partnership started?

MS. BASILE: Mr. Romo did.

THE HEARING OFFICER: I'm sorry. Mr. Aronstein or Romo. Which person indicated when the partnership started around what time period? Is there a date?

MR. GRAY: Mr. Romo said since about 2018.

THE HEARING OFFICER: Since 2018, okay.

MR. MATHERNE: Thank you for mischaracterizing. This is a joint venture.

THE HEARING OFFICER: When did the joint venture begin?

MR. GRAY: We are talking about two different responses. On September 30th, 2022, Mr. Aronstein stated that he and Mr. Romo were operating a joint venture based on a verbal agreement.

THE HEARING OFFICER: Okay.

MR. GRAY: On October 2022, Mr. Romo stated that they had been working together since about 2018, and he wants to continue with the present business arrangement.

THE HEARING OFFICER: Okay. Thank you for that clarification. Thank you.

46

MR. MATHERNE:  Did he explain what the business arrangement was.

MR. GRAY:  You're asking about Mr. Romo?

MR. MATHERNE:  Yes.

MR. GRAY:  No.  That's all he said.

MR. MATHERNE:  Okay.

BY MS. BASILE:

Q.   Okay.  So back to the ROV 45 and 46 are the exhibits.  Now, I am going to go through the other notes -- violations in the notice starting with Paragraph 4 of the notice.  Is that a violation for willfully selling or disposing off a firearm to a person who licensee knew or had reasonable cause to believe the subject to federal firearms disability --

MR. MATHERNE:  What exhibit are you looking at.

MS. BASILE:  39, 40 and 49.

MR. MATHERNE:  Wainstein.

BY MS. BASILE:

Q.   Yes, Wainstein, 39, 40 and 49.  It's a violation of 18 United States code Section 922(d) and 27 CFR Section 478.99(d)  correct, and using Exhibits 39, 40 and 49, could you please explain how you knew that there had been a violation?

A.   On the ATF Form 4473 for Earl Seymour

Wainstein.  We have here -- it should have checked off the box on 21L2 the very last one of the question which asks, if you are such an alien meaning a nonimmigrant alien, you fall within any of the exceptions stating these instructions, you should check yes, and then in 26D where it says, exception to the nonimmigrant alien prohibition while the VISA number is identified, he also would have needed to reference a valid hunting license in order to obtain the firearm and that was not done.

Q.    Okay.  And this is Government's Exhibit 39. Did you later verify whether he had a valid hunting license?

A.    Yes.

Q.    And is that Government's Exhibit 40?

A.    Yes.

Q.    Did he have a valid hunting license, Mr. Wainstein?

A.    No.

Q.    Who did you verify it with?

A.    Barbara Woodward from the Texas Parks and Wildlife Parks license department.

Q.    And she stated he did not have one?

A.    She said she had no record of it.

Q.    And if we look at Government's Exhibit 49, can you explain in the instruction part of the exhibit where

48

it tells of an FFL list of requirements?

A.   Yes.  Other than a blank and incomplete 4473 which is what Mr. Wainstein completed.  So under 21L2 where the answer should have been yes, when you look under question 21L which is on Page 5 on the right column third paragraph.

If there's an alien admitted to the United States under a nonimmigrant visa these aliens must answer yes to the question, and provide additional documentation as required under question 26D to establish that they are excepted from the nonimmigrant alien prohibition.  That's the reference for that.

Q.   Okay.  Anything else about that violation before I move on?

A.   No.

Q.   Okay.  And that was Paragraph 4 of the notice moving on, and that was one of the violations that was added after you spoke to Mr. Romo so he didn't respond to that when you went over violations with him, correct?

A.   Correct.

Q.   Okay.  On Paragraph 5 of the notice is a violation for failing to timely and accurately report the acquisition of firearm and violation of 18 United States code 923(g)(1)(A) and 27 CFR 478.123(a) and if you look at Government's Exhibit 43, can you explain

49

what happened here?

A.    In this particular instance the serial number was incorrectly recorded as a firearms acquisition?

Q.    And what should it have been and what was it?

A.    The number was incorrectly recorded as 36267 RBI176.  It should have been recorded as 36867 RPI176?

Q.    Okay.  And that's in Government's -- the actual A&D book is in Government's Exhibit 43, correct?

A.    Yes.

Q.    Okay.  And when you sat down with Mr. Romo and went over the violation with him, what did he say in response to that violation.

A.    He said it was an oversight.  The error was unintentional.

Q.    Okay.  And Paragraph 6 of the notice is the violation if failing to timely and accurately record a disposition of a firearm on three occasions which is a violation of 18 United States code 934(g)(1)(A) and 27 CFR 478.123(b).  This violation is found in Government's Exhibit 40 or in 47.  Can you explain what happened there?

A.    With regard to these three firearms, two had not been recorded as -- let me restate that.

With regard to these three firearms, two had not been timely recorded as dispositions.  They were

50

located in the inventory it was reconciled.

Additionally a third firearm could not be located at all and we had to prepare theft loss report for that.

Q.   And so Government's Exhibit 34 is highlights of the A&D book showing the incorrect dispositions, correct?

A.   Yes.

Q.   And the Government's Exhibit 47 is the theft loss report that you instructed them to prepare, correct?

THE HEARING WITNESS:  Was it incorrect or they just hadn't disclosed the firearms in the A&D book.

MS. BASILE:  Two of them they had.

MR. GRAY:  To answer this question there were four discrepancies.  The first one was an acquisition discrepancy where the serial number was incorrectly recorded.  The final three, two were firearms that Mr. Romo had taken possession of but they were not logged out as dispositions, and then the third one or the fourth one in total could not be located.  That's where we get the theft loss report.

BY MS. BASILE:

Q.   And is this the final theft loss report that was actually filed Government's Exhibit 47?

A.   Yes.

51

Q.   Okay.  And did you go over that violation with Mr. Romo?

A.   Yes.

Q.   And what did he say in response to why the disposition errors happened?

A.   Well, he said that one the two that he took possession of he just forgot to record them at the time he transferred them to himself.  At the time it was suspected that the missing firearm might be somewhere in the shop but it could not be located so we did have to go with the theft loss report on that one.

Q.   Okay.  And Paragraph 7 of the notice requests eight occasions on two forms where licensee willfully failed to obtain a complete and accurate firearms transaction form ATF 4473 in violation of 18 United States 923(g)(1)(A) and 27 CFR 478.124(c)(1), and we look at Government's Exhibit 39 and 42 could you explain what happened there?

A.   Yes.  Let me go with Exhibit 42 first please.  With regard to Robert L Helscher he did not put his middle name completely with regard to his identification -- the identification of his full name.  He did not correctly record his complete name.  He abbreviated it with an initial.

In that case you really need to put the

52

full middle name or NMN which stands for No Middle Initial and he failed to do that.  Going to Exhibit 39 with regard to Earl Seymour Wainstein under the violation of 21.L.2 that should have been checked off to demonstrate that if falls within the exceptions for a nonimmigrant alien.

The rest of the boxes which are sharper from 21F through K are my mistakes because I made a bad copy of this form, and neglected to get the right column to appear and got ahead of myself and incorrectly cited that and that's on me.

Q.   Okay.  Still the 21L2 is not filled out, correct?

A.   Yes.

Q.   Okay.  So maybe it should have been one violation on this form instead of seven?

MR. MATHERNE:  36.  It should be just 36.

MS. BASILE:  21L2 is also not filled up. We haven't gotten to 36 yet.  That's a different violation.  On the notice it said there was eight violations.  There should be two, one on this form and one on the other form.

MR. MATHERNE:  36 was from the wrong date.

MS. BASILE:  36 is a different violation. We haven't gotten to it yet.

53

MR. MATHERNE:  I'm sorry.

MR. GRAY:  It's okay.  It's coming up.

MS. BASILE:  But the L2 there should be one on this and one on the other middle name one we just talked about.

MR. MATHERNE:  That's two different people though.

MS. BASILE:  Yes.

MR. GRAY:  That's right.

MR. MATHERNE:  I'm sorry.

MS. BASILE:  So they noticed that there were eight violations on two forms.  There should be two violations on two forms.

MR. MATHERNE:  Correct.

MR. GRAY:  That's my mistake.

MR. MATHERNE:  Okay.

MS. BASILE:  Okay.  We're getting to 36 though now.

BY MS. BASILE:

Q.   Okay.  So as to the incomplete ones in Paragraph 7, what did Mr. Romo say when you went over the violations with him on that.

A.   He said he didn't mean to make the mistakes the errors were not intentional it's just an oversight in review.

54

Q.   Okay.  And then the last and final one which you're talking about is a violation of 923(g)(1)(A) and 27 CFR 478.124(c)(5) which is that the licensee willfully failed to sign and date the firearms transactions on two occasions on two different forms, and that is Government's Exhibit 41 and 39, correct?

A.   Yes.

Q.   And if you would just point to whichever one you want first?

A.   We will stay with Wainstein since we're on this one already.

Q.   Okay.

A.   With regard to Earl Seymour Wainstein the transfer date is documented as June 10th, 2022, but the firearm didn't transfer until June 28th, '22 which is reflected in the certification date in Box 31.

Q.   And just for the record who also sold this firearm?

A.   Alan Aronstein.

Q.   Okay.  And again that was Government's Exhibit 39 that we've talked about with several violations, correct?

A.   Yes.

Q.   Okay.  And then the other going back to 41 or going -- did we already talk about 41?

A.    No, no.  We'll do that now.

Q.    Okay.

A.    Exhibit 41 Jessica Evonne Portillo.  The transfer date is identified as June 24th, 2022 but it was not transferred until June 28th of 2022, as is reflected in recertification date in Box 31.

Q.    Okay.  And that's Government's Exhibit 41 and who sold that firearm?

A.    Alan Aronstein.

Q.    And signed it, okay.  And then we didn't talk about the last violation for Robert Helscher which was Government Exhibit 42, who sold the firearm?

A.    Alan Aronstein.

Q.    Okay.  When you reviewed the ROV with Mr. Romo regarding Item 46 being on those two forms, what did he say in response to that violation?

A.    It was a mistake it was not intentional just an oversight.

Q.    Okay.  And Government's Exhibit 33, 34 and 35 the documents showing that Mr. Romo through his attorney requested this hearing and the notice and confirmation of this hearing?

A.    Yes.

Q.    And did Mr. Romo through his attorney also asked for an extension of the hearing which was granted

56

and detailed in Government's Exhibit 36 and 37?

A.    Yes.

Q.    And is Government's Exhibit 48 is an additional scheduling due to illness and conflicts?

A.    Yes.

Q.    Okay.  I have no further questions for the witness.  I would move the Government's Exhibits 1 through 49 be added to the record.

THE HEARING OFFICER:  Hold on a second. Let me do what I need to do here.  I accept Government's Exhibit 1 through 49 for the record.

MS. BASILE:  Thank you.

MR. MATHERNE:  Do you need a copy of mine because I'm going to be referring to them when I do cross examination.

MS. BASILE:  It's okay.  I gave them to the director --

MR. MATHERNE:  Well, I have an extra copy.

THE HEARING OFFICER:  Okay.

MR. MATHERNE:  So that Mr. Gray can look at them, okay?

MS. BASILE:  Thank you.

THE HEARING OFFICER:  Go ahead, sir.

EXAMINATION OF TOMMY GRAY

BY MR. MATHERNE:

57

Q.   Mr. Gray, I think we've introduced ourselves earlier but I believe you said you have been working in your present position as inspector since 2005; is my memory correct?

A.   Yes.

Q.   Okay.  Are you required to have a working knowledge of the GCA, Gun Control Act?

A.   Yes.

Q.   Okay.  Are you required to have a working knowledge of the CFR as are applicable to the Gun Control Act?

A.   Yes.

Q.   Okay.  Can you state the substance of 18 USC 942 B and E?

A.   I will have to look at the reference and read it.  I'm just not going to state it.  I'll read it from a book.

Q.   Well, I'll read it for you.

A.   Sure.

Q.   The substance is concerning an alien that is admitted to the United States for hunting or sporting purposes is in the possession of a hunting license.  Can you state the substance of 27 CFR 4789c?

A.   I'll read it to you or you can read it to me, sir.

58

Q.   It says the same thing.  It says in the provision of this Paragraph C5 do not apply to any alien who is lawfully admitted into the United States under a nonimmigrant visa that is an alien that is admitted into the United States for lawful hunting or sporting purposes.  Now, do you have to have a hunting license in the state of Texas to hunt coyotes or do you know?

A.   I can't say with certainty.

Q.   You don't know?

A.   No.

Q.   Okay.  Do you have to have a hunting license to hunt feral pigs?

A.   To the best of my knowledge, no.

Q.   Okay.  So Mr. Wainstein could have lawfully entered and purchased a weapon without a hunting license, would you agree?

A.   He was cited for not having a hunting license.

Q.   That's correct but that's not a violation because he could have been here for lawful hunting purposes or sporting purposes shooting tin cans off a fence; is that right?

A.   He would've needed the hunting license to purchase a firearm.

Q.   No, sir not according to this.  He does but we'll get into more detail later, okay.

59

A.    (No response.)

Q.    Okay.  Now, are you familiar with the federal agency identified as NICS?

A.    Yes.

Q.    Who are they?

A.    That's criminal records maintained by the FBI.

Q.    Okay.  Do you know what the definition and that statute means?

A.    Yes.

Q.    What does it mean?

A.    It means of the information cannot be readily obtained and it may take a few days to apply.

Q.    Okay.  Do you know what the definition of denied means?

A.    Yes.

Q.    What does it mean?

A.    It means that the potential purchaser of the firearm is denied.

Q.    Okay.  Do you know what the definition of received means?

A.    Yes.

Q.    What does it mean?

A.    It means that the person can't proceed with the transaction.

Q.    Okay.  Does that also mean that they've checked

60

and made sure that the purchase does not violate Texas or federal law?

A.   It means that they have check to see if the person is prohibited and based on the information that they have the person is not prohibited.

Q.   Okay.  Okay.  Now, if a person is not -- the inspection does not warrant a revocation, what are the ways -- here's a guide to FL towards corrective action for future [1:17:51.7] if so what are they?

A.   The investigator of record would review the results of the inspection with the business owner and redirect them to better practices and what the policies are.  Should there be a need for further action, management may send out a warning letter or schedule a warning conference with the business person depending on the severity of the violations.

Q.   Okay.  Isn't that also a warning letter that can be issued?

A.   Yes, sir.  I stand correct, yes, sir.

Q.   Okay.  And then you can also have a warning conference?

A.   That's correct.

Q.   Okay.  I'm going to refer you to my Exhibit 3, do you recognize that document?

A.   Yes, sir.

61

Q.   Okay.  Let's look at Item 1.  This violation involves transferring a firearm to a prohibited person.

A.   No.

Q.   Does this violation involve failing to conduct a required background check?

A.   No.

Q.   Did this violation involve falsifying a report?

A.   No.

Q.   Did this violation involve or pertain to respond to a trace request?

A.   No.

Q.   Did this violation involve abolishment of public safety?

A.   No.

Q.   Do you agree that after this report was issued this violation did not warrant a notice of revocation?

A.   Could you restate that sir?

Q.   Do you agree that in this report the listed items did not warrant issuing a notice to revoke?

A.   Yes.

Q.   Why?

A.   It didn't meet the standard of the administrative action policy.

Q.   But in this report you didn't recommend a revoke, did you?

62

A.  No.

Q.  As a matter fact it says here on Page 1 of this document.  Would you read that statement under the heading of Bencivenga Corporation?

A.  Bencivenga Corporation.

This communication is in connection to your current compliance inspection with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Please note that some violations may require a corrective action on your part and the attached documentation provided for your records only.

Q.  So this was not a warning letter would you agree?

A.  Yeah.

Q.  It didn't result in a conference?

A.  No.

Q.  Okay.  Let's go to Item 2 on that exhibit.

A.  Are you still on Exhibit 4, sir?

Q.  Yes, sir, yes, sir, I'm sorry.

A.  Are we on Page 4?

Q.  Yes, sir.

A.  Okay.

Q.  Okay.  The question I have is going to be the same.  Did this violation involves transferring a firearm to prohibited persons?

63

A.    No.

Q.    Did this violation involve failing to conduct a required background check?

A.    No.

Q.    Did this violation involve falsifying a report?

A.    No.

Q.    Did this violation involve failing to respond to a trace request?

A.    No.

Q.    Did this violation involve a violation of public safety?

A.    No.

Q.    When this report was issued you did not recommend a notice to revoke, did you?

A.    No.

Q.    On Exhibit 4 would you please review it please?

A.    What page sir?

Q.    It's Exhibit 4.  It's Page 4, I'm sorry.

Now, I think we've corrected those with respect to when you took that report.  Now, that's part of the notice to revoke, and did you purposely make a mistake on that, taking that photograph?

A.    No.

Q.    You made a mistake?

A.    I did.

64

Q.   Okay.  Much like very similar to making a mistake for putting a wrong serial number; is that correct?

A.   I made a mistake.

Q.   So did they; is that correct?

A.   Yes.

Q.   Okay.  Let's go to Exhibit 4.  It's on page, Page 4, Number 3.  I'm sorry we have already taken care of that.  Let's go to Exhibit 4 which is Page 4 and Number 4.

A.   Exhibit 4, Page 4?

Q.   Yes, sir, no, Number 4.

A.   Got it.

Q.   And did this violation involve transferring a firearm to a prohibited person?

A.   At the time this report was drafted, no.

Q.   Okay.  Did the violation involve failing to conduct a required background check?

A.   No.

Q.   Did this violation involve falsifying a report?

A.   No.

Q.   Did this violation involve failing to respond to a trace request?

A.   No.

Q.   Did this violation involve violation of public

65

safety?

A.    No.

Q.    At the time that this report was written, would you agree that at that time you did not make any recommendations to revoke -- I'm going to use OFM because it's easier for me to say.  The license of OFM?

MS. BASILE:  OFM.

BY MR. MATHERNE:

Q.    I said at the time you wrote this report.

A.    There was no recommendation to revoke.

Q.    Why not?

A.    It did not meet the standard for revocation.

Q.    Okay.  Okay.  Let's look at Exhibit 5 which is -- which appears to be an amended report from Number 4.  Would you agree to that?

A.    Yes.

Q.    Okay.  Now, what is the basis of your findings in Exhibit No. 5?  I mean what did you do --

MS. BASILE:  What did you add?

MR. MATHERNE:  Beg your pardon?

MS. BASILE:  What did he add?

BY MR. MATHERNE:

Q.    Okay.  The date that you have reported in Exhibit 5 is basically a restatement of the violations in four with a couple of additions.

66

A.    Yes, sir.

Q.    What did you do to be able to supplement that report between the time it was written and the date of this report?

A.    (No response.)

Q.    Date 10/14/22.  What did you do for Item Number 1 which was 10/14/22?  What did you do between August 30th of last year of '21 to this date to amend this report?

A.    Can I answer your question?

Q.    Yes, sir.

A.    What occurred during that timeframe was the discussions that I had with Mr. Aronstein and Mr. Romo and the statements that they provided to me on those two dates.

Q.    Now, did they ever explain to you what the term that joint venture was?

A.    A definition of the term is not provided but that was the term that was used by Mr. Romo.

Q.    In your mind what does a joint venture involve?

A.    That they're working together under the umbrella of one business.

Q.    Okay.  What business was ongoing that you believed was going on?

A.    The Corporation Bencivenga the Corporation but

67

there were finances and payroll and lease agreements and premised provided by Mr. Aronstein.

Q.  Okay.  Let's see here.  Go to my Exhibit No. 9 and it's Page 383.  Actually we don't need to do that. We can go to Exhibit 3 it's easier.  I forgot that I had it.

MR. MATHERNE:  Let's go off the record because I lost my place where I am, okay?

THE HEARING OFFICER:  You can take your time.

MS. BASILE:  Can we take a break?

THE HEARING OFFICER:  We can.  Let's go ahead and take a break.  The time is 11:07 a.m. let's take a ten minute break.

(A break was taken.)

THE HEARING OFFICER:  The time is 11:17 a.m. and we will resume the hearing.

BY MR. MATHERNE:

Q.  Okay.  Mr. Gray, comparing Exhibit 5 and Exhibit 4, would you agree that with the exception on Exhibit 5, Number 1, Item Number 1 and Number 5, those Exhibits 2, 3 and 4 were included in Exhibit No. 4, would you agree to that?

A.  Yes.

Q.  Okay.  Referring to Exhibit 5, Page 2, Number 5

68

you gave a statement that said cease-and-desist engaging in activities not authorized by an attorney licensed by me.  What did you mean by that?

A.   The business's license's corporation.  If they are acting in the context of the partnership which is a different structure.

Q.   Okay.  I think we discussed that, that they alleged it not important to ship.  Would you agree the word "partnership" was never mentioned to you; is that correct?

A.   That's correct.

Q.   They said joint venture?

A.   That's correct.

Q.   Okay.  Did you ever determine what that joint venture was?

A.   I don't recall that I did.

Q.   Okay.  Were you not interested as an inspector for ATF?

A.   I just did not look it up.

Q.   You did not inquire further.  Would you agree?  You did not inquire further.

A.   I did not.

Q.   And you concluded that as a result of your failure to inquire further that they were violating the law?

69

A.   The business is licensed as a corporation.  The business term "provided" was removed from the corporation.  It was something different.

Q.   Okay.  But you didn't find out what it was.

A.   I don't recall that I specifically looked it up, no.

Q.   And you did not determine that it did in fact comply with the law?  In other words you had mind that you will go find that it didn't no matter.

A.   I did not pursue the matter further.

Q.   Okay.  You also state cease-and-desist from engaging in deceptive practice.  What deceptive practice did you conclude they were doing?

A.   The business was operating something other than a corporation.

Q.   What business?

A.   Bencivenga Corporation.

Q.   But you don't know what it was?

A.   I was told that Mr. Aronstein and Mr. Romo were operating as a joint venture.

Q.   Had a joint venture and you didn't determine what it was.

A.   I didn't pursue it further, no.

Q.   Okay.  How does a joint venture have anything to do with a license of OFM?

70

A.    (No response.)

Q.    Suppose they were going to raise chickens, you didn't find that out, did you?

A.    I'm not going to address chickens, but if Mr. Aronstein was functioning as he was he should have been a responsible person on the corporation license.

Q.    What position was he acting as?

A.    A responsible person.

Q.    No, no.  Tell me what he was doing that you conclude that he was the responsible person?

A.    He was managing the business on a daily basis pursuant to the definition.

Q.    What if it was saying that he purchases and sells weapons.  Now, how is that managing business?

A.    He's directing the day-to-day business operations.

Q.    How?

A.    Acquiring the inventory, paying the employees, renting the premises.

Q.    That's the financial operation.  How does that have anything to do with controlling and managing the business?

A.    He is directing the business operations.

Q.    I think that he went in there with the idea that you were going to revoke his license based upon the

71

current orders from the Biden administration.  Would that be a true statement?

A.  No.

Q.  Okay.  Let's look at Exhibit 6 on Page 2 and under the heading compliance history.

And that appears to be chronological list of the inspections and things that took -- compliance inspection that occurred with OFM; is that correct?

A.  Yes.

Q.  Okay.  Okay.  So looking at the December 2002, now, does the ATF maintain a database of compliance inspections that you could go back and see if there were violations conducted on that station?

A.  Yes.

Q.  Okay.  There was no evidence of that presented here, so could we safely assume that there were no violations in that inspection for the December 23rd of 2002?

A.  With regard to that specific one we can make that statement because that was the initial qualification inspection therefore there was no compliance inspection.  That was when Mr. Romo was initially licensed.

Q.  Okay.  All right.  We'll go to the next one December 23rd, 2002.  I think that's the wrong date down

72

there --

(Speaking simultaneously.)

Q. Okay. The next one would be April 22nd of 2000. Now, there's no records of any violations that were found in that compliance inspection that was not presented here. Is that a true statement?

A. We would have to access those records, sir, I don't presently have them.

Q. But you didn't access them; is that a true statement?

A. No, I reviewed previous inspection reports.

Q. Okay. You mentioned them here but they're not part of the evidence that's been presented here today; is that correct?

A. That's correct.

Q. Okay. So, can we safely assume that there were no violations found in those inspections that warranted any warning letter or anything of that nature?

A. I would have to check the records. I can't speak to it without accessing that resource.

Q. But wouldn't that be important to have here for this notice to revoke to show prior violations?

A. My only concern was the inspection that occurred in 2022 at this point.

Q. But you would agree that there's nothing in the

73

record that there were any violations done as a result of that inspection?

A.    I can't speak to that because I am not looking at the documentation.

Q.    What I'm saying is you will agree that there's no evidence in this case at this moment?

A.    That's true.

Q.    Okay.

A.    Thanks for clarifying that.

Q.    Okay.  Would it also be true of the May 26th, 2010, there's no record of any violation that's been made a record in this case?

A.    That's correct.

Q.    Okay.  Would that also be true of the August 16th, 2012?

A.    Yes.

Q.    Likewise October 20th of 2016?

A.    Yes.

Q.    December 9th, 2019.  Now, did you do that inspection, do you recall?

A.    Yes, sir.

Q.    Okay.  Do you recall any violations that had occurred?

A.    I do not believe there were any.

Q.    Okay.  So basically the crux of your notice to

74

revoke is Mr. Aronstein, would that be a true statement?

A.   Yes in this context.

Q.   Okay.  So all the other ones are miniscule and do not warrant a revocation, would that be a true statement?

A.   They did not warrant revocation.

Q.   Right.  Okay.  Now, on Exhibit 6, Page 2 Item 1 through 3.

MS. BASILE:  I'm sorry, which exhibit?

MR. MATHERNE:  6.

BY MR. MATHERNE:

Q.   Page 2 that's after 2 and 3.  1, 2 and 3.  This quote alleges that Mr. Aronstein is a responsive person for the licensee as OFM.  As a willful violator of the GC and OFM failed to acknowledge that fact.  How did you make that determination that he's a responsible person?

A.   Which paragraph are we on sir?

Q.   On 1, 2 and 3.  Number 1 says that he failed to notify.  I will refer to Paragraph 1, 2 and 3 which involve Aronstein.  Would you agree to that?

A.   Yes, sir.

Q.   Okay.  All right.  And Paragraph 2 says an unlisted -- let's refer to them first which is Item Number 2 on Page 3 of Exhibit 6.

A.   Yes.

75

Q.   Okay.  How did you determine that?

A.   I didn't determine that.  That was determined in previous inspections with Mr. Aronstein's businesses.

Q.   Okay.  But now, wasn't Mr. Aronstein there for the previous inspections that you did?

A.   Yes.

Q.   Was there any difference in the operation between then and now?

Well, between the previous inspection which was conducted in I think 2019 to 2022, is there any difference in the operation?

A.   As I recall, yes.

Q.   What?

A.   While they were operating from the previous business premise.  That's where the business was located.

Q.   Right.  But Aronstein was there, correct?

A.   He was.

Q.   So he was a salesman selling guns?

A.   Yes.

Q.   Okay.  Okay.  Now, does the ATF maintain a database that shows persons who have either had their license revoked or denied?

A.   That information would appear in the federal licensing system annotated on specific licenses that,

76

that person may have held at one time.

Q.   Right.  But would you as an inspector have access to that?

A.   Yes.

Q.   So for instance if you wanted to check and see if Alan Aronstein ever had a license and if it was ever revoked and if he ever just let it lapse, you could find that out, right?

A.   Yes.

Q.   Okay.  Did you ever make any check on that?

A.   Yes.

Q.   Where?

A.   When?

Q.   Did your records show that Mr. Aronstein ever held a FFL?

A.   Yes.

Q.   Mr. Aronstein personally held an FFL?

A.   No, no.  He was a responsible person for businesses that held a license.

Q.   Okay.  But Aaron Aronstein never has held an FFL?

A.   That's correct, yes, sir.

Q.   Okay.  Now, do you have any evidence that Alan Aronstein was a partner of OFM?

A.   He told me that they were operating as a joint

77

venture.

Q.    Is that a partnership?

A.    I don't have the definition at hand.

Q.    Okay.

A.    But he stated he was providing the premises, paying the rent, paying the employees, buying the business.

Q.    But does that make him a partner?

A.    It would indicate that he probably needs to be a responsible person on a license.

Q.    Indicated might is what's there.  He might.

A.    If he's controlling the business on a day-to-day basis, he would be a responsible person if he is directing the business.

Q.    Now, do you have any evidence that Alan Aronstein is a site manager of OFM?

A.    Mr. Romo indicated that he was general manager.

Q.    How did he say he was the general manager?  He said he bought and sold guns?

A.    He had told me at one point he was the general manager.

Q.    You didn't testify to that earlier?

A.    You didn't ask.

Q.    You didn't testify that he testified that he was the general manager.  Is that in your notes that you

78

have there that he testified he was the joint manager?

That he said he was the manager.

A.   I would have to check it.

Q.   Yes, check it, check your notes.  You have been reading from the notes.  I'm sure you have prepared for your testimony today see if it's there.

And we would like to have his notes put into evidence.

MS. BASILE:  We don't put our notes into evidence.  They're just --

MR. MATHERNE:  But he's testifying from his notes.  I want the notes in evidence.

MS. BASILE:  We don't put notes and reports in evidence.

BY MR. MATHERNE:

Q.   Do you see the word "site manager" or: "manager" in your notes?

A.   I cannot locate it at this time however; Mr. Romo did tell me that Mr. Aronstein was his general manager.

Q.   You said he bought and sold and audited inventory, you did not testify that he was the general manager.

MS. BASILE:  He's now testifying from his memory.  He can do that as well.

79

MR. MATHERNE:

Q.   Would you agree that Mr. Aronstein was not a site manager?

A.   By the definition of site manager?

Q.   It's in the construction of the code.

A.   I don't have access to it.

Q.   Well, let's go to Walmart, a person in the sales department, a personal that sells guns on behalf of Walmart, would you call them a manager?  Would you call them a manager of Walmart that would warrant them to be listed on their FFL license?

A.   A manager of the whole Walmart, the whole store?

Q.   No, just the sales department.

A.   Okay.  Restate the question please.

Q.   A salesman in Walmart sells guns in the gun department, would that person be considered a responsible person.

A.   Not all salespersons are responsible persons.

Q.   Okay.  Would that be the same or true for Carters Country?  Just selling guns and making sure the paperwork is done correctly.  Would that person be considered a manager or a responsible person?

A.   Not if they are a sales clerk, no.

Q.   Okay.  Would that be a responsible person?

80

A.   Potentially.  It would depend on the owner.

Q.   Okay.  Do you have any evidence that Aronstein was a corporate officer of OFM?

A.   No.

Q.   Any evidence Aronstein is a director?

A.   No.

Q.   Any evidence Aronstein is a shareholder?

A.   No.

Q.   Now, let's go to Exhibit 11.  Would you look in there and tell me where responsible person is defined?

A.   It's not defined, it's not in there.

Q.   Okay.  Let's go to 12, Exhibit 12, which is US code 923.  Show me were responsible person is defined their?

A.   It's not there.

Q.   Okay.  Let's go to Exhibit 13 which is US code nine -- Section 924.  Show me where a responsible person is defined there?

A.   It's not there sir.

Q.   Let's go to Exhibit 14 which I believe is CFR -- which is 27CFR5478, would you tell me where responsible person is defined there?

A.   It's not there.

Q.   Well, how do you come up with a definition of a responsible person when -- strike that.

81

Where in the GCS of 1968 as a responsible person defined?

MS. BASILE:  Mr. Matherne that's a legal question.

MR. MATHERNE:  No, no, I said where I didn't say what, I said where.

MS. BASILE:  I know but it's defined by case law.  It's not defined in the GCA.

BY MR. MATHERNE:

Q.  Would you agree with me that the responsible person is not defined in the Gun Control Act of 1968?

A.  Yes.

Q.  Okay.  We have gone over this but let's go back to Exhibit 6 Page 2, Item -- I'm sorry, it's Exhibit 3, Page 2, I'm sorry I made a mistake.

This is the transfer racket for Wainstein?

A.  Uh-huh.

Q.  Do you see writing or series of number and letters that's written in 27B?  That's on Page 2?

A.  Yes.

Q.  And do you recognize what that would be?

A.  Yes.

Q.  What is it?

A.  That's the transaction number for the background check that was conducted by the FBI.

82

Q.   Okay.  Now, isn't it true that you can call and see what the result was as a result of that number?

A.   It can be accessed if we go by what's on the form at the time.

Q.   They destroy all the records except whether or it's passed or denied.  Actually I think if it's denied they keep all of them.

A.   That's correct.

Q.   If it's passed as they proceed they just have that number and the word "proceed" by there.  Isn't that true?

A.   Yes.

Q.   Okay.  Now, do you have any inkling to say that -- if you notice on this Form on 27D, if you notice I think there's a denied crossed out?

A.   Yes.

Q.   And proceed as checked?

A.   Yes.

Q.   And I think we've talked very long about this proceed.  Now, how is an FFL to determine that a person is not eligible to receive a license if they get this proceed letter?

A.   The response is the response indicating which direction they're going to go.  However, as a foreign national here on a work visa, that individual still

83

would have been required to provide a hunting license.

Q.   That's not true at all.  Doesn't that statute state sporting goods or hunting, you know, I agree that you don't have to have a hunting license to hunt coyotes nor pigs, okay, it's an or sporting goods, hunting or sporting are a hunting license.  Isn't it true --

MS. BASILE:  To buy a firearm you do --

MR. MATHERNE:  I beg your pardon.

MS. BASILE:  To buy a firearm you do have to have a hunting license.

MR. MATHERNE:  No, ma'am, you don't. You-all are incorrect on your interpretation of the statute.  I have the statute here if you'd like me to give it to you.  It's actually part 25.2 under definitions.  Proceed.  The definition of proceed means the end response in anything that the information available at the time of the response did not demonstrate that transfer of the firearm would violate federal or state law.  A proceed response would not lead the FFL from compliance with other provisions if they believe they didn't have it and the law says --

MS. BASILE:  Tells you that you have to have a hunting license.

MR. MATHERNE:  No, ma'am, it does not.

MS. BASILE:  It does, you read it --

84

MR. MATHERNE:  He read the statute wrong.

MS. BASILE:  He read the directions on the form which tell the FFL they have to have a hunting license.

MR. MATHERNE:  No, it's not that on the form at all.

THE HEARING OFFICER:  Did he read 26D?

MR. MATHERNE:  No.

THE HEARING OFFICER:  I don't think you did.  Did you read 26D?

MR. MATHERNE:  26D says exceptions and there is a VISA there.  Okay.  All this information was sent to the NICS and when it came back then it says hey, we've checked federal and state law and he can get the license he can have the transfer.

MS. BASILE:  You're confusing two different things Mr. Matherne.  NICS tells you if the person is prohibited.  NICS didn't find any prohibitors.  The form still requires an alien to have a hunting license to be able to purchase a gun.

MR. MATHERNE:  That's not true at all.

MS. BASILE:  It is.

MR. MATHERNE:  It is not.  The statute says sporting says sporting or hunting or a hunting license.

THE HEARING OFFICER:  I think Tommy just

85

read 21L.  Did you read also 26D?

MR. GRAY:  I believe that I did.  I can reread it if you would like.

THE HEARING OFFICER:  I'd like you to read 26D the exceptions to the nonimmigrant alien prohibition.

MR. GRAY:  Okay.  The form states on the Instruction 26D exceptions to the nonimmigrant prohibition.  An alien admitted to the United States under a nonimmigrant visa is not prohibited from purchasing, receiving or possessing a firearm if the alien is in possession of a hunting license or permit lawfully issued by the federal government, state or local governments.

MR. MATHERNE:  That does not state the statute correctly?  It says hunting or sporting-goods or hunting license.  That particular form does not correctly state the statute.

MS. BASILE:  But that is what the FFL --

MR. MATHERNE:  I don't care what the FFL states.  I'm telling you what the statute says.  The statute says hunting or sporting or hunting license, or not and, or, okay?  So, there's no way that OFM could have denied this person a hunting license and then --

MS. BASILE:  What that tells them has

86

nothing to do with.  That's just one reason they might be prohibited but if they are an alien, NICS is just checking if they are here, if they have criminal history.  They're not checking if they have a hunting license.

MR. MATHERNE:  No.  No, no.  NICS is saying that they don't abide by federal law or state law.

MS. BASILE:  For criminal conviction.

MR. MATHERNE:  On state law.  On state law.

MS. BASILE:  And if they've just never violated the law --

MR. MATHERNE:  All I'm saying is the interpretation that Mr. Gray used there is incorrect. This was a valid transfer, okay, that's all I'm try to tell you.  This is what I'm trying to get is that this form just like it puts on responsible -- pervasion is no such animal in the Gun Control Act of 1968, and putting that you have to have a hunting license as opposed to putting the whole statute there --

MS. BASILE:  The directions tell the FFL that you have to put a hunting license.

MR. MATHERNE:  The statute is wrong.  This direction is wrong.

MS. BASILE:  These are the directions that FFLs have to file when completing a firearms

transaction.

MR. MATHERNE:  When NICS sends back an okay that means that they've checked all the laws, have checked his VISA, they've done everything and everything is a go.

MS. BASILE:  They are not checking all the laws.

MR. MATHERNE:  It says state or federal law.

MS. BASILE:  They haven't violated state or federal law like they haven't been convicted of any crimes here.

MR. MATHERNE:  They've complied with that law.  In other words all I'm saying is --

MS. BASILE:  They're not checking their immigration status --

MR. MATHERNE:  All I'm saying is the interpretation that was used here today and all that is wrong.  It's wrong.

THE HEARING OFFICER:  Is the definition for a responsible person on the application?

MS. BASILE:  Yes.  We read that into the record.

MR. MATHERNE:  It is but you don't have the right to put the definition there.  In the Supreme Court

88

in EPA versus -- West Virginia versus EPA and also the statute the case in Exhibit 15 demonstrates it even further.

BY MR. MATHERNE:

Q.   And now, I think we discussed this pretty good too but when a firearm is discovered as missing out of the inventory, how long do you have before you -- what's the time limit that you have to report it as missing?

A.   Well, the licensee should report it within 24 hours of having discovered that.

Q.   I thought it was 48.

THE HEARING OFFICER:   It is 48.   It is 24 hours for explosives.

BY MR. MATHERNE:

Q.   Okay.  Let's look at Exhibit 2.  I believe this is the -- I'm sorry Exhibit 1.  I believe this is the report of the missing firearm that we discussed previously.  Can you see the date and time that it was discovered missing?

A.   August 22nd.

Q.   What time?

A.   3:00 p.m.

Q.   Does it show what time that it was reported missing?

A.   August 24th of 2022.

89

Q.   At what time?

A.   2:00 p.m.

Q.   Is that compliant with the 48 hours?

A.   Yes.

Q.   Okay.  So that was an error that should have been reported; is that correct?

A.   The firearm was not logged out when Mr. Romo took possession of it.

Q.   No, no, no.  We're not talking about those.  We are talking about the missing one.

A.   Forgive me.  I misspoke.  Thank you.

Q.   We are talking about the missing one.  All I'm saying is that you made an error when you reported that they failed to report it as missing, would you agree to that?

MS. BASILE:  It was a disposition error it was not a theft loss error.

MR. MATHERNE:  That's what this report tells, right?

MS. BASILE:  The notice cites them for failing to do the disposition.  They still didn't do the disposition.

MR. MATHERNE:  No, no, no.  We are not talking about that one.  We are talking about the lost one.  The frame that was lost.

90

MS. BASILE:  That's not in the --

MR. MATHERNE:  That was Number 1.  As Exhibit 1 as one of the violations that was done that he failed to properly report the missing firearm.

MS. BASILE:  But he only reported it because Mr. Gray told him.

MR. MATHERNE:  That's when it was found.  That's when it was found.  They didn't know it was missing before then.  It was a result of his inspection that it was reported missing.

THE HEARING OFFICER:  I don't see a violation in the notice saying that he didn't timely report the loss.

MR. MATHERNE:  It is in here.  Look on my Exhibit 6 Number 5 in the appendix.

MR. GRAY:  Page 5.

MR. MATHERNE:  See how it says OFM callback series X 1046.

THE HEARING OFFICER:  You are talking about Appendix Number 3?

MR. MATHERNE:  Yes, ma'am.

THE HEARING OFFICER:  That's a disposition error.  It's not saying that they didn't timely --

MS. BASILE:  Go back to paragraph --

THE HEARING OFFICER:  It's not the same

91

thing.

MR. MATHERNE:  It was discovered loss and that's showing it was gone is what I'm saying.

MS. BASILE:  Paragraph 3, Appendix 3 goes with Paragraph 6 and they are only cited for having a disposition error.  They're not cited for not timely doing the report anywhere in the notice.

MR. MATHERNE:  That doesn't take care of the disposition error?

THE HEARING OFFICER:  No.

MS. BASILE:  No.  He still has a disposition that was never logged out.

MR. MATHERNE:  Are you saying that even though they reported that they forgot to put the disposition in the disposition book, is that what you're saying?

MR. GRAY:  At the time Mr. Romo took possession of it, yes, sir, that's correct.

MS. BASILE:  He didn't take possession (speaking simultaneously.)

MR. MATHERNE:  Let's look at Exhibit 2, Page 2 and 3.  If you notice Item 170.

MS. BASILE:  Uh-huh.

MR. MATHERNE:  Which is the flame that was missing.  Here's the record in the disposition book

92

(indicating).

MS. BASILE:  Which was entered after he found the error and they fixed.  He entered it after he found the error.

MR. MATHERNE:  He entered it on a book when you sent a notice to --

MS. BASILE:  So now it's correct but at the time of the inspection it was not correct.

MR. MATHERNE:  It was missing.

MS. BASILE:  But they didn't have a disposition and they didn't have a firearm so he has to cite them for that.

MR. MATHERNE:  Wait a second.  When you go through inventory and you discover something missing, that's when it was discovered.  Prior to discovering that it was missing they thought it was there.

MS. BASILE:  Missing guns are a safety issue and so you have --

MR. MATHERNE:  This is not a machine gun.

MS. BASILE:  It's still a safety issue. There's guns missing and not accounted for in their inventory.

THE HEARING OFFICER:  Let me ask a question.  Who discovered the missing firearm?

MR. MATHERNE:  Mr. Gray discovered it.

93

THE HEARING OFFICER:  So had he not discovered it, it would still be missing to this day.

MR. MATHERNE:  Yes, ma'am, but we would know it was missing.

THE HEARING OFFICER:  So they don't do inventory to account for their guns?

MR. MATHERNE:  Not every day, not every day.

MS. BASILE:  Periodically?

MR. MATHERNE:  All I'm saying is that Mr. Gray --

THE HEARING OFFICER:  Do they periodically do --

MR. MATHERNE:  -- is that Mr. Gray discovered it and reported as missing and was put in the disposition book.

THE HEARING OFFICER:  Do they do periodically do inventory?

MR. MATHERNE:  I don't know but I'm assuming they do but here again he did an inspection before and he didn't find any errors like that.

THE HEARING OFFICER:  Okay.  But there wasn't a violation cited for not doing that loss report.  The violation that was cited was for an open entry.  There was no accounting for that gun.

94

MR. MATHERNE:  But we didn't know it was missing until Mr. Gray going through the inventory found it.  That's all I'm saying.  We can't report something in the disposition book if we're not aware that it's not there, okay, that's all I'm saying.

MR. MATHERNE:  I don't have any more questions at this time.

THE HEARING OFFICER:  Did you want to --

MR. MATHERNE:  I'm going to put on Mr. Aronstein but I'm assuming she wanted to --

THE HEARING OFFICER:  Mr. Aronstein or Mr. Romo?

MR. ROMO:  You keep mentioning his name and you never mention mine.

MR. MATHERNE:  I want to.  Do you want to cross-examine?

MS. BASILE:  Mr. Romo?

Redirect?  No.

MR. MATHERNE:  Redirect is what I meant.

MS. BASILE:  No.

MR. MATHERNE:  Okay.  All right.  Then I will put on Mr. Romo.

Are we ready?

MS. BASILE:  Yes, sir.

EXAMINATION OF RAMIRO ROMO

95

BY MR. MATHERNE:

Q.   Would you identify yourself sir, please?

A.   Romiro Romo Junior.

Q.   Where do you reside, sir?

A.   8103 Bo Jack Drive.

Q.   Was Bencivenga Corporation chartered in the state of Texas 1987?

A.   Yes, sir.

Q.   Did Bencivenga Corporation LLC., begin to operate a DBA under the name of OFM Corporation?

A.   Yes, sir.

Q.   Are you the sole shareholder?

A.   Yes, sir.

Q.   Are you the director?

A.   Yes, sir.

Q.   Are you the president?

A.   Yes, sir.

Q.   Are you the sole person who possesses directly and directly the power to directly call the direction of the management and policies of OFM?

A.   Yes, sir.

Q.   And a statement in Exhibit 5 on Page 5 it states that Bencivenga is an operation with Crusader Firearms as a joint venture.  Is there such a company as Crusader Firearms LLC?

A.   Yes.

Q.   And is Crusader Firearms Group, LLC as opposed to Crusader Firearms, LLC?

A.   I believe so.

Q.   Okay.  Now, is there an enterprise at Crusader Firearms, LLC where Alan Aronstein has agreed to do work for with OFM?

A.   No, sir.

Q.   Okay.  Is there an enterprise between Crusader LLC., and you the way you have agreed to share private losses?

A.   No.

Q.   Is there an enterprise between Crusader Firearms and Alan Aronstein and you where there's a future right of control or management?

A.   No, sir.

Q.   Do you have a personal agreement that Mr. Alan Aronstein that if he finds a buyer for your business he will receive a commission at the closing of the sale?

A.   Absolutely.

Q.   Is that you meant when you said we have a joint venture?

A.   That's correct.  That's exactly what it was and that was what I told the inspectors.

Q.   Are you --

97

THE HEARING OFFICER:  I'm sorry.  I have a question.  You're selling your business, is that what you were just saying?

MR. ROMO:  Yes.

THE HEARING OFFICER:  When did you start --

MR. MATHERNE:  No, no, he's looking for a buyer.

THE HEARING OFFICER:  Wait a second.  I'm asking Mr. Romo.

MR. MATHERNE:  Okay.

MR ROMO:  My business is composed of very expensive tooling mold which we use.  I spent over a quarter million dollars to have built.  There's a value there.  Mr. Aronstein has numerous contacts with different business people.  The whole purpose of us getting together was he was going to try to find somebody to buy my equipment the molds, and then I would give him a percentage.

THE HEARING OFFICER:  Okay.  So, you've been trying to sell your business since 2018?

MR. ROMO:  I've been trying to sell the molds not the business.

THE HEARING OFFICER:  Okay.  You've been trying to sell them since 2018?

MR. ROMO:  No since 2013.

98

THE HEARING OFFICER:  Since 2013?

MR. ROMO:  Yes.

THE HEARING OFFICER:  Okay.

MR. ROMO:  Let me try to explain it to you so you can remove that doubt in your face.  In 2013 I had a big contract with Stoeger Firearms.  Stoeger got bought out by another company.  It took them a year and a half to decide whether they wanted to continue with my product and that cratered me.  That's why it's been that long and I just have not found anything.  The firearms business keeps up and down, sideways everything like that.

THE HEARING OFFICER:  Okay.  Thank you.

MR. ROMO:  You are welcome.

BY MR. MATHERNE:

Q.   Are you associated with Alan Aronstein as an unpaid consultant because he has extensive knowledge in the firearms including in compliance and requirements under the GCA?

A.   Absolutely.

Q.   Is Alan Aronstein basically a sales clerk?

A.   Pretty much.

Q.   When asking as a sales clerk for OFM, does Alan have discretion as to whether or not an applicant is allowed to purchase a firearm?

99

A.   No.

Q.   Does Alan Aronstein rely solely upon the NICS check to determine whether or not a customer is permitted to purchase a firearm?

A.   Correct.

Q.   To your knowledge is Alan Aronstein prohibited from transporting, shipping or receiving firearms or ammunition in interstate or foreign commercial under Section 922G in and of the GCA?

A.   I have absolutely no knowledge of that.

Q.   But you have no knowledge that he is not to; is that also correct?

A.   No, either way.  I don't have knowledge either way.

Q.   Does Alan Aronstein possess directly or indirectly a power to direct the cause or directions of the management or policies of OFM?

A.   No, sir.

Q.   And I think I have already asked.  Is Alan Aronstein a director?

A.   No, sir.

Q.   Is he a site manager?

A.   No, sir.

Q.   Is he a partner?

A.   No, sir.

100

Q. Do you have a partnership agreement?

A. No, sir.

Q. Does he own any shares?

A. No, sir.

Q. Is he an officer?

A. No, sir.

Q. There's been a lot of discussion about transfer of firearms to a gentleman by the name of Earl Seymour Wainstein. To your knowledge was all the appropriate documentation complied with and transmitted to NICS?

A. Absolutely nothing took place until we got to proceed.

Q. No. I said with all the information that was required, to your knowledge was it at all transferred up there?

A. Yes, sir.

Q. Okay.

A. To NICS.

Q. And to your knowledge when you received work, do you assume that NICS has made certain that all federal and state laws have been complied with in order to allow the transaction to proceed?

A. Yes. The Holy Grail.

Q. Did OFM have any reason based on an exit authorization to proceed to believe -- I'll suspect that

Mr. Weinstein was prohibited from purchasing that firearm?

A.   No, sir.

Q.   Now, based on these other information, I think Mr. Gray has testified that transferring numbers, putting the wrong dates were not willfully done.  It was just accidentally done; is that correct?

A.   Script was errors.

MR. MATHERNE:  Pass the witness.

BY MS. BASILE:

Q.   Okay.  Mr. Romo, as I said I'm the Division Counsel.  I just have a few questions.  First I want to go to one thing that just came up that you just said.

You said that Mr. Aronstein and yourself have no discretion as to whether you transfer a firearm or not.  If someone comes in and you suspect straw purchasing, your position is that you still have to sell them firearm?  You do have discretion, correct?

A.   Rephrase that.  That was a little confusing question.

Q.   Yes.  One of the questions he asked you after you said that Mr. Aronstein is just the sales clerk which said he had no discretion as to whether he transfers a firearm.  Can you --

MR. MATHERNE:  Didn't I say to sell or not

to sell?

MS. BASILE:  Yes.

MR. MATHERNE:  Not to sell.  A sell or not to sell.  He has reason not to sell if he suspected it's a straw purchase.

MS. BASILE:  Okay.  I just wanted to make sure I understood that correctly.

BY MS. BASILE:

Q.  Okay.  First let's talk about when Elaine Mata came up there.  Do you remember telling her that Alan Aronstein runs the show?

A.  Can I clarify?

Q.  Yes, please.

A.  Jessica came back and said there was somebody at the front.  Elaine Mata did not identify herself to the Jessica upfront.  Jessica had no idea who she was. She just said I want to talk to the owner.  Jessica does a lot of work for Aronstein on the phone, on sales and other craft that he sells --

Q.  So you will agree that Jessica --

A.  I'm not through.

Q.  -- that Jessica was referring to Aronstein as the owner?

A.  Yes.

Q.  Go ahead.

A.   And when she brought back, I went up there and introduced -- I've met Elaine twice.  She would get one of my inspections.  She didn't buy any product, and I told her I said, you know, the problem I have is the books are stumped on Alan.  I relegate to do them.

Q.   So you also agreed that you didn't want to do the inspection at that time without --

A.   I didn't tell her no.  I said it would be a lot easier if we sit.  I said I got him on the phone and Alan also knows Elaine, and he told her he said, you know he would be back in three or four 4 days whatever, he said it would take a couple of days.  Fine.  She said we can reschedule.  That was it.

Q.   Well, so we're not really disagreeing --

A.   She didn't ask me.  She did not ask me.  I wanted to look at the books now.  I wanted to do the section today.  I would have just walked right back and look at the books.  I had no problem with that.

Q.   You are just saying it would be better for Aronstein to be there?

A.   I would be more comfortable.

Q.   You preferred for Aronstein to be there?

A.   I would be more comfortable.

Q.   Okay.  And then do you remember this written statement.  I know you will object to it Mr. Matherne

104

but the written statement, you did sign this both times, correct?

A.   Yes.

Q.   And you read it I assume?

A.   Yes.

Q.   And it says in here that Aronstein conducts all firearms transactions for the business, correct, it does say that.

A.   Say that again.

Q.   It says that Aronstein conducts all firearm transactions for the business.

A.   I signed that.  I didn't think anything of it to tell you the truth.  I thought it was just a formality just not an inspection because this gentleman and that gentleman has been there a couple times.  They stayed there for a long time not one day but a week to two weeks.  They said I will be back in five days so I didn't suspect anything.

I didn't suspect that they were setting me up which what this is all about.  I wasn't expecting that.  I thought it was a very congenial conversation, you know, Alan is not here something like that and so I called him he said fine, okay, yes.  I signed that. Whatever it says that's why I signed, yes, but the impression I had is there wasn't anything that would

not -- I didn't see anybody getting the throwback getting to list somebody.  I explained to Elaine that. I trusted Elaine and that's what it was.

Q.  I don't think that's the case Mr. Romo.  I think they were just doing their job, and when someone tells them, when your secretary tells them that you're not the owner that Aronstein's the owner that's going to raise flags for them, and they needed to find out what was going on.  That's what's happening here.

A.  They didn't ask him who has the FFL, did she? She said who is the owner.  She didn't ask who has the FFL in this location.  She did not identify herself. I'm Elaine Mata I'm with ATF I'm here to do an inspection.  Jessica would have run right back to me.

Q.  Okay.  She immediately end up talking to you and you immediately called Aronstein on the phone, right?

A.  No.  I went up and talked to Elaine.

Q.  You talked to Elaine and then you called Aronstein on the phone?

A.  Because Elaine said when can we do it.  I said well, he should be coming pretty soon.  Let me get a hold of him, okay, and I stopped Alan and said let me talk to Elaine and talked to Elaine.

Q.  Okay.  I think we are saying the same thing but

okay.

A.   No. It's not the same thing.

Q.   You preferred that Aronstein do the inspection; is that fair.

A.   Alan does whatever I tell him to do, okay, he does whatever I tell him or ask him to do.  My point in that thing there is that Elaine Mata did not identify herself --

Q.   According to Jessica --

A.   I worked at a different location for a number of years and I had different ATF inspectors knock on the door, and the first thing they do is identify themselves.  Elaine never did that.

Q.   But you said you already knew her.

A.   Well, yeah, but she didn't identify herself to Jessica?

Q.   Okay.

A.   Because I'm in the back.

Q.   Does she already know Jessica?

A.   She did not identify herself ma'am.

Q.   Okay.  I'm just saying, did Jessica already know her?

A.   No.

Q.   Okay.  Okay.  That's one thing.  Jessica told her you're the owner but then as soon as she speaks with

107

you, you also called Aronstein on the phone to do the inspection?

A. After Elaine and I had a conversation.

Q. Yes. Okay.

A. If Elaine told me I wanted to the inspection now. I would have walked right back. That was not a problem.

Q. But you preferred Aronstein's team to be there?

A. I feel more comfortable with Mr. Aronstein being there, yes.

Q. Okay. So as to that who purchases the firearms for the business?

A. I do.

Q. And who pays the employees?

A. He does.

Q. And he pays them out of his prior company that he no longer has a firearms license?

A. It's all the same thing, yeah.

Q. What's all the same thing?

A. The money comes in so you got to pay employees.

Q. So he's paying the employees for your business, the work at your business?

A. Well, he's got other things that he's doing.

Q. Which are?

A. I'm sorry?

Q.    Can you tell me what those are?

A.    You need to talk to him.

Q.    Oh.  They are unrelated to your business.

A.    Yes.

Q.    Okay.  But he's paying the employees that work at your business, right, he has the lease that we went over.  Is everything that we said with the lease correct?

A.    I'm subleasing.

Q.    You're subleasing for $10 and he's paying $6000 approximately, roughly, I know there is a lot of math on that document, but you would agree he is paying approximately $6000 and you are subleasing for $10?

A.    Yes.

Q.    And it's his prior employees.  Now, tell me what you know about -- does he currently have a firearms license Alan Aronstein?

A.    No, he doesn't.

Q.    Was he previously a responsible person on four licenses --

A.    I don't know anything about his prior --

Q.    -- that he surrendered.  You don't know that?

A.    I don't know the names.  I don't know anything about his business.

Q.    And you know he does not have a license?

A.  I'm sorry?

Q.  You know he doesn't currently have a firearms license?

A.  That he's showed me, no.

Q.  Okay.  Do you know that he applied for one and was denied?

A.  I understand.

Q.  You knew that?

A.  Yes, now.

Q.  And you know he was found to be a willful violator of the GCA?

A.  Right.

Q.  And that he can't be on a firearms license. Did you know that?

A.  That he cannot what?

Q.  He cannot have a firearms license currently. Did you know that?

A.  (No response.)

Q.  You either do or you do not.

A.  I do or I don't.

Next question.

Q.  So you do or you don't?

A.  I do or I don't.

Q.  Do you know that he can't --

A.  Yes, of course.

Q.   Okay.  So you already said he pays the employees, you're saying you order the firearms?

A.   Yes.

Q.   So if Mr. Hawkins heard him talking to a vendor about firearms prices, what would --

A.   You would have to ask Mr. Hawkins.

MR. ROMO:  Was I there?

MR. HAWKINS:  No, sir.

A.   Thank you.  I have no idea.

BY MR. MATHERNE:

Q.   He was sitting at your business talking to a firearms vendor.  That would be out of the ordinary for him to be negotiating firearms --

A.   He's a firearms vendor?

Q.   No.  Mr. Aronstein was negotiating with a firearms vendor in Bencivenga, would that be something that could have occurred?

A.   Yes.

Q.   Okay.  And is his desk more essentially located in the middle of the business and yours in the back?

A.   Way, way in the back between the front door and the toilet.

Q.   We described that correctly that he's --

A.   That's what you get for $10 dollars a month ma'am.

Q.    Okay.

A.    Is that reasonable $10 a month?

Q.    And who would you say spends more time at the business?

A.    I don't keep up with him.  I'm there 40, 48 hours.

Q.    But he is there more often?

A.    I guess.  I don't keep a truck of him.  I mean he doesn't check in with me either or checks out with me.  He does what he wants to do.

Q.    So we talked about like 600 -- I think there were 400 dispositions during the inspection period.  If we looked at all 4473s.  Who would have sold most of the guns?

A.    It was him.

Q.    No.  But who would have signed as the -- you know the three forms we have here that had problems, Mr. Aronstein signed all of them.  If we looked at the 400, would he have signed all of them, would you have signed any?

A.    I'm not understanding.  You mean the 4473.

Q.    Yes, yes.

A.    I would say 50-50 maybe or maybe 75-25, that's what he is.  He's my clerk.

Q.    He does the transactions?

A.   Yes.

Q.   Okay.  So you do the ordering and he does the transactions.  He pays the employees.  He pays the lease, correct, what was the other?  He maintains the casualty insurance and the taxes and insurance?

A.   Yes.  Let me ask you something.

Q.   Yes.

A.   I didn't pay much attention to it.  When is the first time that these two gentlemen came to the facility?

Q.   So it was when you were moving your business from your old location to Aronstein's location.  That's when --

A.   I was already there when they came over.  I had failed to file the amendment to move but they were there two three times?

Q.   Two.  They went there in 2019 --

A.   And they were aware what was going on.  Why is all of a sudden this coming up?  This is nothing new. My position there.  My rent agreement.  My everything. We talked about it a long time.  Why is it just now coming up?

Q.   Well, I don't know if Mr. Gray wants to elaborate on the day that you were going to the Astros game.  What happened?  What you were told and then you

went to your car and wrote it down.  Do you want to re-capsulate that?

MR. GRAY:  I can read it again if I need to.

MS. BASILE:  Or just tell us?

MR. GRAY:  That's when Mr. Aronstein said they were operating a joint venture that he was paying the employees and all that.  That's what I documented.

MS. BASILE:  I think that was the change.

MR. MATHERNE:  So that's the first time you mentioned that?

MR. ROMO:  I believe you mentioned that the very first time you came into my office.  I believe he was there also.

MR. GRAY:  No.  That was the first time.

MR. ROMO:  He knew.  He didn't know.  He knew me for the first time.  What I'm saying is we're talking about something happened for four five years and then all of a sudden, wham!  Bring up the guillotine on Mr. Romo.  It's not because I'm Mexican, is it?  Is it.

MS. BASILE:  Of course not.

MR. ROMO:  Okay.

MS. BASILE:  It's a compilation of the things that you said and that Mr. Aronstein said to Ms. Mata.

114

MR. ROMO:  But the business model is still there.  I mean that's the way it operates.

MS. BASILE:  But when they came in '19 they just talked to you.  When they came back in 2022 you -- when Elaine came back in 2022 --

MR. ROMO:  The very first report it's not in this.  He didn't come when I was on 34th Street.  I had somebody else come.

MS. BASILE:  Yes, so --

MR. ROMO:  We already had that kind of agreement.

MS. BASILE:  And how long ago was that?

MR. ROMO:  It was 2016, '17.

MS. BASILE:  Well, you told Mr. Gray though that your relationship with [2:39:15.3] Mr. Romo started in 2018.

MR. ROMO:  I said '16, '17.  Before he came somebody was doing an inspection in my place.  I don't see that report anymore.

MS. BASILE:  We do have the signed acknowledgement here but we don't -- there was a report of violations, you mean?  I didn't include the reported violations if that's what you mean.  We do have the signed acknowledgement in here that someone would have went over with you.

MR. ROMO:  You don't have it.

MS. BASILE:  We do.  What's the date?

MR. GRAY:  116.

MS. BASILE:  We have it.  It's Government's Exhibit -- well, maybe not.  We have 2012. We have one from '02, '08, '12, '19, '19 and '22.  So someone came in '16 then there was another signed acknowledgment?

MR. ROMO:  Yes.

MS. BASILE:  Okay.  So we don't have that one.

MR. ROMO:  It's the 34th street.

MS. BASILE:  Okay.  And you were already working with Mr. Aronstein in '16?

MR. ROMO:  He knew her.  She was at the gun store.  What's the lady's name.

MR. GRAY:  Jennifer Hartman.

MS. BASILE:  She came to your business then.

MR. ROMO:  She came for two days and wrote me a report but I don't see it in there.

MS. BASILE:  Okay.

MR. GRAY:  Thank you.

MS. BASILE:  I don't have any further questions.

116

BY MR. MATHERNE:

Q.   Okay.  Did you ever tell anyone and in particular that Alan was a manager?

A.   No.

Q.   Okay.  On the outside of the door, is the name Bencivenga Corporation or OFM on the door?

A.   No.

Q.   Is Crusader Gun Control painted on the door?

A.   No.

Q.   Do you recall what name is on the door?

A.   B14.

Q.   There is no business name?

A.   No.

Q.   Is there a reason for that?

A.   I could really care less about what sign he puts up there.

Q.   In other words there is no identification of any of the companies on the doors, right?

A.   No.

Q.   So when someone comes in and says who is the owner?  They don't know that there's more than one business, so they don't know which business they're talking about.  Would that be a true statement?

A.   Yes.

MR. MATHERNE:  No further questions.

117

THE HEARING OFFICER:  Do you have anything else?

MR. MATHERNE:  No, ma'am.

THE HEARING OFFICER:  Nothing else?

MR ROMO:  I really wish I could say thank you-all for your time, but you know how it goes.  No coffee.  No water.

MR. MATHERNE:  Well, I think that we have presented sufficient evidence here today that Mr. Aronstein is not a responsible person, and that the violations that were shown on the 1st and October 30th report of violations while they are violations, but they were not serious enough to require a revocation of the licenses.

As a matter fact there was no report by Mr. Gray that the license should have been revoked and he agreed to that those items were -- the ones were reported did not warrant a revocation and they were explained that we made a mistake.  Just like he took his picture of the form when he cut off where it was that was a mistake, okay, so we all make mistakes, and i don't think anything here rises to the level that his license should be revoked.  I rest.

THE HEARING OFFICER:  Mr. Romo?

MR. ROMO:  Yes, ma'am.

118

THE HEARING OFFICER:  Why is Mr. Aronstein paying your employees?

MR. ROMO:  Because I don't have any money.  If he would be able to find us a buyer for the tools I can hire everybody.  It's just a good investment for him.

MR. MATHERNE:  So how much did you pay for those tools.  Do you remember?

MR. ROMO:  Yes.  $2,310,000 and with Stoeger on it was able to make about one million on it when it got bought out.

MS. BASILE:  Who --

MR. ROMO:  Are we will on the record or are we just chitchatting.

THE HEARING OFFICER:  No.  No, no, sir.  We are still on the record.

MR. ROMO:  Just turn it -- I would rather not be on the record anymore.

THE HEARING OFFICER:  No, sir.  I control that.  You are here to --

MR. ROMO:  You said we were done.

THE HEARING OFFICER:  No, we are not done.

MR. ROMO:  Okay.  Go ahead.

THE HEARING OFFICER:  You are here to explain to me why I should not revoke the license, and

so I need to fully understand what's going on, and that's why I asked that question.

MR. ROOM:  Without the license then my tooling is worthless.

THE HEARING OFFICER:  I'm sorry, say that again.

MR. ROMO:  My tooling without my mold -- my tooling is worthless.  I mean we had like two cents a pound when you process a pound for aluminum and two cents for steel.  We've had several interested buyers that have come in and looked at what we have, stuff like that, and just have not been able to put it together.

MR. MATHERNE:  The tooling that he is talking about, the molds that he's talking about the machine that is used in them is hard to find, and we are modifying those tools that we have been using.  It's amazing how many they are.  I mean Mr. Aronstein has a memory like a friend of mine.  I used to do aircraft accident reconstruction.  We had a case a case where we had 50,000 multipage documents.

We hit it in the second case and I called this friend of mine that we had worked on.  It says Pathy.  I know we had a document that says this and this and this.  Where is it?  He says I'll call you back in 30 minutes.  He says it's Document 232 or 465.  They

120

were duping us.  That's the type of memory that Mr. Aronstein has.  He can look at a gun part and tell you where it was and where it should go.

I have a Remington shotgun that I gave him and he said that gun was made in 1962.  I went and looked it up and it was made in 1962 so that's the knowledge that this man has in the gun industry, and so not only is he trying to find a buyer for Mr. Romo, he is also developing a machine that can used those daises (phonetic).

I didn't realize those things cost two and a half million dollars.  That's a lot of money, and that was brought back -- when were they done?  Today, they would probably be worth five times that.  They would probably be worth two to three times that.  That's what Mr. Aronstein is working for is trying to get a business so he can get (inaudible).

MS. BASILE:  Mr. Romo, you said you don't have any money, how do you order the firearms for the business?

MR. MATHERNE:  From the sales I can tell you that.  In other words that money is kept separate, and when they sell a firearm that money is kept separate, and it pays to buy new materials to make the firearms, okay.

MS. BASILE:  And the profits for the business, how are those --

MR. MATHERNE:  It's not because overhead takes care of that.  It's a small business.

MS. BASILE:  So from 400 firearms you or Mr. Aronstein don't get any payment?

MR. ROMO:  No.

MR. MATHERNE:  The excise --

MR. ROMO:  I get paid little for that.

THE HEARING OFFICER:  Okay.  Let Mr. Romo answer.

MR. ROMO:  Excise tax.

MS. BASILE:  Who does?

MR. ROMO:  The excise tax.

MS. BASILE:  So you're making no money from this firearms business?

MR. ROMO:  I'm sorry.

MS. BASILE:  You're making zero money yourself from this, and Mr. Aronstein is not making any money from the firearms business either?

MR. ROMO:  No.  No, ma'am.

MS. BASILE:  So the firearms you sell you just use that money to buy new firearms?

MR. ROMO:  (Nodded head).

MR. MATHERNE:  Alan sells a lot of parts.

122

It's incredible the knowledge of this man.  You can take a piece of a gun and show it to him, and he will show you where it goes.  The man's memory with weapons is absolutely incredible to me.

MR. ROMO:  The way he pays for the other things that he has is build parts.  You-all pointed out that he's someone eBay.  He's online doing that stuff. I mean, he sells little parts stuff like that, you know, that don't have anything to do with me.

MS. BASILE:  He does that from your business, right?

MR. ROMO:  Well, he's the one paying for the facility.

MS. BASILE:  Yeah.

MR. ROMO:  It doesn't say OFM.  The only things that say OFM are the firearms.

MS. BASILE:  But there's other businesses happening in the same space is what you're saying?

MR. ROMO:  Yes.

MS. BASILE:  Yeah.

THE HEARING OFFICER:  Okay.  Any other questions or comments?

MR. MATHERNE:  No, ma'am.

THE HEARING OFFICER:  Questions or comments Mr. Romo?

MR. ROMO:  Thank you.

THE HEARING OFFICER:  Okay.  Well, thank you everyone.  I believe I have all the information I need.  I will make my final decision based on the information provided at this hearing today in the record before me.  If the decision is that the license is not to be revoked you will receive a written notice of that decision.

In the event that is determined that the license will be revoked, you will receive a final notice of denial of application, revocation, suspension and/or fine of firearms license.  You will also receive a copy of my findings and conclusions.

If you receive a final notice, you may file a request in federal district court in the district where you conduct business under the provisions of Section 923(f)(3) Title 18 United States code for De Novo hearing.

This request must be submitted within 60 days of the receipt of the final notice.  Is there anything else anyone else would like to add to the record?

MR. MATHERNE:  No, ma'am.

MR. GRAY:  No, ma'am.

THE HEARING OFFICER:  If there's nothing

124

further anyone would like to add.  The time is 12:29 p.m. and this hearing is closed.

(Proceedings concluded at 12:29 p.m.)

125

(THE STATE OF TEXAS.)

(COUNTY OF _____)


                    CERTIFICATE OF COURT REPORTER

                    I, Amanda Sailsbury, Certified Shorthand

Reporter, in and for the State of Texas, do hereby

certify that I was present virtually at the time and

place herein before set forth; that I reported the

proceedings in oral stenographic shorthand, and that my

oral stenographic notes were thereafter reduced to

writing by computer-assisted transcription by me and/ or

under my supervision.

                                I further certify that the

foregoing is a lawful, true, and correct transcript of

the proceedings had upon the taking of said hearing.

                                Given under my hand, I have

hereto set my official signature on the __ day of

November, 2023.



                          _____
                          AMANDA K. SAILSBURY, CSR 11923
                          Expiration Date:  03-31-24
                          Hill & Romero
                          Certified Court Reporters
                          Firm Registration No. 313
                          7000 N. 10th Street, Suite C-2B
                          McAllen, Texas 78504
                          (956) 287-8898