# EXHIBIT H

## LEASE AGREEMENT

THIS LEASE AGREEMENT made the 2O day of _____*August*_____, 2019 between **HARTMAN MITCHELLDALE BUSINESS PARK, LLC,** a Texas limited liability company, herein called "Landlord," and **CRUSADER GUN GROUP, LLC,** a Texas limited liability company, herein called "Tenant".

### WITNESSETH
### ARTICLE I — PREMISES

1.1     Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, upon and subject to the terms of this Lease, those premises located on the property commonly known as Mitchelldale Business Park ("Center") as legally described and depicted on Exhibits "A" and "B", respectively, attached hereto and by reference made a part hereof. Said premises, known as Suite 12B-14 in the building with an address of 5151 Mitchelldale Drive, Houston, Texas 77092 ("Premises"), consists of approximately 7,200 rentable square feet and is depicted on the floor plan attached hereto and by reference made a part hereof as Exhibit "C". Said Premises is to be constructed in substantial accordance with the construction rider attached hereto and by reference made a part hereof as Exhibit "E" and the Fascia Sign Criteria attached hereto and by reference made a part hereof as Exhibit "D".

### ARTICLE II — TERM OF LEASE

2.1     TO HAVE AND TO HOLD the Premises unto the Tenant from and after the commencement of the term hereof as hereinafter provided for a term of **thirty-nine (39)** calendar months, excluding the initial partial month if the lease term begins on any other day than the first of the month, beginning after commencement of the term thereof.

2.2     The term of this Lease shall commence on **September 1, 2019** and the term hereof shall end on **November 30, 2022.** The parties each agree, upon demand of the other, to execute a written declaration in recordable form expressing the commencement and termination dates of the term hereof.

### ARTICLE III — RENT AND OTHER CHARGES

3.1.     As rentals under this Lease Agreement and for the use and occupancy of the Premises, Tenant binds and obligates itself to pay Landlord at the address designated herein or on or at any other place designated in writing by Landlord in Harris County, Texas, without deduction or off set, Rent in the sum of Two Hundred Seventeen Thousand, One Hundred Fifty-Two Dollars and 00/100 ($217,152.00), for the total term of this Lease Agreement, payable in monthly installments of:

| | | | | |
|---|---|---|---|---|
| 09/01/19 | TO | 11/30/19 | $    0.00 | per month |
| 12/01/19 | TO | 11/30/20 | $4,050.00 | per month plus Additional Rent |
| 12/01/20 | TO | 11/30/21 | $4,200.00 | per month plus Additional Rent |
| 12/01/21 | TO | 11/30/22 | $4,500.00 | per month plus Additional Rent |

*Additional Rent: $1.64 psf annually; $984.00 estimated amount per month;
Taxes and Insurance: $1.33 psf annually; $798.00 estimated amount per month

In advance on the first day of each calendar month during this lease term, provided that in the event the lease term commences on a day which is not the first day of the calendar month, then Tenant shall be obligated to pay to Landlord a pro rata monthly rental payment equal to the number of days remaining in the month as the same bears to the total monthly rental referred to above. Tenant agrees to pay an additional amount equal to ten percent (10%) of any amount due to Landlord for any Rent that is not received by Landlord within ten (10) days of due date. This amount will become additional rent and a default on that amount will be a default on this Lease.

3.2.     Additionally, Landlord agrees to allow Security Deposit on file for Crusader Gun Company, Inc. in the sum of **Seven Thousand Four Hundred Eighty-Eight Dollars and 00/100 ($7,488.00)** to be transferred and held on file as a security deposit for Tenant.

908-12B14

1

**Exhibit** 2

**Page** ₁ **of** 23



**EXHIBIT**

**17**



Initials

ATF 0779

## ARTICLE IV — MAINTENANCE OF COMMON AREAS

4.1     Landlord agrees to construct, and to maintain during the entire term of this Lease, the parking areas, approaches, exits, entrances and roadways included in the Office/Warehouse substantially as shown on the plot plan annexed hereto as Exhibit "B," in good order and repair.

4.2.     Landlord agrees that during the term of this Lease, Tenant shall have the non-exclusive right to use the parking facilities in the Office/Warehouse (provided and designated by Landlord) for the accommodation and parking of automobiles of Tenant, its officers, agents and employees, and its customers and others doing business with the Tenant while doing business in the Office/Warehouse, but it is understood and agreed that Landlord shall have the right to designate from time to time, and to change in a reasonable manner from time to time, the portions of the Office/Warehouse that shall be used as parking areas, approaches, exits, entrances and the like, so long as such changes do not restrict or reduce the amount of parking available to Tenant within 100' of Tenant's front door.

4.3.     Common area maintenance (CAM) charge shall be used by the Landlord for the maintenance, repairing and cleaning of the parking areas and drives, keeping them free of trash and abandoned cars, maintaining and repairing exterior lighting for the Center, water, maintenance and upkeep of the Center's landscaping, maintenance and painting of exterior walls, maintaining and repairing the roofs, garbage and trash removal, administrative costs, personnel, maintenance people and other people and other expenses and/or services as may be, in the reasonable judgment of the Landlord to be in the best interest of the Office/Warehouse in order to keep and maintain the Center in a first-class operating condition.

4.4.     In addition to the rent specified in Section 3.1 above, and/or amounts due herein Tenant covenants and agrees to pay Landlord, as additional rent ("Additional Rent") an estimated Common Area Maintenance charge of **$1.64** per square foot for interior area in the demised Premises for the term of this Lease. The total monthly payment, subject to the terms in Section 3.1 above, shall be **$984.00.**

4.5.     Should the Landlord's Common Area Maintenance Costs exceed that amount of the estimated Common Area Maintenance charge specified in Section 4.4 above, Landlord may, at his sole discretion, bill all Tenants of said Office/Warehouse for their pro-rata share of all reasonable expenses or costs exceeding the estimated Common Area Maintenance charges specified in Section 4.4 above on a monthly basis, in addition to the estimated monthly Common Area Maintenance charge.

4.6.     Should any Tenant requiring such be negligent in scheduling the timely removal of said garbage/trash, Landlord may then, at his sole discretion, order such removal and bill Tenant for said services. Tenant will pay Landlord the costs of such removal within ten (10) days of Landlord's billing date. Nonpayment of this billing in the specified time allotted as well as nonpayment of levied charges on prorated basis by the other Tenants on the normal usage plan, will constitute a default by Tenant under the terms and provisions of this Lease. Landlord will assign each Tenant a specific dumpster or location (if Tenant requires own dumpster), as outlined in blue on the attached plot plan labeled Exhibit "B," at Landlord's sole discretion, thus allowing dumpster locations that are screened for visual acceptance and proper maintenance.

## ARTICLE V — TAXES AND INSURANCE

5.1.     In addition to the Rent specified in Section 3.1 above, and/or other amount due herein, Tenant covenants and agrees to pay Landlord, an estimated taxes and insurance charge of **$1.33** per square foot of interior area in the Premises for the term of this Lease. The total monthly payment, subject to the terms in Section 3.1 above, shall be **$798.00.** Tenant will pay to Landlord in Houston, Harris County, Texas, upon Landlord's demand, the pro-rata share of any increase in taxes assessed against the leased Premises. Tenant's pro-rata share shall be 1.906%.

908-12B14

2

**Exhibit** 2

**Page** 2 **of** 23



Initials

ATF 0780

5.2.    In addition to the Rent, Common Area Maintenance payments and other charges called for above, and as additional rent, for the purposes hereof, the term "Taxes" shall mean all taxes, assessments and other governmental charges, whether federal, state, county, or municipal, including any taxes assessed by a "Property Management District" created by the Legislature, and whether assessed by taxing districts or authorities presently taxing the Property or by others, subsequently created or otherwise, and any sales taxes, use taxes, capital taxes, franchise taxes, gross margin taxes or any other taxes or assessments based upon the revenues received from the Property or otherwise attributed to the Property, its rental or operation, which may be assessed against Landlord, including fees for attorneys, court costs, tax consultants, arbitrators, appraisers, experts and other witnesses, incurred by Landlord in contesting any taxes or the assessed valuation of all or any part of the Property. If because of any change in the method of taxation, any other tax or assessment (including without limitation any franchise, income, profit, sales, use, occupancy, gross receipts or rental tax) is imposed on Landlord as the owner of the Property, or the occupancy, rents or income from the Property in substitution for, or as a supplement to any taxes, such other tax or assessment, computed as if the Property were Landlord's sole asset, shall be included within the term "Taxes". Notwithstanding any provision in this Section to the contrary, the definition of the term "Taxes" shall not include any estate, inheritance, successor, transfer, gift or income tax imposed on Landlord unless such taxes are in substitution for or as a supplement to any taxes payable hereunder.

5.3.    Tenant shall be obligated and agrees to pay all such taxes which may be lawfully charged, assessed or imposed upon any fixtures, equipment and personal property in the demised Premises; and Tenant shall be obligated to pay all license fees, sales taxes and other fees and taxes which may be lawfully imposed upon or with respect to the business of Tenant conducted in or upon the demised Premises.

5.4.    As additional rental, Tenant will pay to Landlord in Harris, Harris County, Texas, upon Landlord's demand, in each year pro rata cost of fire and extended insurance, public liability insurance and other insurance pertaining to the leased Premises. Any proration of such increase shall be in the same manner as in paragraph 5.1 above.

5.5.    It is agreed that all determinations shall be made by the Landlord in good faith. Landlord will, upon request, furnish copies of all tax renditions and statements, insurance policies and premium statements and other data and material in Landlord's possession relating to calculation and determination of all such amounts determined by Landlord to be due by Tenant under this Article V.

## ARTICLE VI — UTILITIES

6.1.    Tenant will at its own cost and expense pay for all gas, heat, electricity, and other utilities used in the demised Premises and will save and hold Landlord harmless from any charge or liability for the same.

## ARTICLE VII — TENANT'S USE OF PREMISES

7.1.    It is understood, and Tenant so agrees that the demised Premises, during the term hereof, may be used and occupied only for **manufacturing and testing of firearms**. Tenant binds and obligates itself to occupy and use the leased Premises continuously during the term of this Lease for the purpose provided above and according to the generally accepted standards for the operation of the same or similar businesses, and during regular business hours as provided in this Lease.

7.2.    Tenant agrees, during the entire term hereof, to conduct its business in the Premises at all times in a high class and reputable manner. Tenant shall promptly comply with all laws, ordinances, and lawful orders and regulation affecting the demised Premises and the cleanliness, safety, occupation and use of the same. No auction or bankruptcy sale may be conducted in the demised Premises without the previous written consent of Landlord. Tenant agrees that it will conduct its business in the demised Premises during the regular and customary hours of such type of business on all business days, and will conduct such business in lawful manner and in good faith. Tenant shall not use the sidewalks or any area adjacent to the Premises for business purposes without the previous written consent of Landlord.

7.3.    In addition to the foregoing, Tenant agrees that it will at all times during the term hereof:

(a)    Maintain the demised Premises and exterior and interior portions of all windows, doors and all other glass or plate glass fixtures in first class condition and keep the demised Premises in a neat and clean condition.

(b)    Cause all goods and merchandise to be delivered and removed and all removal of garbage and refuse to be made only by way of the areas which may be designated by Landlord for Tenant's use for such purposes.

3

908-12B14

**Exhibit 2**

**Page 3 of 23**



ATF 0781

7.4.    Tenant further agrees that it will not at any time during the term hereof (a) place on the exterior walls (including both interior and exterior surfaces of windows and doors), the roof of the demised Premises or any other part of the Office/Warehouse outside the demised Premises any sign, symbol, advertisement, neon lights, other light, or any other object or thing visible to public view outside of the demised Premises without the prior written consent of Landlord, or (b) perform any act or carry on any practice which may injure the demised Premises or the building in which the same are located or any other part of the Office/Warehouse or cause any offensive odors or loud noise or constitute a nuisance or menace to any other tenants therein, or (c) operate or cause to be operated any incinerator or other device for burning of trash on the demised Premises or anywhere in the Office/Warehouse.

## ARTICLE VIII — MAINTENANCE

8.1.    Other than as provided below in this section, Landlord agrees to keep in good order, condition and repair the foundations, exterior walls (except glass and glass windows and the so-called store front), roof and structural portions of the demised Premises, except for reasonable use and wear and any damage thereof caused by any act of negligence of "Tenant," its employees, agents, licensees or contractors.

8.2.    Tenant agrees throughout the term hereof to keep and maintain the Premises and every part thereof (except as herein above provided) in good order, condition and repair, including without limitation, all plumbing facilities within the demised Premises, fixtures and interior walls, floors, ceiling, signs, air conditioning and heating equipment, all interior building appliances and similar equipment and the sewer line from the Premises to its point of connection with the main sewer line maintained by Landlord to serve the Office/Warehouse. Tenant specifically agrees to replace all glass and glass windows in the demised Premises which may be broken or cracked during this Lease at Tenant's sole cost excluding normal wear and tear.

8.3.    Tenant shall not make any alterations, improvements or additions to the Premises without first obtaining, in each instance, the written consent of Landlord. Any and all alterations, additions, improvement, and fixtures (other than the usual trade fixtures) which may be made or installed by either Landlord or Tenant upon the Premises and which in any manner are attached to the floors, walls or ceiling (including without limitation any linoleum or other floor covering which may be cemented or otherwise adhesively attached to the floor, or air conditioning and heating systems) shall remain upon the Premises and at the termination of this Lease shall be surrendered with the Premises as a part thereof without disturbance, molestation or injury except for cabinets and light fixtures which have been paid for and installed by Tenant. Said cabinets shall remain the property of Tenant, and Tenant may remove them at any time, or, at Tenant's option, within a reasonable time after the termination of this Lease.

8.4.    Tenant, at Tenant's sole cost and expense, shall maintain and repair the plumbing systems and electrical systems serving the Premises. Landlord shall inspect and deliver the existing heating, ventilation and air conditioning and related distribution systems ("HVAC") in good working order upon Commencement of Lease. Thereafter, Tenant, at Tenant's sole cost and expense, shall maintain and repair HVAC. Tenant agrees to enter into and maintain through the Lease Term a regularly scheduled preventative maintenance/service contract with a qualified HVAC contractor for servicing such HVAC system(s) The service contract must become effective within thirty (30) days of occupancy, and service visits shall be performed on a quarterly basis. Notwithstanding any contrary provision in the Lease, so long as Tenant maintains the HVAC units serving the Premises ("HVAC units"), and Tenant operates the HVAC units in accordance with Landlord's and the manufacturer's specifications, then during the initial twenty-four (24) months of the Lease Term only, Tenant shall not be obligated to pay more than Two Thousand Five Hundred Dollars ($2,500.00) in repair and replacement costs per unit per annum (the "HVAC Cost Ceiling"). All repair and replacement costs for any HVAC Unit which are in excess of the HVAC Cost Ceiling shall be borne by Landlord. Tenant acknowledges that the aforementioned HVAC Cost Ceiling applies to routine repairs and maintenance only, and shall not be construed to apply to instances relating to damages caused by Tenant or Tenant's agent, theft, or vandalism. During the Lease Term, if an HVAC unit is replaced by Landlord as a result of the HVAC Cost Ceiling, Tenant thereafter shall assume all costs for maintenance and repairs for such specific HVAC system and may rely upon the manufacturer's warranty on such.

## ARTICLE IX — INDEMNITY & PUBLIC LIABILITY

9.1    Tenant agrees to indemnify and save Landlord harmless from all claims (including reasonable costs and expenses of defending such claims) arising (or alleged to arise) from any act or omission of Tenant or Tenant's agents, or contractors, or arising from any injury, damage or death to any person or the property of any person should such occur during the term of this Lease in or about the Tenant's leased Premises from any cause whatsoever (including without limitations bursting pipes and smoke) by reason or construction, use, occupancy or enjoyment of the Premises

908-12B14

4

**Exhibit  2**

**Page  4 of 23**

Initials

ATF 0782

by Tenant or any person therein holding under Tenant. Tenant assumes responsibility for the condition of the Premises and agrees to give Landlord written notice in the event of any damage, defect, or disrepair therein. Tenant will provide a waiver of subrogation from Tenant's fire and extended coverage insurance carrier to Landlord upon request. Tenant agrees that Landlord shall not be responsible or liable to tenants or those claiming under Tenant for any loss while occupying any other part of the Office/Warehouse, excluding Landlord, Landlord's employees, representatives or agents who may occupy any other part of the Office/Warehouse.

9.2     Tenant will maintain, at its own cost and expense, public liability and property damage insurance in a form and with a company acceptable to Landlord in a minimum amount of $25,000.00 for property damage, $100,000.00 for injury to or death of one person and $300,000.00 for injury to or death of more than one person and in one accident or casualty. Such policy shall name Landlord (and any of its affiliates, subsidiaries, successors, and assigns designated by Landlord) and Tenant as the insured and shall be non-cancellable with respect to Landlord except after thirty (30) days written notice. A certificate of such policy will be deposited with Landlord at least ten (10) days prior to the commencement date of this Lease and renewals thereof as required shall be delivered to Landlord at least ten (10) days prior to the expiration of the respective policy terms.

## ARTICLE X — NON-LIABILITY FOR CERTAIN DAMAGES

10.1. Landlord shall not be liable to Tenant for any injury to person or damage to property caused by Premises becoming out of repair or by gas, water, steam, electricity, or oil leaking or escaping into the demised Premises (except where due to Landlord's negligence or failure to make repairs required to be made hereunder, after the expiration of thirty days and after written notice to Landlord of the need for such repairs), nor shall Landlord be liable to Tenant for any loss or damage that be occasioned by or through the acts or omissions of other tenants of the Center or any other persons whatsoever, except acts or omissions of employees and agents of Landlord. All property kept, stored or maintained within the Premises shall be at Tenant's sole risk.

## ARTICLE XI — LANDLORD'S ACCESS TO PREMISES

11.1. Landlord shall have the right to enter upon the Premises at all reasonable hours for the purpose of making emergency repairs to the Premises or any property owned or controlled by Landlord. If Landlord deems necessary any repairs or maintenance work required under this Lease to be made by Tenant. Landlord may demand that Tenant make the same forthwith. If Tenant refuses or neglects to commence such repairs, Landlord may (but shall not be obligated to) make or cause such repairs or maintenance work to be made (without in any way waiving any other rights of Landlord hereunder for Tenant's said default); and if Landlord causes such repairs or maintenance work to be made, Tenant agrees to pay Landlord, as additional rent, the cost of any such repair or maintenance work thereof with interest at ten percent (10%) per annum, and if it shall default in such payment, Landlord shall have the remedies provided in Article XVI hereof.

## ARTICLE XII — FIRE AND CASUALTY INSURANCE

12.1. Tenant shall keep its fixtures, merchandise, and equipment insured against loss or damage by fire or casualty with the usual extended coverage clauses, and in the event of loss thereof or damage thereto neither Tenant nor its insurer shall have any recourse against Landlord, it being understood and agreed that Tenant assumes all risk of damage to its own property arising from any cause whatsoever, including without limitation loss by theft or otherwise, excluding any loss or damage caused by Landlord's agents, employees, or representatives, and that each insurance policy maintained by Tenant shall contain an express waiver of any rights of subrogation by the insurer or underwriter to any claim against Landlord.

12.2     Tenant agrees that it will not carry any stock of goods or do anything in or about the demised Premises which will in any way increase the premiums for insurance carrier by Landlord or any other tenants on or with respect to the demised Premises, the building of which the demised Premises are a part of, or any other buildings in the Office/Warehouse or their respective contents; and Tenant will on demand reimburse Landlord and all other tenants of Landlord in Office/Warehouse for all extra premiums charged to Landlord caused by Tenant's use of the demised Premises, whether or not Landlord has consented to the same. If Tenant shall install any electrical equipment that overloads the lines in the demised Premises, Tenant shall at its expense make whatever changes are necessary to comply with the requirements of the insurance underwriters and governmental authorities having jurisdiction thereover.

908-12B14

**Exhibit** 5 **2**

**Page 5 of 23**


Initials

ATF 0783

## ARTICLE XIII — CASUALTY DAMAGE OR DESTRUCTION

13.1 If at any time when twelve (12) full calendar months or more remain in the lease term, any part of the entire building should be destroyed or damaged by fire or other risk covered by Landlord's fire and extended coverage insurance and such damage or destruction amounts to less than twenty percent (20%) of current replacement cost of the entire building and such damage can be repaired with the application of reasonable diligence within fifteen (15) working days, then in such event Landlord will be obligated to repair and reconstruct the Premises, within a reasonable time, subject to delays caused by strikes, shortage of labor or material, war, Acts of God and other conditions beyond Landlord's reasonable control. Otherwise, if the demised Premises, or the building should be destroyed or damaged by fire or any other casualty, then Landlord shall have the election to terminate this Lease or to repair and reconstruct the Premises, and Landlord will notify Tenant of its election within thirty (30) days after receipt of written notice from Tenant of such damage or destruction.

## ARTICLE XIV — EMINENT DOMAIN

14.1 If there shall be taken during the term of this Lease all of the demised Premises, or so large a part thereof that the balance cannot be practicably and economically restored to a unit, then in any of such events this Lease shall terminate. If a lesser part of the leased Premises or building should be so taken, then Landlord may elect to terminate this Lease or to continue same in effect, but if Landlord elects to continue Lease, the minimum rental shall be reduced in proportion to the area of the leased Premises so taken.

14.2 All sums awarded or agreed upon between Landlord and the condemning authority for taking of the fee or the leasehold interest, whether as damages or as compensation, will be the property of Landlord. Any amounts specifically awarded or agreed upon by the Tenant and the condemning authority for the taking of Tenant's trade fixtures or other equipment shall be the property of Tenant.

## ARTICLE XV — ASSIGNMENTS-SUBLETTING

15.1.   Notwithstanding any other provision of this Lease, Tenant covenants and agrees that it will not assign this Lease or sublet (which term, without limitation, shall include granting of concessions, licenses and the like) the whole or any part of the demised Premises without the express written consent of Landlord, and in any case where Landlord shall consent to such assignment or subletting, the Tenant named herein shall remain fully liable for the obligations of the "Tenant" hereunder; including without limitation, the obligation to pay all Rent and other amounts provided under this Lease, for and during the entire term of this Lease.

## ARTICLE XVI — DEFAULTS

16.1. It is covenanted and agreed that if Tenant shall neglect or fail to perform or observe any of the covenants, terms, provisions, or conditions contained in this Lease to be performed or observed by it, or if the estate hereby created shall be taken by execution or by other process of law, or if Tenant shall be declared bankrupt or insolvent according to law, or if any assignment shall be made of the property of Tenant for the benefit of creditors, or if a receiver, guardian, conservator, or other similar officer shall be appointed to take charge of all or any substantial part of Tenant's property by a court of competent jurisdiction, or if Tenant shall file a petition or a petition shall be filed for a reorganization of Tenant under any provisions of the Bankruptcy Act now or hereafter enacted, or if Tenant shall file a petition for arrangement or other relief under any provisions of the Bankruptcy Act now or hereafter enacted and providing a plan or method for a debtor to settle, satisfy, or extend the time for payment of debts, then and in any of the said cases (notwithstanding and license of any former breach of covenant or waiver of the benefit thereof or consent in any former instance), Landlord lawfully may, immediately, or at any time thereafter, and without demand or notice, immediately and upon the demised Premises or any part thereof in the name of the whole and repossess the same as of Landlord's former estate, and expel Tenant and those claiming by, through or under it and remove its or their effects (through reasonable means) without being deemed guilty of any manner of trespass, and without liability for any damage of loss thereby occasioned, and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant. Tenant covenants and agrees, notwithstanding any entry or reentry by Landlord, whether by summary proceedings, termination of this Lease or otherwise, to pay and to be liable for on all the days originally fixed herein for the payment thereof, an amount equal to the several installments of rent and all other amounts and charges which would, under the terms of this Lease, become due if this Lease had not been terminated or if Landlord had not entered or reentered as aforesaid, and whether the demised Premises be re-let or remain vacant in whole or in part for the entire remaining term or for any period or periods less than the remainder of such term subject only to a credit for the net amount of rentals, if any, actually collected by Landlord for so doing and without any obligation on the part of Landlord to re-let (or to attempt to re-let same); or at the election of Landlord,

908-12B14

6

**Exhibit 2**

**Page 6 of 23**

Initials



ATF 0784

Tenant, upon the time of such termination shall pay the amount that represents the excess of the rental and other amounts and payments hereinabove, above the reasonable rental value of said demised Premises for such remainder or said term.

16.2. In case Tenant defaults in the payment of rental or other amount becoming due by Tenant hereunder or in the performance of observance of any of the terms, covenants, agreements, or conditions contained in the Lease, Tenant agrees to pay Landlord all reasonable attorney's fees and costs thereby incurred by Landlord, in addition to all other amounts owing and which may become owing by Tenant hereunder.

16.3. In event Tenant shall fail to neglect to pay any insurance premiums or to maintain any insurance policies which Tenant is obligated to pay or maintain under any terms or provisions of this Lease, landlord shall have the right (but shall not be obligated to) without impairing or waiving any other right or remedy herein provided for such default by Tenant, to pay such insurance premiums. To maintain policies of insurance, and all amounts thus paid out by Landlord and costs and expenses thus incurred by Landlord, together with interest thereon at the rate of ten percent (10%) per annum from the date expended by Landlord until repaid.

16.4. It is agreed that Landlord shall have and Tenant hereby grants to Landlord a valid first security interest and contractual lien upon all the goods, chattels, furniture, trade fixtures and property which Tenant may have or own upon the demised Premises at any time or times during the term of this Lease. Landlord's lien shall not cover complete firearms, serial numbered parts, customers' parts, or records thereof. It is agreed that such express security interest shall not be construed as a waiver of any statutory or other lien given or which may be given Landlord, but shall be additional thereto.

## ARTICLE XVII — MISCELLANEOUS PROVISIONS

17.1. Financing - Subordination: It is expressly stipulated and agreed that Tenant's rights, title, estate, and interest in and under this Lease and the covenants of quiet enjoyment and warranties of Landlord herein contained are and shall be at all times subject and subordinate to any mortgagee, deed of trust or ground lease which now or may in the future affect the Land or any interest of Landlord in the Building, and to all increases, renewals, modifications, consolidations, replacements, and extensions thereof. This Paragraph is self-operative. No further instrument is required to effect the subordination of this Lease to any such mortgagee, deed of trust or ground lease. In confirmation of the subordination, however, Tenant agrees to execute, acknowledge, and deliver within ten (10) days after receipt of any certificate or instrument requested by Landlord that evidences the subordination. Tenant hereby irrevocably appoints Landlord its attorney--in-fact to execute, acknowledge and deliver any such certificate or instrument for Tenant. Tenant agrees that if the Building is sold at foreclosure under any such mortgage or deed of trust or is transferred in lieu of foreclosure, or if Landlord repossesses the Building under any such ground lease, Tenant will attorn to the purchaser, transferee or Landlord (as the case may be, the "Applicable Successor") upon request. Tenant will recognize such Applicable Successor as the Landlord under this Lease if the Applicable Successor elects to keep this Lease in effect. This Lease and all rights of Tenant are further subject and subordinate to all other existing title matters that affect the Building or the Land, including all utility easements and agreements. However, Landlord shall request, but shall not be obligated to obtain, a non-disturbance and attornment agreement in favor of Tenant from the current mortgagee or lien-holder or any future mortgagees or lien-holders on the Building. If any such Deed of Trust, mortgage, or other security instrument is foreclosed, or the Project is sold under Deed in Lieu of Foreclosure, Tenant shall, upon request, attorn to such purchase or grantee, as the case may be, and execute instrument(s) confirming such attornment; provided, however, that Tenants attornment shall be conditioned upon the agreement by such successor to Landlord's interest not to disturb Tenant's possession hereunder during the Term so long as Tenant performs its obligations under this Lease.

17.2. Right to Relocate. In the event the Leased Premises contain less than 10,000 square feet of Net Rentable Area, Landlord reserves the right, at its option and upon giving thirty (30) days prior written notice to Tenant, to relocate Tenant from the Leased Premises to any other available space of substantially equal size and area and equivalent rental in the building. Landlord agrees to bear the reasonable cost of the relocation.

17.3. Holding Over: Should Tenant remain in possession of the Premises after the expiration of the term of this Lease, without the execution of a new Lease, then Tenant shall be deemed to be occupying the Premises as a Tenant under a month-to-month tenancy, subject to all the covenants and obligations of this Lease and at a rental equal to 150% of the previous monthly rental and Common Area Maintenance.

17.4. Waiver: Failure on the part of Landlord to complain of any action or non-action on part of Tenant, no matter how long the same may continue, shall not be deemed to be a waiver by Landlord of any of its rights hereunder.

908-12B14

7

**Exhibit 2**

**Page 7 of 23**


Initials

ATF 0785

Further, it is covenanted and agreed that no waiver at any time of any of the other provisions herein shall be construed as a waiver at any subsequent time of the same provisions. The consent of approval by Landlord to any action of Tenant requiring Landlord's consent or approval shall be required for any subsequent similar act by Tenant.

17.5. Personal Guaranty. Notwithstanding anything to the contrary in this Lease, this Lease shall not be binding on Landlord until an original of this Lease executed by both Landlord and Tenant and an original guaranty in the form attached hereto as **Exhibit "G"**, executed by each Guarantor and dated effective as of the Effective Date of this Lease, is delivered to and accepted by Landlord.

17.6. Notices: Whenever by the terms of this Lease notice shall or may be given either to Landlord or to Tenant, such notice shall be in writing and shall be delivered in hand or sent by Registered or Certified Mail, postage prepaid.

If intended for Landlord, address to:

**Hartman Mitchelldale Business Park, LLC**
**2909 Hillcroft, Suite 420**
**Houston, TX 77057**
**Attn: Office of the General Counsel**

If intended for Tenant, addressed to:

**Alan Aronstein**
**P.O. Box 571781**
**Houston, Texas 77257**

or such other address as may from time to time hereafter by designated by Tenant by like notice.

17.7. Mechanic's Liens: Tenant and Landlord agree that each shall pay, when due, all sums of money that may become due for, or purporting to be for, any labor, services, material, supplies, or equipment alleged to have been furnished or to be furnished to or for Tenant. If secured by mechanic's materialman's or other lien against the demised Premises or Landlord's interest therein, and will cause each such lien to be fully discharged and released at the time the performance of any obligation secured by any such lien matures or becomes due. If Tenant desires to contest any such lien, it may do so; but notwithstanding any such contest, if any such lien shall be reduced to final judgment and such judgment or such process as may be issued for the enforcement thereof is not promptly stayed or is so stayed and shall entirely pay and discharge said judgment forthwith. Landlord shall have the right to post and maintain on the demised Premises such notices of non-responsibility as are provided for under the Mechanic's Lien Laws of Texas.

17.8. Invalidity of Particular Provisions: If any term or provisions of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

17.9. Provisions, Bindings, etc.: Except as herein otherwise expressly provided, the terms and provisions shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns respectively, of Landlord and Tenant. Each term and each provision of this Lease to be performed by Tenant shall be construed to be both a covenant and a condition. The reference contained to successors and assigns of Tenant is not intended to constitute a consent to assignment by Tenant, but has reference only to those instances in which Landlord may later give written consent to a particular assignment.

17.10.  Definition of Terms: As used in this Lease and when required by the context, each number (singular and plural) shall include all numbers, and each gender shall include all genders; and unless the context otherwise required, the word "person" shall include "corporation, firm, or association," and furthermore, it is agreed and understood that any or all references made to "Lessor" and "Lessee" in this Lease shall by synonymous with any or all references to "Landlord" and "Tenant" in said Lease, and any or all Exhibits, Addenda, Attachments, or parts thereof.

17.11.   Time of Essence: Time is and shall be of the essence of this Lease and of each term and provision hereof.

908-12B14

8
**Exhibit 2**

**Page 8 of 23**

Initials

ATF 0786

17.11.   Governing Law: This Lease shall be governed exclusively by the provisions hereof and by the laws of the State of Texas, as the same may from time to time exist.

17.12.   Tenant Signs: (if any) refer to Exhibit "D" attached hereto and made a part hereto.

17.13.   Mortgagee's Acceptance:   This agreement shall only be effective after written approval by Landlord's mortgagee accepting the terms and conditions herein.

17.14. Estoppel Certificate: Tenant agrees at the request of Landlord to execute an Estoppel Certificate and return same to Landlord within ten (10) days of Landlord's request.  Failure to sign same when requested will constitute a default under this Lease Agreement.

17.15.   Additions to Common Areas:  Landlord reserves the right to make additions to the parking lot and/or the common area of the Office/Warehouse (whether erected, built or installed) provided that such additions do not substantially alter the Premises or parking lot of the Office/Warehouse.

17.16.   Entire Agreement:  This agreement and any addenda thereto constitutes the sole agreement of the parties hereto and supersedes any prior understandings or written or oral agreements respecting the leased Premises.  No amendment, modification, or alteration of the terms of conditions herein shall be binding unless the same shall be in writing and duly executed by the parties hereto.

17.17.   To the extent that the validity of or the protection afforded by any policy of insurance is not impaired thereby, Landlord and Tenant each expressly waives any cause of action or right to recovery which either may have hereafter against the other for any loss or damage, as the case may be, arising out of any risk covered by any such insurance policy, whether or not such policy shall have been taken out by the party sustaining such loss or damage.

17.18.   Notwithstanding anything herein to the contrary, to secure the payment of all rental obligations due and to become due hereunder, and the faithful performance of this Lease by the Tenant, hereby gives the Landlord an express CONTRACT LIEN on all property, chattels and inventory in the Premises, exclusive of that owned by others.  All exemption laws are hereby waived in favor of said lien.  This lien is given in addition to the Landlord's Statutory Lien and shall be cumulative thereof.  This Lease is also intended to and constitutes a security agreement and the lien herein created for security interest herein established.  The security interest herein established may be foreclosed without court proceedings by a public or private sale as a security interest under the Uniform Commercial Code of this state, and pursuant thereof.  Tenant agrees that upon Landlord's request Tenant shall execute UCC-1's.

17.19.   Notwithstanding anything herein to the contrary, both Landlord and Tenant agree that any delay in the Tenant occupancy of space, will not affect the starting date on the Lease.  Whether the delay is caused by either Landlord or Tenant, the rental starting date shall remain as described in the lease.

17.20.   In consideration of Landlord's covenants and agreements hereunder, Tenant hereby covenants and agrees not to disclose any terms, covenants or conditions of this Lease to any other party without the prior written consent of Landlord.

17.21.   The parties to this contract agree to negotiate in good faith in an effort to resolve any dispute related to the contract that may arise between the parties. If the dispute cannot be resolved by negotiation, the dispute will be submitted to mediation before resorting to litigation.  If the need for mediation arises, a mutually acceptable mediator shall be chosen by the parties to the dispute who shall share the cost of mediation services equally.

17.22.   Should Tenant decide to vacate the Premises upon expiration of this Lease, Tenant agrees to provide Landlord with ninety (90) days prior written notice of its intent to vacate. If ninety (90) days prior written notice is not provided and the space is vacated upon expiration or anytime thereafter without proper notice, the Tenant agrees to forfeit the security deposit.

17.23.   Landlord's Consent to Entry.  Without waiving any of its rights or remedies under this Lease, Landlord hereby consents to the inspection of the Premises by the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), as necessary for inspections to be performed by ATF pursuant to 18 U.S.C. §923(g)(1) and 27 C.F.R. §478.23.

SIGNATURE PAGE TO FOLLOW

908-12B14

**Exhibit  2**[9]

**Page   9 of 23**



**TENANT:**

**Crusader Gun Group, LLC**
a Texas limited liability company

By: _Alan Aronstein_

Name: _Alan Aronstein_

Title: _President_

Date: _8-15-2019_

**LANDLORD:**

**Hartman Mitchelldale Business Park, LLC**
a Texas limited liability company

By: _Mark Torok_

Name: _MARK TOROK_

Title: _GENERAL COUNSEL_

Date: _8-20-19_

908-12B14

**Exhibit 2** [10]
**Page** _10_ **of** _23_



Initials

ATF 0788

Exhibit "A"

LEGAL DESCRIPTION

TRACT 1

Description of a 7.2076 acre tract of land (313,964 square feet) being out of and a portion of Unrestricted Reserve "A" of CENTRAL PARK NORTHWEST as recorded in Volume 202, Page 64 of the Harris County Map Records, situated in the John Flowers Survey, Abstract No. 269 in the City of Houston, Harris County, Texas, said 7.2076 acre tract of land being more particularly described by metes and bounds as follows with bearings being referenced to the plat of said CENTRAL PARK NORTHWEST:

BEGINNING at an "X" found in concrete for the northwest comer of the aforesaid Unrestricted Reserve "A" of CENTRAL PARK NORTHWEST and the northeast comer of a called 2 acre tract as described in Volume 1104, Page 434 of the Harris County Deed Records and being in the south line of a 150' feet wide Houston Lighting & Power Company fee strip as recorded in Volume 2154, Page 1 of the Harris County Deed Records;

THENCE, North 88° 02 25 East, along the common north line of said Unrestricted Reserve "A" and south line of said Houston Lighting & Power Company fee strip, a distance of 622.00 feet to a 5/S-inch iron rod found for the northeast comer of the herein described tract;

THENCE, South 01 ° 57 35 East, a distance of 480.45 feet to a 5/8-inch iron rod found for the southeast comer of the herein described tract and being in the north right-of-way line of Mitchelldale Street (60 feet wide);

THENCE, South 86° 49 00 West, along the common south line of said Unrestricted Reserve "A" and north right-of-way line of said Mitchelldale Street, a distance of 120.18 feet to a point on a Southwestern Bell Telephone Company manhole for the point of curvature of a curve to the left;

THENCE, southwesterly, continuing along the common south line of said Unrestricted Reserve "A" and the north right-of-way line of said Mitchelldale Street, and along the arc of said curve to the left having a radius of 1,250.00 feet, a central angle of 15° 40 00, a chord which bears South 78° 59 00 West, a distance of 340.73 feet, an arc distance of 341.79 feet to a S/8-inch iron rod found for a point of reverse curvature of a curve to the right;

THENCE, southwesterly, continuing along the common south line of said Unrestricted Reserve "A" and the north right-of-way line of said Mitchelldale Street, and along the arc of said curve to the right having a radius of 570.00 feet, a central angle of 15° 20 00, a chord which bears South 78° 49 00 West, a distance of 152.09 feet, an arc distance of 152.54 feet to a 5/8-inch iron rod found for the southwest comer of said Unrestricted Reserve "A" and the herein described tract;

THENCE, North 03° 31 00 West, along the west line of said CENTRAL PARK NORTHWEST and the east line of the aforementioned called 2 acre tract, a distance of 561.24 feet to the POINT OF BEGINNING and containing a computed area of 7.2076 acres (313,964 square feet) of land.

TRACT 2

Description of a 5.7768 acre tract of land (251,638 square feet) being out of and a portion of Unrestricted Reserve "A" of CENTRAL PARK NORTHWEST as recorded in Volume 202, Page 64 of the Harris County Map Records, situated in the John Flowers Survey, Abstract No. 269 in the City of Houston, Harris County, Texas, said 5.7768 acre tract of land being more particularly described by metes and bounds as follows with bearings being referenced to the plat of said Central Park Northwest:

COMMENCING at an "X" found in concrete for the northwest comer of said Unrestricted Reserve "A" of CENTRAL PARK NORTHWEST and being in the south line of a ISO-feet wide Houston Lighting & Power Company fee strip as recorded in Volume 2154, Page 1 of the Harris County Deed Records;

908-12B14        **Exhibit 2** [11]

**Page 11 of 23**



THENCE, N 88° 02 25 E, along the north line of said Unrestricted Reserve "A" and south line of said Houston Lighting & Power Company fee strip, a distance of 622.00 feet to a 5/8-inch iron rod found for the POINT OF BEGINNING and northwest corner of the herein described tract;

THENCE, N 88° 02 25 E, continuing along the north line of said Unrestricted Reserve "A" and south line of said Houston Lighting & Power Company fee strip, a distance of 530.00 feet to a 5/8-inch iron rod found for the northeast corner of the herein described tract and the northwest corner of a called 3.0006 acre tract as described under Harris County Clerk's File No. R404509;

THENCE, S 01 ° 57 35 E, along the east line of said Unrestricted Reserve "A" and the west line of said 3.0006 acre tract, a distance of 469.13 feet to a 5/8-inch iron rod found for the southeast corner of the herein described tract in the north right-of-way line of Mitchell dale Street (60 feet wide);

THENCE, S 86° 49 00 W, along the south line of said Unrestricted Reserve "A" and north right-of-way line of said Mitchelldale Street, a distance of 530.12 feet to a 5/8-inch iron rod found for the southwest corner of the herein described tract;

THENCE, N 01° 57 35 W, a distance of 480.45 feet to the POINT OF BEGINNING and containing a computed area of 5.7768 acres (251,638 square feet) of land.

TRACT 3

Description of a 4.6240 acre tract of land (201,422 square feet) being out of and a portion of Unrestricted Reserve "B" of CENTRAL PARK NORTHWEST as recorded in Volume 202, Page 64 of the Harris County Map Records, situated in the John Flowers Survey, Abstract No. 269 in the City of Houston. Harris County, Texas, said 4.6240 acre tract of land being more particularly described by metes and bounds as follows with bearings being referenced to the plat of said CENTRAL PARK NORTHWEST:

BEGINNING at a capped 5/8-inch iron rod found in the east right-of-way line of Fairway Park Drive (60 feet wide) for the southwest corner of the aforesaid Unrestricted Reserve "B" of CENTRAL PARK NORTHWEST and being in the north line of FAIRWAY PARK as recorded in Volume 184, Page 135 of the Harris County Map Records;

THENCE, N 02° 59 50 W, along the west line of said Unrestricted Reserve "B" and east right-of-way line of said Fairway Park Drive, a distance of 141.50 feet to a 1l2-inch iron found for the point of curvature of a curve to the left;

THENCE, northwesterly, along the west line of said Unrestricted Reserve "B" and east right-of-way line of said Fairway Park Drive, and along the arc of said curve to the left having a radius of 665.00 feet, a central angle of 09° 30 00, a chord which bears N 07° 44 50 W, a distance 'of 110.13 feet, an arc distance of 110.26 feet to a 1l2-inch iron rod found for the point of tangency of said curve;

THENCE, N 12° 29 50 W, continuing along the west line of said Unrestricted Reserve "B" and east right-of-way line of said Fairway Park Drive, a distance of 204.83 feet to an "X" found in brick paving for the southerly cut-back corner of the southeast intersection of said Fairway Park Drive and Mitchelldale Street;

"THENCE, N 33° 58 56 E, along a cut back line, a distance of 13.78 feet to an "X" found in brick paving in the south right-of-way line of said Mitchelldale Street (60 feet wide) and being in the arc of a curve to the right and being the northerly cut back corner of said southeast intersection;

THENCE, northeasterly, along the north line of said Unrestricted Reserve "B" and south right-of-way line of said Mitchelldale Street, and along the arc of said curve to the right having a radius of 1,190.00 feet, a central angle of 06° 06 49, a chord which bears N 83° 45 36 E, a distance of 126.91 feet, an arc distance of 126.97 feet to a capped 5/8-inch iron rod found for the point of tangency of said curve;

908-12B14

**Exhibit 2**

12

**Page 12 of 23**


Initials

ATF 0790

THENCE, N 86° 49 00 E, containing along the north line of said Unrestricted Reserve "B" and south right-of-way line of said Mitchelldale Street, a distance of 321.40 feet to a capped 5/8-inch iron rod found for the northeast corner of the herein described tract;

THENCE, S 03° 11 00 E, a distance of 472.43 feet to a 5/8-inch iron rod found in a south line of said Unrestricted Reserve "B" for the southeast corner of the herein described tract, said point being in the north line of a called 6.4932 acre tract as described under Harris County Clerk's File No. P776261;

THENCE, S 86° 50 00 W, along north line of said 6.4932 acre tract and the south line of said Unrestricted Reserve "B", a distance of 29.16 feet to a capped 5/8-inch iron rod found for the northwest corner of said 6.4932 acre tract and the northeast corner of the aforementioned F AIRWAY PARK, Unrestricted Reserve "A";

THENCE, S 87° 00 l0 W, along the common south line of said Unrestricted Reserve "B" and north line of the aforesaid FAIRWAY PARK, a distance of 385.84 feet to the POINT OF BEGINNING and containing a computed area of 4.6240 acres (201,422 square feet) of land.

TRACT 4

Description of a 3.1432 acre tract of land (l36,918 square feet) being all of Unrestricted Reserve "C" of CENTRAL PARK NORTHWEST as recorded in Volume 202, Page 64 of the Harris County Map Records, situated in the John Flowers Survey, Abstract No. 269 in the City of Houston, Harris County, Texas, said 3.1432 acre tract of land being more particularly described by metes and bounds as follows with bearings being referenced to the plat of said CENTRAL PARK NORTHWEST:

BEGINNING at a capped 5/8-inch iron rod found for the southwest corner of the aforesaid Unrestricted Reserve "C" of CENTRAL PARK NORTHWEST and the southeast corner of a called 2.000 acre tract as described under Harris County Clerk's File No. N869204 and being in the north line of FAIRWAY PARK as recorded in Volume 184, Page 135 of the Harris County Map Records;

THENCE, N 03° 31 00 W, along the west line of said Unrestricted Reserve "C" and the east line of said 2.000 acre tract, a distance of 402.30 feet to a capped 5/8- inch iron found in the south right-of-way line of Mitchell dale Street (60 feet wide) for the northeast corner of said 2.000 acre tract, the northwest corner of said Unrestricted Reserve "C" and also being a point on the arc of a curve to the left;

THENCE, northeasterly, along-the north line of said Unrestricted Reserve "C" and the south right-of-way line of said Mitchelldale Street, and along the arc of said curve to the left having a radius of 630.00 feet, a central angle of 15 20 00 a chord which bears N 78° 49 00 E, a distance of 168.10 feet, an arc distance of 169.60 feet to a capped 5/8-inch iron rod found for the point of reverse curvature of a curve to the right;

THENCE, northeasterly, continuing along the north line of said Unrestricted Reserve "C" and the south right-of-way line of said Mitchelldale Street, and along the arc of said curve to the right having a radius of 1,190.00 feet, a central angle of 05° 42 00 ,a chord which bears N 74° 00 00 E, a distance of 118.34 feet, an arc distance of 118.39 feet to a capped 5/8-inch iron rod found for the northerly cut back corner of the southwest intersection of said Mitchelldale Street and Fairway Park Drive (60 feet wide);

THENCE, S 57° 42 12 E, along a cut back line, a distance of 14.09 feet to a capped 5/8-inch iron rod found in the west right-of-way line of said Fairway Park Drive for the southerly cut back corner of said southwest intersection and a northeast corner of said Unrestricted Reserve "C" and the herein described tract;

THENCE, S 12° 29 50 E, along the east line of said Unrestricted Reserve "C" and west right-of-way line of said Fairway Park Drive, a distance of 206.17 feet to a capped 5/8-inch iron rod found for the point of curvature of a curve to the right;

THENCE, southeasterly, continuing along the east line of said Unrestricted Reserve "C" and west right-of-way line of said Fairway Park Drive, and along the arc of said curve to the right having a radius of 605.00 feet, a central angle

908-12B14

**Exhibit** <sub>z</sub> 13

**Page** l3 **of** 23


Initials

ATF 0791

of 09° 30 00, a chord which bears S 07° 44 50 E, a distance of 100.20 feet, an arc distance of 100.31 feet to a 1I2-inch iron rod found for the point of tangency of said curve;

THENCE, S 02° 59 50 E, continuing along the east line of said Unrestricted Reserve *"C"* and west right-of-way line of said Fairway Park Drive, a distance of 141.50 feet to a 5/8-inch iron rod found for the southeast corner of said Unrestricted Reserve "C" and the herein described tract and being in the north line of aforesaid Fairway Park;

THENCE, S 87° 00 10 W, along the south line of said Unrestricted Reserve "C" and north line of said Fairway Park, a distance of 331.87 feet to the POINT OF BEGINNING and containing a computed area of 3.1432 acres (136,918 square feet) of land,

TRACTS 5

Description of a 4.2411 acre tract of land (184,743 square feet) being out of and a portion of Unrestricted Reserve "B" of CENTRAL PARK NORTHWEST as recorded in Volume 202, Page 64 of the Harris County Map Records, situated in the John Flowers Survey, Abstract No. 269 in the City of Houston, Harris County, Texas, said 4.2411 acre tract of land being more particularly described by metes and bounds as follows with bearings being referenced to the plat of said CENTRAL PARK NORTHWEST: COMMENCING at a capped 5/8-inch iron rod found in the east right-of-way line of Fairway Park Drive (60 feet wide) for the southwest corner of said Unrestricted Reserve "B" of CENTRAL PARK NORTHWEST and also in the north line of Fairway Park as recorded in Volume 184, Page 135 of the Harris County Map Records;

THENCE, N 87° 00 10 E, along the south line of said Unrestricted Reserve "B" and north line of said Fairway Park, a distance of 385.84 feet to a capped 5/8-inch iron found for the northeast corner of said Fairway Park and the northwest corner of a called 6.4932 acre tract as described under Harris County Clerk's File No. P776261;

THENCE, N 86° 50 00 E, continuing along a south line of said Unrestricted Reserve "B"; and the north line of said 6.4932 acre tract, a distance of 29.16 feet to a 5/8·inch iron rod found for the southwest corner and POINT OF BEGINNING of the herein described tract;

THENCE, N 03° 11 00 W, a distance of 472.43 feet to a capped 5/8-inch iron rod found in the south right-of way line of Mitchelldale Street (60 feet wide) for the northwest corner of the herein described tract; THENCE, N 86° 49 00 E, along the north line of said Unrestricted Reserve "B" and south right-of-way line of said Mitchelldale Street, a distance of 391.00 feet to a capped 518-inch iron rod found for the northeast corner of the herein described tract;

THENCE, S 03° 11 00 E, a distance of 472.55 feet to a capped 5/S-inch iron rod found in the south line of said Unrestricted Reserve "B" for the northeast corner of a called 0.6932 acre tract as described under Harris County Clerk's File No. M730835 and the southeast corner of the herein described tract;

THENCE, S 86° 50 00 W, along the south line of said Unrestricted Reserve "B" and the north line of said 0.6932 acre tract and continuing along the north line of the aforesaid 6.4932 acre tract, a distance of 391.00 feet to the POINT OF BEGINNING and containing a computed area of 4.2411 acres (184,743 square feet) of land.

908-12B14

**Exhibit** 2 <sup>14</sup>

**Page** 14 **of** 23



Initials

Exhibit "B"

PLOT PLAN



908-12B14

**Exhibit** 2 15
**Page** 15 **of** 23



ATF 0793

Exhibit "C"

FLOOR PLAN



SUITE #12B-14

7,200 SF

908-12B14

**Exhibit 2** [16]
**Page** _16_ **of** _23_



ATF 0794

**Exhibit "D"**

**FASCIA SIGN CRITERIA**

The basic criteria governing signs are as follows:

1. There shall be no flashing, action, or mechanical intimation allowed on Tenant signs.
2. Signs are to be centered over the entrance door on the vertical space directly above the door.
3. The sign is to me made of porcelain sign panels, dark bronze color with white letters made of vinyl. Color may be used on the logo if it is specified in the logo design.
4. One typeface is recommended. Helvetica Compact is the Center standard.
5. Sign drawings shall be submitted to the Landlord in triplicate for approval prior to any fabrication being initiated. Drawings are to be submitted by an established sign manufacturer. Any sign not meeting the sign criteria will be at the Tenant's own risk.

908-12B14

**Exhibit** $_z$ 17

**Page** $_{/7}$ **of** $23$

Initials

ATF 0795

Exhibit "E"

CONSTRUCTION RIDER

This Construction Rider is attached to and forms a part that certain Lease Agreement ("Lease") dated _____, 2019, between **Hartman Mitchelldale Business Park, LLC** a Texas limited liability company as "Landlord" and **Crusader Gun Group, LLC**, a Texas limited liability company as "Tenant".

**Section 1.01.** Tenant agrees that it has examined the Premises and accepts the same in their present physical condition on as "AS IS" basis, **EXCEPT**, Landlord, at Landlord's sole cost and expense shall: *repair and replace the lighting fixtures.*

Any work, construction or installations desired by Tenant shall be the sole obligation and at the sole cost of Tenant and shall only be made with Landlord's prior written consent. Landlord or its agents have made no representations or promises with respect to the Premises or the building of which the Premises from a part except as herein expressly set forth. Tenant may construct improvements at the Leased Premised only upon satisfying the following "conditions precedent": (i) that Landlord and Tenant shall have mutually agreed in writing upon plans and specifications and one or more general contractors (herein sometimes referred to as "contractor") to be utilized by Tenant; (ii) that Tenant has tendered to Landlord: a true copy of a "Building Permit" (meaning all required governmental regulatory authority and other permits, consents and letters of utility availability) for the work of Tenant and its contractors solely responsible for compliance with all municipal, State and Federal rules, regulations, and laws which govern Tenant's construction and occupancy of the Premises. Landlord's approval o f Tenant's plans and specifications is to satisfy a condition precedent to the commencement of Tenant's construction, and should not be relied upon by Tenant as a representation or warranty by Landlord of any kind or nature, expressed or implied, all of which are hereby disclaimed. Landlord makes no representation or warranty that Tenant's proposed construction is structurally sound, is in compliance with the above-mentioned rules, regulations, or laws, or is sufficient to obtain all required permits. In the event that the Lease is in full force and effect but Tenant has not provided Landlord with a Building Permit within thirty (30) days after the date condition (i) is satisfied, Landlord may, in addition to other remedies which may them be available to Landlord, cancel and terminate the Lease by notice to Tenant given at any time thereafter. Upon any such cancellation and termination by Landlord, Landlord and Tenant shall each respectively be released from all further liability under the Lease, irrespective of what costs or expenses either of such parties shall have incurred prior to any such cancellation and termination. If such final working drawing are mutually approved by Landlord and Tenant in writing, such working drawings shall be initialed or signed by Landlord and Tenant and dated and designated Exhibit "F" but need not be attached to the Lease.

At all the times while Tenant is constructing the improvements at the Premises and installing its trade equipment, furniture and fixtures, Tenant shall not interfere with the conducting of business at Mitchelldale. Tenant shall comply with said reasonable requests Landlord as might make for the purpose of avoiding such interference.

**Section 1.02.** All improvements constructed by Tenant at the Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease. The aforesaid improvements, if constructed by Tenant, are not intended as any nature of rent or compensation to Landlord.

**Section 1.03.** Any work at the Premises involving the sprinkler system (if any) or life safety systems serving the Premises shall be performed by Landlord or its contractors at Tenant's cost. Tenant shall pay the cost of any such work (or reimburse Landlord therefor) within sixty (60), days after delivery to Tenant of a statement therefor.

**Section 1.04.** In the event Tenant fails to satisfy the conditions set forth in herein or fails to commence construction on or before the expiration of ten (10) days from the date of tender of possession of the Premises to Tenant, then such failure shall constitute an Event of Default under the Lease and without further notice Landlord shall have the right to either terminate the Lease at any time thereafter or exercise such other remedies as may be available to Landlord pursuant to the terms of the Lease.

908-12B14

**Exhibit** 2    18
**Page** 18 **of** 23


Initials

ATF 0796

Exhibit "F"

COMMENCEMENT LETTER

This Commencement Letter is made as of _____, 2019, between **HARTMAN MITCHELLDALE BUSINESS PARK, LLC,** a Texas limited liability company ("Landlord"), and _____, ("Tenant"). Landlord and Tenant agree to and acknowledge the following matters:

1. Landlord and Tenant have entered into that certain Lease dated as of _____, 2019 ("Lease"), covering the Premises in the Building, commonly known as Mitchelldale Business Park and located at _____ Mitchelldale, Houston, Texas 77092, as more particularly described in the Lease.

2. All terms defined in the Lease shall have the same meaning when used in this Commencement Letter.

3. The Commencement Date is _____, and the Expiration Date of the Lease is _____.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Commencement Letter as of the day and year first above written.

**"LANDLORD":**                                           **"TENANT":**

**HARTMAN MITCHELLDALE BUSINESS PARK**          _____
a Texas limited liability company

By: _____                      By: _____
Name:_____                       Name:_____
Title:_____                      Title:_____

908-12B14                 **Exhibit** 2          19
                          **Page** 19 **of** 23



ATF 0797

### Exhibit "G"

#### GUARANTY OF LEASE

FOR VALUE RECEIVED, and in consideration for, and as an inducement to **HARTMAN MITCHELLDALE BUSINESS PARK, LLC**, a Texas limited liability company, to enter into a lease (the "Lease") as "Landlord" with **CRUSADER GUN GROUP, LLC**, a Texas limited liability company, as "Tenant," for premises containing approximately 7,200 rentable square feet of space in the Building, commonly known as Mitchelldale, the undersigned unconditionally, jointly and severally, guarantees to Landlord the full, punctual, and complete payment of all rent and other sums to be paid to Landlord under the Lease, including all attorney's fees, costs and expenses of collection incurred by Landlord in enforcing its rights and remedies under the Lease and this Guaranty, together with the full and timely performance and observance of all the covenants, conditions and agreements therein provided to be performed and observed by Tenant and expressly agree that the validity of this Guaranty of Lease and the obligations of the undersigned hereunder shall in no wise be terminated, affected or impaired by reason of any forbearances, settlements or compromises between Landlord and Tenant or the invalidity of the Lease for any reason whatsoever or by the relief of Tenant from any of Tenant's obligations under the Lease by operation of law or otherwise, including, without limitation of the generality of the foregoing, the rejection of or assignment of the Lease in connection with proceedings under any bankruptcy laws now in effect or hereafter enacted.

The undersigned further covenants and agrees that this Guaranty of Lease shall be and remain in full force and effect as to any renewal, modification or extension, whether or not known to or approved by the undersigned and that no subletting, assignment or other transfer of the Lease, or any interest therein, shall operate to extinguish or diminish the liability of the undersigned hereunder; however, the undersigned's liability for this Guaranty of Lease shall only extend for the thirty-nine (39) months following the Commencement Date and such Guaranty of Lease shall be of no force and effect against the undersigned following the expiration of such 39-month period. In the event of any termination of the Lease by Landlord, the undersigned's liability hereunder shall not be terminated, but the undersigned shall be and remain liable for all damages, costs, expenses and other claims which may arise under the Lease. If the undersigned shall, directly or indirectly, advance any sums to the Tenant, such sums and indebtedness shall be subordinate in all respects to the amounts then and thereafter due and owing by Tenant under the Lease.

This instrument is a guaranty of payment and not of collection.

Wherever reference is made to the liability of Tenant in the Lease, such reference shall be deemed likewise to refer to the undersigned, jointly and severally, with Tenant. The liability of the undersigned for the obligations of the Lease shall be primary. In any right of action which shall accrue to Landlord under the Lease, Landlord may, at Landlord's option, proceed against the undersigned and/or Tenant, jointly and severally, and may proceed against the undersigned without having demanded performance of, commenced any action against or having obtained any judgment against Tenant. The undersigned hereby waives any obligation on the part of Landlord to enforce the terms of the Lease against Tenant as a condition to Landlord's right to proceed against (i) notice of acceptance of this Guaranty of Lease and of presentment, demand and protest; (ii) notice of any default hereunder or under the Lease and of all indulgences; (iii) demand for observance or performance of, or enforcement of, any terms or provisions of this Guaranty of Lease or the Lease; and (iv) all other notices and demands otherwise required by law which the undersigned may lawfully waive. The undersigned agree that in the event this Guaranty of Lease shall be enforced by suit or otherwise, the undersigned will reimburse the Landlord, upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorney's fees, costs and expenses.

Failure of Landlord to insist upon performance or observance of any of the terms, provisions or covenants of the Lease or to the exercise of any right therein contained shall not be construed as a waiver or relinquishment for the future of any such term, provision, covenant or right, but the same shall continue and remain in full force and effect. Receipt by Landlord of rent with knowledge of the breach of any provision of the foregoing Lease shall not be deemed a waiver of such breach.

The undersigned hereby waives, to the maximum extent permitted by law, all defenses available to a surety, whether the waiver is specifically herein enumerated or not.

908-12B14

### Exhibit 2
20

### Page 20 of 23



Initials

ATF 0798

It is further agreed that all of the terms and provisions hereof shall inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the Landlord, and shall be binding upon the heirs, successors and assigns of the undersigned.

In the event more than one person or entity execute this Guaranty of Lease, the liability of such signatories hereby shall be joint and several.

This Guaranty of Lease shall be governed by the laws of the State of Texas, and shall be performed in all respects in Harris County, Texas.

EXECUTED as of the Effective Date of Lease.

GUARANTOR:

_____

Alan Aronstein

Address:        4720 Banning Dr.
Houston, Texas  77027

908-12B14        **Exhibit 2**    <sup>21</sup>

**Page 21 of 23**

Initials



ATF 0799

## GUARANTY OF LEASE

FOR VALUE RECEIVED, and in consideration for, and as an inducement to **HARTMAN MITCHELLDALE BUSINESS PARK, LLC**, a Texas limited liability company, to enter into a lease (the "Lease") as "Landlord" with **CRUSADER GUN GROUP, LLC**, a Texas limited liability company, as "Tenant," for premises containing approximately 7,200 rentable square feet of space in the Building, commonly known as Mitchelldale, the undersigned unconditionally, jointly and severally, guarantees to Landlord the full, punctual, and complete payment of all rent and other sums to be paid to Landlord under the Lease, including all attorney's fees, costs and expenses of collection incurred by Landlord in enforcing its rights and remedies under the Lease and this Guaranty, together with the full and timely performance and observance of all the covenants, conditions and agreements therein provided to be performed and observed by Tenant and expressly agree that the validity of this Guaranty of Lease and the obligations of the undersigned hereunder shall in no wise be terminated, affected or impaired by reason of any forbearances, settlements or compromises between Landlord and Tenant or the invalidity of the Lease for any reason whatsoever or by the relief of Tenant from any of Tenant's obligations under the Lease by operation of law or otherwise, including, without limitation of the generality of the foregoing, the rejection of or assignment of the Lease in connection with proceedings under any bankruptcy laws now in effect or hereafter enacted.

The undersigned further covenants and agrees that this Guaranty of Lease shall be and remain in full force and effect as to any renewal, modification or extension, whether or not known to or approved by the undersigned and that no subletting, assignment or other transfer of the Lease, or any interest therein, shall operate to extinguish or diminish the liability of the undersigned hereunder; however, the undersigned's liability for this Guaranty of Lease shall only extend for the thirty-nine (39) months following the Commencement Date and such Guaranty of Lease shall be of no force and effect against the undersigned following the expiration of such 39-month period. In the event of any termination of the Lease by Landlord, the undersigned's liability hereunder shall not be terminated, but the undersigned shall be and remain liable for all damages, costs, expenses and other claims which may arise under the Lease. If the undersigned shall, directly or indirectly, advance any sums to the Tenant, such sums and indebtedness shall be subordinate in all respects to the amounts then and thereafter due and owing by Tenant under the Lease.

This instrument is a guaranty of payment and not of collection.

Wherever reference is made to the liability of Tenant in the Lease, such reference shall be deemed likewise to refer to the undersigned, jointly and severally, with Tenant. The liability of the undersigned for the obligations of the Lease shall be primary. In any right of action which shall accrue to Landlord under the Lease, Landlord may, at Landlord's option, proceed against the undersigned and/or Tenant, jointly and severally, and may proceed against the undersigned without having demanded performance of, commenced any action against or having obtained any judgment against Tenant. The undersigned hereby waives any obligation on the part of Landlord to enforce the terms of the Lease against Tenant as a condition to Landlord's right to proceed against (i) notice of acceptance of this Guaranty of Lease and of presentment, demand and protest; (ii) notice of any default hereunder or under the Lease and of all indulgences; (iii) demand for observance or performance of, or enforcement of, any terms or provisions of this Guaranty of Lease or the Lease; and (iv) all other notices and demands otherwise required by law which the undersigned may lawfully waive. The undersigned agree that in the event this Guaranty of Lease shall be enforced by suit or otherwise, the undersigned will reimburse the Landlord, upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorney's fees, costs and expenses.

Failure of Landlord to insist upon performance or observance of any of the terms, provisions or covenants of the Lease or to the exercise of any right therein contained shall not be construed as a waiver or relinquishment for the future of any such term, provision, covenant or right, but the same shall continue and remain in full force and effect. Receipt by Landlord of rent with knowledge of the breach of any provision of the foregoing Lease shall not be deemed a waiver of such breach.

The undersigned hereby waives, to the maximum extent permitted by law, all defenses available to a surety, whether the waiver is specifically herein enumerated or not.

908-12B14

1

**Exhibit** 2

**Page** 22 **of** 23



Initials

ATF 0800

It is further agreed that all of the terms and provisions hereof shall inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the Landlord, and shall be binding upon the heirs, successors and assigns of the undersigned.

In the event more than one person or entity execute this Guaranty of Lease, the liability of such signatories hereby shall be joint and several.

This Guaranty of Lease shall be governed by the laws of the State of Texas, and shall be performed in all respects in Harris County, Texas.

EXECUTED as of the Effective Date of Lease.

GUARANTOR:

Alan Aronstein

Address:       4720 Banning Dr.
               Houston, Texas  77027

908-12B14

**Exhibit** 2

**Page** 23 **of** 23

2



Initials

ATF 0801

ATF 0802

## LANDLORD'S CONSENT TO SUBLEASE

THIS CONSENT TO SUBLEASE is made this ____ day of _____, 2019, by **Hartman Mitchelldale Business Park, LLC**, a Texas limited liability company ("Landlord") with respect to the following facts:

### RECITALS

A.     Pursuant to that certain Lease Agreement dated August 20, 2019, between Landlord, as lessor, and **Crusader Gun Group, LLC**, a Texas limited liability company as tenant and sublessor ("Sublessor" and "Tenant") together with all modifications, amendments, riders and exhibits thereto, a copy of which is attached hereto as Exhibit A (the "Prime Lease"), Landlord leased to Tenant approximately 7,200 square feet of space in Suite 12B-14 (the "Premises") in the building commonly known as Mitchelldale (the "Building"), located at 5151 Mitchelldale, Houston, Texas 77092.

B.     Tenant now desires to sublease a portion of the Premises (the "Sublease") to **Bencivenga Corporation**, a Texas corporation d/b/a OFM Corp., ("Sublessee") and requests the consent of Landlord to such Sublease.

### CONSENT

1.     Landlord Consent.  Landlord hereby consents to Sublessor's sublease of the Premises to Sublessee pursuant to the Sublease between Sublessor and Sublessee, a copy of which has been delivered to and reviewed by Landlord.

2.     No Release of Sublessor.  Landlord's consent set forth in Paragraph 1 above shall not release Tenant of its obligations or alter the primary liability of Tenant to pay the rent and perform and comply with all of its other obligations under the Lease.

3.     Sublessor's Default.  If Sublessor defaults on any monetary obligations under the Prime Lease, Landlord shall also notify Sublessee consistent with the notice obligations to Sublessor in the Prime Lease.

4.     Sublessee Agreement.  Sublessee agrees to abide by all terms and conditions of the Prime Lease.

5.     Landlord Liability.  Landlord shall not be liable to Sublessee under the Sublease. Sublessee shall look to Sublessor for performance of any obligations imposed by the Sublease.

6.     Conflict.  In the event of any conflict in the provisions, rights, obligations and/or duties between the Prime Lease and the Sublease, the Prime Lease shall control.

7.     No Further Consent.  Landlord's consent set forth herein shall not constitute consent to any subsequent assignment, subletting or other transfer of rights or sharing of the Premises.

EXHIBIT

**18**

ATF 0803

IN WITNESS WHEREOF, the undersigned hereby executes this Landlord's Consent to Sublease as of the day and year first above written.

LANDLORD:

**Hartman SPE, LLC,**
a Delaware limited liability company

By: _____

Name: Mark T. Torok

Its:   General Counsel


TENANT/SUBLESSOR:

**Crusader Gun Group, LLC,**
A Texas limited liability company

By: _____

Name:   Alan Aronstein

Its:   President


SUBLESSEE:

**Bencivenga Corp.,**
a Texas corporation d/b/a OFM Corp.

By: _____

Name:   RAMIRO E. Romanta

Its:   PRESIDENT / OWNER


ATF 0804

5-76-201-07-1B-02738

# Lease Agreement

Date: <u>11/01/2019</u>

Agreement between <u>Crusader Gun Group, LLC</u> Lessor, and <u>OFM Corp.</u> Tenant(s), for the Office Space

located at <u>5151 Mitchelldale St. Ste B-14 Houston, Tx.</u>

Tenant(s) agree to rent this Space for <u>$10.00</u> per month, plus other valuable consideration.

The first month's rent is <u>$10.00</u>

The following is included:

Provisions of Lessor's Lease Agreement are applicable except for rent payment Provisions.

TENANTS AGREE TO THE FOLLOWING:

1) To accept the Space "as is," having already inspected it.
2) To allow Lessors to inspect the Space, at any and all reasonable times.
3) Use of space area that is designated by Lessors.

Tenants hereby acknowledge that they have read this Agreement, understand it, agree to it, and have been given a copy.

Lessor: _____    Lessee: _____
            President                        Owner – President

Exhibit 4
Page 1 of 1

EXHIBIT
19    NOV 07 2019

ATF 0805

ATF 0806

Crusader Gun Group, LLC

Extension of Lease dated August 01, 2019 is extended for Five Years, Thru August 01, 2024.

Crusader Gun Group ,LLC
Alan Aronstein

Ramiro E. Romo, Jr
Bencivenga Corp.

EXHIBIT
20

ATF 0807

ATF 0808